NO. 11-15331-C

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Appellee.

vs.

JOEL ESQUENAZI

Appellant

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**BRIEF OF APPELLANT**

_____

Michael J. Rosen (FL Bar #183719)
MICHAEL J. ROSEN, P.A.
2937 SW 27th Avenue, Suite 101
Miami, Florida 33133
Tel: 305-446-6116
Email: mjr@mjrosenlaw.com

Michael A. Sink (CO Bar #36064)
T. Markus Funk (CO Bar #43500)
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202
Tel:  303-291-2300
Email:  msink@perkinscoie.com
          mfunk@perkinscoie.com

ATTORNEYS FOR APPELLANT
JOEL ESQUENAZI

## TABLE OF CONTENTS

Page

STANDARDS OF REVIEW ...................................................................4

    A.    Failure to Conduct a Hearing to Address Possible Issues
           Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ..................4

    B.    Statutory Construction and Sufficiency of the Evidence...........4

    C.    Jury Instructions........................................................................5

    D.    Sentencing Standards - Aggravating Role, Obstruction of
           Justice or Perjury, and Loss Amount ........................................5

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................6

STATEMENT OF THE CASE................................................................6

STATEMENT OF FACTS ....................................................................13

SUMMARY OF THE ARGUMENT .......................................................18

ARGUMENT ....................................................................................20

    I.    THE DISTRICT COURT ERRED WHEN IT REFUSED TO
        CONDUCT AN EVIDENTIARY HEARING ON *BRADY*
        ISSUES................................................................................20

    II.    ESQUENAZI IS ENTITLED TO AN ACQUITTAL
        BECAUSE EMPLOYEES OF HAITI TELECO WERE NOT
        DIRECTED "FOREIGN OFFICIALS" WITHIN THE
        MEANING OF THE FCPA SIMPLY BECAUSE THE
        NATIONAL BANK OF HAITI OWNED SHARES OF HAITI
        TELECO AND THE HAITIAN GOVERNMENT
        APPOINTED BOARD MEMBERS AND DIRECTORS ................25

        A.    The FCPA Must Be Construed to Exclude Payments
            Made to State-Owned Business Enterprises that Do Not
            Perform Governmental Functions............................................27

            1.    The Statutory Context of the FCPA Indicates that
                "Instrumentality" Must Be Construed to Exclude
                Both State-Owned Business Enterprises that Do
                Not Perform Governmental Functions and
                Employees of the Same ................................................30

i

TABLE OF CONTENTS
(continued)

Page

2.  In the Alternative, the FCPA's Definition of
    "Foreign Official" Is Ambiguous, and Should Be
    Construed to Exclude State-Owned Business
    Enterprises that Do Not Perform Governmental
    Functions.........................................................................35

    a.  Legislative History Supports Construing the
        FCPA to Exclude State-Owned Business
        Enterprises that Do Not Perform
        Governmental Functions. . ...............................35

    b.  The Use of the Term "Instrumentality" in
        Other Statutes Supports Construing the
        FCPA to Exclude State-Owned Business
        Enterprises that Do Not Perform
        Governmental Functions. . ...............................37

    c.  The Rule of Lenity Requires the Court to
        Construe the FCPA to Exclude State-
        Owned Business Enterprises that Do Not
        Perform Governmental Functions. ...................40

    3.  In the Alternative, the FCPA Is Unconstitutionally
        Vague as Applied to Esquenazi....................................41

B.  The Government Failed to Present Any Evidence that
    Haiti Teleco Performed a Governmental Function Similar
    to that Performed by Political Subdivisions Like a
    Department or Agency............................................................45

C.  Esquenazi Is Also Entitled to Acquittal on the Money
    Laundering and Wire Transfer Counts Because They
    Were Predicated on Unproven FCPA Violations...................48

III.  THE JURY INSTRUCTIONS ON THE FCPA DID NOT
      ADEQUATELY CONVEY THE REQUISITE
      GOVERNMENTAL FUNCTION NECESSARY TO
      ESTABLISH THAT HAITI TELECO WAS AN
      "INSTRUMENTALITY" OF THE HAITIAN
      GOVERNMENT OR ESQUENAZI'S KNOWLEDGE OF
      THE SAME .........................................................................51

TABLE OF CONTENTS
(continued)

Page

IV.    THE DISTRICT COURT ERRED BY IMPROPERLY
       APPLYING THE SENTENCING GUIDELINES AS TO
       LEADERSHIP ROLE, PERJURY AND LOSS AMOUNT .............55

       A.    Esquenazi Did Not Exercise a Leadership Role ......................55

       B.    Esquenazi Did Not Obstruct Justice or Commit Perjury .........59

       C.    The Amount of Loss Should Have Been Measured by the
             Personal Benefit to Esquenazi, Not Terra................................62

CONCLUSION ........................................................................................64

## TABLE OF AUTHORITIES

CASES

*Arthur Anderson LLP v. United States,*
 544 U.S. 696 (2005)..............................................................................51

*Bogle v. McClure,*
 332 F.3d 1347 (11th Cir. 2003) ...........................................................5

*Brady v. Maryland,*
 373 U.S. 83 (1963)................................................................... passim

*Central Bank of Denver v. First Interstate Bank,*
 511 U.S. 164 (1994).............................................................................39

*Connally v. Gen. Constr. Co.,*
 269 U.S. 385 (1926).............................................................................41

*Deal v. United States,*
 508 U.S. 129 (1993).............................................................................35

*Dole Food Co. v. Patrickson,*
 538 U.S. 468 (2003).............................................................................39

*Edison v. Douberly,*
 604 F.3d 1307 (11th Cir. 2010) ...........................................................38

*Federal Aviation Administration v. Cooper,*
 132 S. Ct. 1441 (2012).........................................................................28

*Garcia v. United States,*
 469 U.S. 70 (1984)...............................................................................35

*Hall v. American National Red Cross,*
 86 F.3d 919 (9th Cir. 1996) ................................................................32

*In re Grand Jury Subpoena Dated August 9, 2000,*
 218 F. Supp. 2d 544 (S.D.N.Y. 2002) ................................................32

*Kelley v. Sec'y for Dep't of Corrs.,*
 377 F.3d 1317 (11th Cir. 2004) ...........................................................21

TABLE OF AUTHORITIES
(continued)

Page

*Kolender v. Lawson,*
    461 U.S. 352 (1983)..........................................................................41

*Koval v. Washington County Redevelopment Authority,*
    574 F.3d 238 (3d Cir. 2009) ...........................................................38

*Kyles v. Whitley,*
    514 U.S. 419 (1995)..........................................................................21

*Lamb v. Phillip Morris, Inc.,*
    915 F.2d 1024 (6th Cir. 1990) .........................................................25

*Leocal v. Ashcroft,*
    543 U.S. 1 (2004)..............................................................................30

*Nationwide Mut. Ins. Co. v. Darden,*
    503 U.S. 318 (1992)..........................................................................28

*Nixon v. Missouri Municipal League,*
    541 U.S. 125 (2004)..........................................................................33

*Norfolk & Western R. Co. v. Train Dispatchers,*
    499 U.S. 117 (1991)..........................................................................31

*Pennsylvania v. Ritchie,*
    480 U.S. 39 (1987)............................................................................21

*Reno v. Koray,*
    515 U.S. 50 (1995)............................................................................40

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997)..........................................................................37

*Rose v. Long Island R.R. Pension Plan,*
    828 F.2d 910 (2d Cir. 1987) ............................................................38

*Russell Motor Car Co. v. United States,*
    261 U.S. 514 (1923)..........................................................................29

*Schindler Elevator Corp. v. United States,*
    131 S. Ct. 1885 (2011)......................................................................28

TABLE OF AUTHORITIES
(continued)

Page

*Skilling v. United States,*
   130 S. Ct. 2896 (2010)........................................................................44

*Small v. United States,*
   544 U.S. 385 (2005)............................................................................29

*Stano v. Dugger,*
   901 F.2d 898 (11th Cir. 1990) ............................................................22

*Stewart v. Dutra Constr. Co.*
   543 U.S. 481 (2005)............................................................................28

*Strickler v. Greene,*
   527 U.S. 263 (1999)............................................................................21

*Territory of Alaska v. American Can Company,*
   358 U.S. 224 (1959)............................................................................36

*United States v. Aguilar,*
   No. 2:10-CR-1031(A) ........................................................................10

*United States v. Agurs,*
   427 U.S. 97 (1976)..............................................................................21

*United States v. American Trucking Assns., Inc.,*
   310 U.S. 534 (1940)............................................................................33

*United States v. Anderson,*
   517 F.3d 953 (7th Cir. 2008) ..............................................................62

*United States v. Antone,*
   603 F.2d 566 (5th Cir. 1979) ..............................................................25

*United States v. Arbolaez,*
   450 F.3d 1283 (11th Cir. 2006) ............................................................4

*United States v. Bagley,*
   473 U.S. 667 (1985)............................................................................21

*United States v. Biro,*
   143 F.3d 1421 (11th Cir. 1998) ..........................................................42

TABLE OF AUTHORITIES
(continued)

Page

*United States v. Blondek,*
   741 F. Supp. 116 (N.D. Tex. 1990) ...................................................................32

*United States v. Bodmer,*
   342 F. Supp. 2d 176 (S.D.N.Y. 2004) ........................................................ 35, 40

*United States v. Booker,*
   543 U.S. 220 (2003)..........................................................................................55

*United States v. Brown,*
   459 F.3d 509 (5th Cir. 2006) ...........................................................................41

*United States v. Brown,*
   944 F.2d 1377 (7th Cir. 1991) .................................................................. 57, 59

*United States v. Campa,*
   529 F.3d 980 (11th Cir. 2008) ...........................................................................4

*United States v. Carson,*
   No. SA CR 09-00077-JVS, 2011 WL 5101701 (C.D. Cal. May 18, 2011) 27, 36

*United States v. Castro,*
   455 F.3d 1249 (11th Cir. 2006) .........................................................................4

*United States v. Cohen,*
   171 F.3d 796 (3d Cir. 1999) ............................................................................63

*United States v. Daniels,*
   148 F.3d 1260 (11th Cir. 1998) .........................................................................6

*United States v. De La Rosa,*
   922 F.2d 675 (11th Cir. 1991) ...........................................................................5

*United States v. DeGovanni,*
   104 F.3d 43 (3d Cir. 1997) ..............................................................................56

*United States v. DeVegter,*
   439 F.3d 1299 (11th Cir. 2006) .......................................................................63

*United States v. Dunnigan,*
   507 U.S. 87 (1993)...........................................................................................60

TABLE OF AUTHORITIES
(continued)

Page

*United States v. Espinosa-Hernandez,*
   918 F.2d 911 (11th Cir. 1990) ...........................................................22

*United States v. Fernandez,*
   136 F.3d 1434 (11th Cir. 1998) .........................................................22

*United States v. Galardi,*
   476 F.2d 1072 (9th Cir. 1973) ...........................................................50

*United States v. Geffard,*
   87 F.3d 448 (11th Cir. 1996) .............................................................60

*United States v. Gonzalez,*
   940 F.2d 1413 (11th Cir. 1991) .........................................................54

*United States v. Granderson,*
   511 U.S. 39 (1994)..............................................................................40

*United States v. Gregg,*
   179 F.3d 1312 (11th Cir. 1999) ................................................... 5, 60

*United States v. Grigsby,*
   111 F.3d 806 (11th Cir. 1997) .............................................................5

*United States v. Izydore,*
   167 F.3d 213 (5th Cir. 1999) .............................................................49

*United States v. Jefferson*
   No. 1:08-CR-209 (E.D. Va. July 30, 2009)......................................10

*United States v. Jennings,*
   599 F.3d 1241 (11th Cir. 2010) .........................................................59

*United States v. Jensen,*
   532 F. Supp. 2d 1187 (N.D. Cal. 2008)............................................36

*United States v. Kapordelis,*
   569 F.3d 1291 (11th Cir. 2009) ...........................................................4

*United States v. Kay,*
   359 F.3d 738 (5th Cir. 2004) .............................................................27

TABLE OF AUTHORITIES
(continued)

Page

*United States v. Kay*,
  513 F.3d 432 (5th Cir. 2007) ............................................................42

*United States v. Keene*,
  470 F.3d 1347 (11th Cir. 2011) ........................................................55

*United States v. Kirland*,
  985 F.2d 535 (11th Cir. 1993) ............................................................5

*United States v. Kozeny*,
  582 F. Supp. 2d 535 (S.D.N.Y. 2008) ..............................................35

*United States v. Landers*,
  68 F.3d 882 (5th Cir. 1995) ..............................................................63

*United States v. Lanier*,
  520 U.S. 259 (1997).................................................................... 40, 42

*United States v. McNab*,
  331 F.3d 1228 (11th Cir. 2003) ........................................................23

*United States v. Nam Quoc Nguyen, et al*,
  08-CR-522.............................................................................................8

*United States v. Nosal*,
  --- F.3d ----, 2012 WL 1176119 (9th Cir. April 10, 2012) ................44

*United States v. Nosrati-Shamloo*,
  255 F.3d 1290 (11th Cir. 2001) ..........................................................6

*United States v. Orleans*,
  425 U.S. 807 (1976)..........................................................................38

*United States v. Pringle*,
  350 F.3d 1172 (11th Cir. 2003) ........................................................35

*United States v. Robertson*,
  493 F.3d 1322 (11th Cir. 2007) ........................................................49

*United States v. Santos*,
  553 U.S. 507 (2008).................................................................... 28, 40

TABLE OF AUTHORITIES
(continued)

Page

*United States v. Shabani,*
  513 U.S. 10 (1994).........................................................................40

*United States v. Stevens,*
  130 S. Ct. 1577 (2010)..................................................................31

*United States v. Suarez,*
  313 F.3d 1287 (11th Cir. 2002) .....................................................56

*United States v. Williams,*
  553 U.S. 285 (2008)................................................................ 31, 40

*United States v. Yates,*
  990 F.2d 1179 (11th Cir. 1993) ................................................ 56, 57

*United States v. Ziglin,*
  964 F.2d 756 (8th Cir. 1992) .........................................................63

*United States v. Zimmer,*
  299 F.3d 710 (8th Cir. 2002) .........................................................56

*United v. Goyal,*
  629 F.3d 912, (9th Cir. 2011) .......................................................44

*Unites States v. Martinez*
  584 F.3d 1022 (11th Cir. 2009) .....................................................56

*Ward v. Hall,*
  592 F.3d 1144 (11th Cir. 2010) .....................................................21

*Whitfield v. United States,*
  543 U.S. 209 (2005).......................................................................39

*Williams v. United States,*
  503 U.S. 193 (1992).......................................................................55

U.S. CONSTITUTION

Amend. IV, .........................................................................................39

Amend. V, Due Process Clause .........................................................39

TABLE OF AUTHORITIES
(continued)

Page

STATUTES AND GUIDELINES

1 U.S.C. § 1-6 ................................................................................................28

15 U.S.C. § 78m(q)(1)(B) ...........................................................................39

15 U.S.C. § 78dd-2 .............................................................................. passim

18 U.S.C. § 1343 ..........................................................................................63

18 U.S.C. § 1621(1) .....................................................................................60

18 U.S.C. § 1956 ........................................................................ 6, 11, 48, 50

18 U.S.C. § 2 ..................................................................................................6

18 U.S.C. § 371 ....................................................................................... 6, 48

18 U.S.C. § 3742 ............................................................................................3

18 U.S.C. § 112 ............................................................................................32

18 U.S.C. § 1116 ..........................................................................................32

18 U.S.C. § 1956(h) .....................................................................................50

28 U.S.C. § 1002(32) ...................................................................................38

28 U.S.C. § 1291 ............................................................................................3

28 U.S.C. § 1603(b) .....................................................................................39

28 U.S.C. § 2671 ..........................................................................................34

28 U.S.C. § 1346(b) .....................................................................................38

42 U.S.C. § 12131(1) ...................................................................................38

U.S.S.G 2C1.1 ........................................................................................ 62, 64

U.S.S.G. 3C1.1 .............................................................................................59

TABLE OF AUTHORITIES
(continued)

Page

OTHER AUTHORITIES

*Black's Law Dictionary* ...................................................................... 28, 50

*Webster's New World College Dictionary* (4th ed. 2002) .....................................28

*American Heritage Dictionary of the English Language*: New College Edition....28

John Ashcroft & John Ratcliffe, *The Recent and Unusual Evolution of an Expanding FCPA*, 26 Notre Dame J.L. Ethics & Pub. Pol'y 25 (2012) 1 .. 19, 44

Mike Koehler, *The Façade of FCPA Enforcement*, 41 Geo. J. Int'l L. 907, 927 (2010) ........................................................... 19, 43

James R. Doty, *Toward a Reg. FCPA: A Modest Proposal for Change in Administering the Foreign Corrupt Practices Act*, 62 Bus. Law. 1233, 1238-39 (2007) .................................................................43

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

The Appellant, Joel Esquenazi, through his undersigned counsel and pursuant to 11th Circuit Rule 26.1-1, hereby submit the following list of all trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

Anderson, Rhonda Anne, trial counsel for Appellant Carlos Rodriguez;

Cirincione, James F., counsel for Appellant Carlos Rodriguez;

Diaz, Richard John, trial counsel for Appellant Joel Esquenazi;

Esquenazi, Joel, Appellant;

Fagan, Aurora, counsel for Appellee;

Ferrer, Wilfredo A., counsel for Appellee;

Funk, T. Markus, counsel for Appellant Joel Esquenazi;

Gerrity, Kevin B., counsel for Appellee;

Grove, Daren, counsel for Appellee;

Halfenger, G. Michael, counsel for Appellant Carlos Rodriguez;

Hernandez, Arturo V., trial counsel for Appellant Carlos Rodriguez;

Johnston, Pamela L., counsel for Appellant Carlos Rodriguez;

Koukios, James M., counsel for Appellee;

1

Martinez, Hon. Jose E., Trial Judge;

Mrazek, Nicola J., counsel for Appellee;

Republic of Haiti, victim;

Rodriguez, Carlos, Appellant;

Rosen, Michael James, counsel for Appellant Joel Esquenazi;

Schultz, Anne R., counsel for Appellee;

Simon, David W., counsel for Appellant Carlos Rodriguez;

Sink, Michael A., counsel for Appellant Joel Esquenazi;

Telecommunications D'Haiti, victim; and

Valiente, Lauren L., counsel for Appellant Carlos Rodríguez.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Joel Esquenazi requests oral argument.  This case involves complex legal and factual issues, and the Esquenazi believes that oral argument will assist the Court in resolving those issues.

## STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES

Appellant Joel Esquenazi hereby adopts those portions of Co-appellant Carlos Rodriguez's brief relating to the Foreign Corrupt Practices Act (FCPA), 15 U.S.C. § 78dd-2(a)(1)-(2), intra-state wire fraud issues, and the Haitian bribery counts.

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court entered judgment on October 26, 2011, and an amended judgment on November 3, 2011.  On November 7, 2011, Esquenazi filed a timely notice of appeal.  This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT REGARDING INCARCERATION

Esquenazi is currently incarcerated at the Fort Dix Federal Correctional Institution and serving a sentence of 180 months' imprisonment.

## STANDARDS OF REVIEW

**A.      Failure to Conduct a Hearing to Address Possible Issues Under**

***Brady v. Maryland*, 373 U.S. 83, 87 (1963)**.  "Generally, a district court's refusal

to hold an evidentiary hearing is reviewed for an abuse of discretion."  *United*

*States v. Kapordelis*, 569 F.3d 1291, 1308 (11th Cir. 2009).  In some cases,

however, courts of appeals review *de novo* a refusal to hold evidentiary hearings

involving constitutional issues.  *See*, *e.g.*, *United States v. Arbolaez*, 450 F.3d

1283, 1293 n.11 (11th Cir. 2006) (discussing various standards applicable to

Fourth Amendment hearings pursuant to *Franks v. Delaware*, 438 U.S. 154

(1978)).  Because *Brady* addresses Due Process rights under the Fifth Amendment,

this Court should review *de novo* the district court's refusal to grant an evidentiary

hearing.

**B.      Statutory Construction and Sufficiency of the Evidence**.  This

Court reviews *de novo* a district court's construction of the statutory elements of a

criminal offense.  *See United States v. Castro*, 455 F.3d 1249, 1251 (11th Cir.

2006).  This Court also reviews "the sufficiency of the evidence *de novo* and

view[s] the evidence in the light most favorable to the government with all

reasonable inferences and credibility choices made in favor of the government to

determine whether a reasonable jury could convict."  *United States v. Campa*, 529

F.3d 980, 992 (11th Cir. 2008).

4

**C.    Jury Instructions**.  Jury instructions are reviewed to determine whether they misstate the law or mislead the jury to the prejudice of the party who objects to them.  *United States v. Grigsby*, 111 F.3d 806, 814 (11th Cir. 1997).  Provided the instructions accurately reflect the law, the district court enjoys "wide discretion as to the style and wording employed in its instruction[s]."  *Bogle v. McClure*, 332 F.3d 1347, 1356 (11th Cir. 2003).

**D.    Sentencing Standards - Aggravating Role, Obstruction of Justice or Perjury, and Loss Amount**.  "The government has the burden of proving by a preponderance of the evidence the existence of the aggravating role."  *United States v. De La Rosa*, 922 F.2d 675, 680 (11th Cir. 1991).  A district court's determination as to a defendant's role in the offense is a finding of fact subject to a clearly erroneous standard of review.  Whether a particular provision of the guidelines applies to a given set of facts, on the other hand, is a question of law reviewed *de novo*."  *United States v. Kirland*, 985 F.2d 535, 537 (11th Cir. 1993).  This Court reviews for clear error a district court's findings in support of an obstruction of justice offense level enhancement based on perjury, according great deference to the district court's credibility determinations.  *See United States v. Gregg*, 179 F.3d 1312, 1316 (11th Cir. 1999).  A district court's determination regarding the amount of loss for sentencing purposes is reviewed for clear error.

*See United States v. Nosrati-Shamloo*, 255 F.3d 1290, 1291 (11th Cir. 2001);

*United States v. Daniels*, 148 F.3d 1260, 1261 (11th Cir. 1998).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Whether the district court erred by refusing to conduct an evidentiary hearing on *Brady* issues.

Whether Esquenazi is entitled to an acquittal because employees of Haiti Teleco were not "foreign officials" within the meaning of FCPA simply because the National Bank of Haiti owned shares of Haiti Teleco and the Haitian government appoint board members and directors.

Whether the FCPA jury instructions adequately conveyed the requisite governmental function necessary to establish that Haiti Teleco was an "instrumentality" of the Haitian government and Esquenazi's knowledge of the same.

Whether the district court erred by improperly applying the sentencing guidelines as to leadership role, perjury and loss amount.

## STATEMENT OF THE CASE

Joel Esquenazi was indicted on twenty-one counts of conspiracy to commit violations of the FCPA and wire fraud (Count 1), violating the FCPA (Counts 2-8), conspiracy to commit money laundering (Count 9), and money laundering (Counts 10-21), in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78dd-2(a), 18 U.S.C. § 2, 18 U.S.C. § 1956(h), and 18 U.S.C. § 1956(a)(1)(B)(i), respectively.[1]

The indictment alleged that between 2001 and 2004, Esquenazi and Carlos Rodriguez, co-owners and executives of Terra Telecommunications Company

---

[1] Dkt. 3.

6

(Terra), a Miami-based telecommunications company, used various consultants[2] to pay kick-backs to two employees, Robert Antoine and Jean Rene Duperval, of the Haitian telecommunications company, Telecommunications D'Haiti S.A. (Haiti Teleco), in exchange for reduced international telecommunications rates and unearned credits.[3]  The original indictment also named Antoine, Duperval, and Marguerite Grandison as co-defendants.  Antoine pled guilty.[4]  Duperval and Grandison's trial was later severed from Esquenazi and Rodriguez's.[5]

The Government's FCPA theory throughout the case was that Antoine and Duperval were "foreign officials" under the FCPA simply because Haiti Telco was partially owned and purportedly "controlled" by the Republic of Haiti.[6]

Esquenazi moved to dismiss the indictment for failure to state a criminal offense and for vagueness, arguing that 1) Antoine and Duperval were not foreign officials; 2) Haiti Teleco was not an instrumentality of Haiti; and 3) the FCPA's language including "any department, agency, or instrumentality" in the definition of "foreign official" is unconstitutionally vague.[7]  In its response to Esquenazi's

---

[2] Dkt. 3 at 4-6, ¶¶ 10-12, 14.

[3] Dkt. 3 at 7-8, ¶ 3.

[4] Dkt. 132.

[5] Dkt. 419, 421, 439.

[6] Dkt. 3 at 2-3, 5, ¶¶ 3-4, 13.

[7] Dkt. 283.

motion to dismiss the indictment, the Government blithely asserted, without meaningful legal support or contextual analysis, that the FCPA's "current interpretation by courts, its legislative history, and U.S. treaty obligations provide no support for the defendants' novel and confusing definition."[8]  The Government's primary argument was that the Defendants' arguments were "a premature request for a ruling on the sufficiency of the government's evidence" or were premature "arguments for jury instructions."[9]  The Government asserted that it stood "prepared to brief and argue this issue again, should the defendants raise it, upon a Rule 29 motion or in the context of formulating jury instructions."[10]

In its three page order denying Esquenazi's motion to dismiss, the district court characterized Esquenazi's motion as "discuss[ing] a number of factual issues," and asserted that "the Government has sufficiently alleged that Antoine and Duperval were foreign officials by alleging that these individuals were directors in the state-owned Haiti Teleco."[11]  It also disagreed that "Haiti Teleco cannot be an instrumentality under the FCPA's definition of foreign official"

---

[8] Dkt. 294 at 9.  In two footnotes, the Government cited to *United States v. Nam Quoc Nguyen, et al*, 08-CR-522, Dkt. 110, which summarily rejected without written opinion a similar motion to dismiss an FCPA indictment, which included a void for vagueness challenge.  *Id.* at 8, fn. 2 & 9, fn. 3.

[9] *Id.* at 1 & 9.

[10] *Id.* at 9.

[11] Dkt. 309 at 2, 3.

because the "plain language of this statute and the plain meaning of this term show that as the facts are alleged in the indictment Haiti Teleco could be an instrumentality of the Haitian government," but offered no analysis of the statutory language or explanation as to why the Government's *ipse dixit* interpretation was consistent with the plain meaning of the statute.[12]

At the jury instruction stage, Esquenazi again requested jury instructions that defined "instrumentality" in light of the statutory context of the FCPA.[13] Seemingly oblivious to its own prior arguments, the Government now accused Esquenazi of proposing a jury instruction "directly contradict[ing]" the district court's ruling on the motion to dismiss, and "ignor[ing]" the district court's finding that "state-owned enterprises can be government instrumentalities under the plain meaning of the statute, a ruling echoed since by two separate courts in the Central District of California."[14] Once again, the Government offered no legal authority construing the statute or contextual analysis of the actual language in support of its interpretation.  Instead it continued to bootstrap its position, claiming in essence that 1) the Government is permitted to construe the statute broadly; 2) it has done so in the past with little judicial comment; and 3) some other district courts have

---

[12] *Id.* at 3.

[13] Dkt. 403; Dkt. 404; Dkt. 405.

[14] Dkt. 409 at 1, 3.

allowed the Government's position.[15]  Again, the district court adopted the

Government's position regarding "instrumentality" with little statutory analysis or

explanation.[16]

On August 4, 2011, Esquenazi was convicted by a jury on all twenty-one

counts of the indictment.[17]

No later than August 9, 2011, the Government received a declaration from

Jean Max Bellerive, the Prime Minister of Haiti.  The Prime Minister's declaration,

dated July 26, 2011 – ten days *before* the jury reached its verdict - asserted that:

> The law of September 16, 1963 grants the Haitian State or any other
> State body to acquire shares in Limited Companies.  Once the State
> becomes a shareholder it must obtain a change in the bylaws to change
> the Limited Company (S.A.) to Limited Mixed Company (S.A.M.).
> This change is *essential* to allow the State to appoint its representatives
> to the Board of Directors.  As far as [Haiti Teleco] is concerned, the
> company *never underwent legal change* and kept its old bylaws of
> Limited Company.  . . .  *Based on the foregoing, [Haiti Teleco] has*

---

[15] *See*, *e.g.*, Dkt. 409 at 2 (proposed instructions were based on and similar to
"the instruction on 'foreign official' given in *United States v. Jefferson* and *United
States v. Aguilar*, both FCPA cases that went to trial and concerned state-owned
and state-controlled entities").

[16] Dkt. 320; *see also* Dkt. 409 at 2-4 (discussing prior decisions of district
courts in *United States v. Jefferson*, No. 1:08-CR-209, Dkt. 684 at 75-87 (E.D. Va.
July 30, 2009), and *United States v. Aguilar*, No. 2:10-CR-1031(A), Dkt. 511 at 35
(C.D. Cal. May 16, 2011), substantially adopting the Government's jury
instructions, but not analyzing the text of the FCPA).

[17] Dkt. 522.

*never been and is not a State enterprise.* Since its formation to date, it has and remains a Company under common law.[18]

The Government provided the document to defense counsel on August 10, 2011.

Around August 25, 2011, Prime Minister Bellerive provided a second declaration, which – in the words of the Government – the Government "assisted Mr. Bellerive in preparing."[19]  In the second declaration, he asserted that he:

> [D]id not know that [his prior declaration] was going to be used in criminal legal proceedings in the United States or that it was going to be used in support of the argument that, after the takeover by BRH [Bank of the Republic of Haiti] and before its modernization, [Haiti Teleco] was not part of the Public Administration of Haiti.  This is obviously not the case since, during that time, [Haiti Teleco] belonged to BRH, which is an institution of the Haitian state.  That document had been signed strictly for internal purposes and to be used in support of the on-going modernization process of [Haiti Teleco].[20]

Mr. Bellerive, however, confirmed the facts in his first declaration were correct, reiterating that between 1968 and the partial modernization of Haiti Telco in 2001, "no Haitian law *ever established* [Haiti Teleco] as a publicly-owned institution."[21]

On August 25, 2011, Esquenazi joined Rodriguez's motion for a judgment of acquittal or new trial, noting that the Government had failed to prove the elements of an FCPA violation, the jury instruction regarding an "instrumentality"

---

[18] Dkt. 581-1 at 4 (emphasis added).

[19] Dkt. 561 at 10.

[20] Dkt. 581-2 at 3, ¶2; Dkt. 561, at 10.

[21] Dkt. 581-2 at 3, ¶5 (emphasis added).

11

under the FCPA was in error, and the Prime Minister's competing declarations were new evidence warranting a new trial.[22]  The district court denied the motion on October 14, 2011, asserting that the jury instructions properly defined an "instrumentality" under the FCPA "through a non-exclusive multi-factor definition," and that the Prime Minister's July 26, 2011 declaration "provides no newly discovered evidence and would not have affected the jury verdict."[23]

For sentencing, the probation office calculated a total offense level of 40 in its Pre-Sentence Investigation Report (PSIR).  Esquenazi objected to the PSIR's enhancements.[24]  On October 22, 2011, Esquenazi filed a Motion for Variance/Downward Departure from the Sentencing Guidelines, which the district court granted.[25]  On October 25, 2011, Esquenazi was sentenced to 180 months' imprisonment, three years of supervised release, $2,200,000 in restitution and a $2,100 special assessment.  More specifically, the district court sentenced Esquenazi to a term of sixty months on Counts 1 through 8 and consecutive one hundred twenty months on Counts 9 through 21.[26]

---

[22] Dkt. 542, 543, 546, 547, 586.

[23] Dkt. 609 at 10, 13, 23.

[24] Dkt. 565; Dkt. 603.

[25] Dkt. 620; Dkt. 646 at 67.

[26] Dkt. 629; Dkt. 646.

12

## STATEMENT OF FACTS

A.    *Terra's Relationship with Haiti Teleco*

In 1997, Esquenazi and Rodriguez formed Terra to provide telecommunications services in various countries throughout Latin America and the Caribbean. Terra was a leading company in the marketing of prepaid phone cards and wholesale minutes.[27] As part of its business operations, Terra used upwards of ten consultants familiar with various countries to assist it in doing business with those countries in conformance with their laws.[28] In 2000, Haiti World Access International, Inc. (Haiti World Access) approached Terra about forming a joint venture to do business with Haiti Teleco.[29] The parties executed a joint venture agreement.[30] The contract required Terra to invest substantial resources, including expenditures for infrastructure in Haiti.

In May of 2001, Esquenazi flew to Haiti to meet with Patrick Joseph, Haiti Teleco's Director General. The meeting took place after Joseph voiced concerns over Haiti World Access's failure to pay its invoices totaling over $400,000.[31] During the visit, Joseph decided to terminate Haiti World Access's contract and

---

[27] Dkt. 504 at 38; Dkt. 509 at 56-57, 61.

[28] Dkt. 491 at 4-5, 53; Dkt. 55 at 20.

[29] Dkt. 491 at 55; Dkt. 508 at 71; Dkt. 704, Joint Ex. A & Ex. 209.

[30] Dkt. 704, Joint Ex. A; Dkt. 508 at 72.

[31] Dkt. 504 at 128-129.

from that point forward deal exclusively with Terra.[32]  Haiti Teleco and Terra

entered into a contract on May 30, 2001.[33]  The contract required additional

investments from Terra, but switched the nature of the relationship from a per-

minute rate basis to a joint venture arrangement with Haiti Teleco.  In some cases,

equipment purchased and installed in Haiti by Terra was to be compensated for by

credits being applied to Terra's account.  Upon return to Miami, Terra terminated

its joint venture with Haiti World Access.[34]  Based on his conversation with

Joseph, Esquenazi believed Terra's relationship with Haiti Teleco would be

unencumbered by debts from Haiti World Access.[35]  Over time, Haiti Teleco grew

to be approximately twenty to twenty-five percent of Terra's overall business.[36]

### B.    Billing Disputes and Payments

A few months after executing the new joint venture agreement, Antoine

joined Haiti Teleco as the Director of International Affairs.  Antoine was

responsible for administering Haiti Teleco's relationships with foreign carriers like

Terra.[37]  Despite the new agreement, Antoine on Haiti Teleco's behalf continued to

---

[32] *Id.*

[33] *Id.*; Dkt. 704, Ex. 210.

[34] Dkt. 491 at 56-57; Dkt. 504 at 130.

[35] Dkt. 504 at 132.

[36] Dkt. 504 at 46.

[37] Dkt. 702-1 at 15-16.

bill on a per-minute basis, issued invoices to Terra based on amounts previously owed by Haiti World Access, and failed to account for the credits to which Terra was entitled.[38]  Terra disputed the charges and credits, but to little avail.[39] Eventually, Terra filed a complaint with Conatel, the Haitian communications commission.[40]  Simultaneously, because Terra earned money from customers, at Haiti Teleco's request, it issued disbursements to third-parties, including a law firm representing Haiti Teleco and two consulting companies - J.D. Locator, owned by Juan Diaz, and A&G Distributors, owned by Alix Pradel - with whom Terra had written agreements.[41]

Antoine, after he was indicted and pled guilty, reached an agreement with the Government, and now claimed that the consulting agreements with J.D. Locator and A&G Distributors were a sham, and that the payments were part of an explicit agreement between him and Esquenazi to pay Antoine 50% of the amount by which he reduced the invoices.[42]  In other words, according to Antoine, Terra gave him a 50% kick-back on all invoice reductions or credits.  Between 2001 and 2004, according to Antoine, Terra would at his direction pay intermediaries such as

---

[38] Dkt. 493 at 23-24; Ex. 189;

[39] Dkt. 704, Ex. H; Dkt. 702-1 at 71-72.

[40] Dkt. 508 at 83-85.

[41] Dkt. 702-1 at 39-45; Dkt. 704, Ex. 301.

[42] Dkt. 702-1 at 33-36, 44, 49; Dkt. 491 at 75-84; Dkt. 800 at 81, 94.

J.D. Locator and A & G Distributors, who would in turn forward the money on to Antoine, who would share the money with Diaz and Pradel.  Antoine and Jean Fourcand, who ran a deli in Miami, also claimed that Terra agreed to provide calling cards free of charge to Fourcand – though Terra issued invoices for them.[43]

Antoine was replaced by Duperval in August 2003.[44]  On November 18, 2003, Terra and Telecom Consulting Services Corporation (TCSC) executed a commission agreement under which Terra would pay TCSC for its help obtaining a contract with Haiti Teleco.[45]  Pursuant to the agreement, Terra made payments to TCSC.[46]  Grandison, who owned TCSC and was Duperval's sister, made 23 payments to Duperval and his wife.[47]  According to the Government, these payments were made to lower Terra's invoices and per-minute rates.[48]

C.    *Haiti Teleco's History and Legal Status*

Government witness Gary Lissade testified that Haiti Teleco was started in 1968 as private company.[49]  As part of the original contract with the Republic of

---

[43] Dkt. 482 at 55; Dkt. 800 at 113; Dkt. 704, Ex. 117.

[44] Dkt. 496 at 6.

[45] Dkt. 503 at 12; Dkt. 703 at 51-56; Dkt. 703-1 at 62; Dkt. 704, Ex. 73.

[46] Dkt. 503 at 12; Dkt. 704, Exs. 700F, 700H.

[47] *Id.*

[48] Dkt. 503 at 13, 25-28; Dkt. 704, Ex. 601.

[49] Dkt. 493 at 39, 66.

Haiti, the Haitian government had the right to appoint at least two board members to Haiti Teleco, but no board members were appointed by the Haitian government at that time.  Around 1971-1972, the Bank of the Republic of Haiti purchased 97% of Haiti Teleco, although no law marked the change in ownership.  The Bank of the Republic of Haiti is Haiti's central bank.  At no time, however, was Haiti Teleco's business status changed from "S.A." - indicating a privately held limited company - to "S.A.M." - indicating a limited mixed company.[50]  Haiti Teleco did, however, use "S.A.M." periodically on letterhead and bills.[51]  And governmental officials, including President Jean Bertrand Aristide, appointed Patrick Joseph as General Director of Haiti Teleco in 2001, as well as various members of the board of directors, prior to being deposed in 2004.  Other non-expert witnesses also stated their opinions that Haiti Teleco was a national, nationalized, or state-owned phone company.  According to the first Bellerive declaration, the change in corporate formation was "essential to allow the State to appoint its representatives to the Board of Directors," and Haiti Teleco "never underwent legal change."[52]

On October 10, 1996, the Republic of Haiti passed a bill providing for the modernization of "state-owned companies" like Haiti Teleco through private

---

[50] *Id.* at 65-97.

[51] Dkt. 482 at 31-32; Dkt. 800 at 64; Dkt. 492 at 70-71; Dkt. 703 at 7-8.

[52] Dkt. 581-1 at 4.

investment and government concessions.[53]  The modernization process of Haiti

Teleco was completed between 2009 and 2010.[54]

## SUMMARY OF THE ARGUMENT

Although the FCPA is aimed at corrupt payments made to "foreign

officials," the Government never established that Haiti Teleco performed

government functions similar to a governmental department or agency, such that

Haiti Teleco's employees would qualify as "foreign officials."  Instead, the

Government relied on the National Bank of Haiti's ownership of stock in Haiti

Teleco and the Haitian government's appointment board members and directors.

Six days after the jury reached its verdict, however, the Government disclosed the

existence of a declaration from the then-current Prime Minister of Haiti, Jean Max

Bellerive, prepared ten days prior to the case going to the jury.  The declaration

stated that Haiti Teleco "has never been and is not a State enterprise," and that the

by-laws of the company had never been changed as required by law to make Haiti

Teleco a government-owned entity.

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Government has an

affirmative obligation under the Due Process Clause of the Fifth Amendment to

"learn of any favorable evidence known to others acting on the government's

---

[53] *See* Dkt. 482 at 53-54; Dkt. 701-111 at 39-41; Dkt. 704, Ex. 455T.

[54] Dkt. 482 at 54.

behalf in the case" and disclose any potentially exculpatory evidence to the defendant.  Esquenazi requested a *Brady* hearing to determine if and when the Government knew of the contents of this critical declaration.  The district court erred in refusing to hold an evidentiary hearing under the circumstances.

Esquenazi is also entitled to an acquittal on all FCPA-based counts because the term "instrumentality" in the FCPA should be construed to encompass only foreign entities performing governmental functions similar to departments or agencies.  Here, the Government failed to establish that Haiti Teleco performed a governmental function.  Despite the Government's continued reliance on the premise that state-ownership or state-control of a business entity makes that entity and "instrumentality" of the government under the FCPA, that theory was explicitly considered by the drafters of the FCPA, but not included in the statute, and is inconsistent with the language of the statute as drafted.  Because so many individuals and companies prosecuted by the Government prefer to resolve their cases prior to trial, the validity of the Government's theory has seldom been tested in court, and never before by a United States Court of Appeals.[55]  This case presents an opportunity to review the Government's aggressive enforcement of a

---

[55] *See* John Ashcroft & John Ratcliffe, *The Recent and Unusual Evolution of an Expanding FCPA*, 26 Notre Dame J.L. Ethics & Pub. Pol'y 25, 33-34 (2012); Mike Koehler, *The Façade of FCPA Enforcement*, 41 Geo. J. Int'l L. 907, 927 (2010).

less-than-clear federal statute and properly limit its scope to corrupt payments made to "foreign officials," including employees of "instrumentalities" that perform governmental functions similar to governmental departments and agencies.

Esquenazi is also entitled to an acquittal or a new trial because the jury instructions failed to require that the jury determine whether Haiti Teleco ever exercised a government function akin to a department or agency, or even define "governmental function."  Because the jury could have reached its verdict without any consideration of the function of Haiti Teleco, the jury instructions were deficient.

Finally, the district court improperly calculated Esquenazi's sentence. Esquenazi's leadership role should have been that of an organizer or manager rather than a leader.  Further, his enhanced sentence for perjury was improper both as to the substance of the district court's findings and the procedure by which it made the determination.

## ARGUMENT

## I.    THE DISTRICT COURT ERRED WHEN IT REFUSED TO CONDUCT AN EVIDENTIARY HEARING ON *BRADY* ISSUES

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that the Government violates the Due Process Clause of the Fifth Amendment when it suppresses material evidence favorable to the defendant, regardless of the good

20

faith or bad faith of the Government. *Brady* created an obligation on the Government to disclose potentially exculpatory information to the defense, even where no specific request has been made by the defendant for the evidence, and even if the evidence is useful only for impeachment. *Brady*, 373 U.S. at 87; *United States v. Agurs*, 427 U.S. 97, 107-114 (1976); *United States v. Bagley*, 473 U.S. 667, 676 (1985). The Government also has an affirmative obligation to "learn of any favorable evidence known to others acting on the government's behalf in the case" and disclose the potentially exculpatory evidence to the defendant. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also Ward v. Hall*, 592 F.3d 1144, 1183 (11th Cir. 2010).

A *Brady* violation occurs, therefore, where: 1) the government possessed evidence that was favorable to the accused, because it is either exculpatory or impeaching; 2) the evidence was suppressed by the Government, either willfully or inadvertently; and 3) the evidence was material so as to establish prejudice. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Kelley v. Sec'y for Dep't of Corrs.*, 377 F.3d 1317, 1354 (11th Cir. 2004).[56] Where a defendant can establish

---

[56] Suppressed evidence is material when "there is a reasonable probability that ... the result of the proceeding would have been different" had the evidence been available to the defense. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (quotation omitted). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

the second and third factors, an evidentiary hearing is warranted to determine whether the Government improperly suppressed evidence. *See Stano v. Dugger*, 901 F.2d 898, 903-5 (11th Cir. 1990).[57]

In this case, six days after the jury reached its verdict, the Government turned over to the defense an affidavit from the Prime Minister of Haiti, Jean Max Bellerive, prepared ten days prior to the case going to the jury. That affidavit stated in no uncertain terms his opinion that Haiti Teleco "has never been and is not a State enterprise." This information is material because it establishes the opinion of the head of the Haitian government, with law enforcement responsibilities, as to an essential element of the Government's FCPA counts – whether employees of Haiti Teleco met the definition of "foreign officials." The Government's only evidence on this element was the opinion of an expert witness, Gary Lissade, who in turn based his opinion on corporate letter head and bank ownership percentages but not on an examination of Haiti Teleco's by-laws, coupled with generic statements by co-conspirators that Haiti Teleco was a national, nationalized, or state-owned phone company. Given the scant and circumstantial nature of the evidence, the Prime Minister's declaration, therefore,

---

[57] *See also United States v. Fernandez*, 136 F.3d 1434, 1438-40 (11th Cir. 1998); *United States v. Espinosa-Hernandez*, 918 F.2d 911, 913-14 (11th Cir. 1990).

would have likely carried great weight with the jury and establishes a "reasonable probability" that "the result of the proceeding would have been different" had his opinion been available to the defense prior to the case being submitted to the jury. So too, would the fact that Haiti Teleco's by-laws had never been changed, thus rendering President Aristide's appointments to the Board of Directors invalid. *Cf. United States v. McNab*, 331 F.3d 1228, 1241 (11th Cir. 2003) (a court may "rely upon [the] representations by foreign officials as to the validity of their government's laws").

Based on the declaration, Esquenazi joined in Rodriquez's motion for a judgment of acquittal or new trial based upon newly discovered evidence and requested a hearing on the new evidence to examine possible *Brady* issues. The district court denied the motion without conducting an evidentiary hearing. In so doing, the district court held that 1) the defense was already aware of the information; 2) that the second affidavit established that Haiti Teleco was a government entity; and 3) that the Government adequately established by affidavit that it was not aware of the first Bellerive affidavit until August 9, 2011.

But none of the district court's reasons vitiated the need for a *Brady* hearing. In the first place, there is no evidence that the defense was aware of either *the Prime Minister's opinion* regarding the legal status of Haiti Telco or the fact that the by-laws had not been changed as required under Haitian law. The fact that

Esquenazi and Rodriguez had an expert that was prepared to testify that Haiti Teleco was not a public entity does not establish that the defense knew of either the Prime Minister's opinion regarding the status of Haiti Telco or the fact that the by-laws had not been changed – thus invalidating President Aristide's appointments.

Second, Prime Minister's Bellerive's second affidavit does not establish that Haiti Teleco was a government entity. The second declaration expressly affirms all of the content of the first affidavit, including the assertion that Haiti Teleco "has never been and is not a State enterprise." All the second affidavit asserts is that Haiti Teleco was part of the "public administration." But no effort is made to explain the difference between a "state enterprise" in the first declaration and "public administration" in the second, government-prepared, declaration – or how those two statements can be reconciled. And most critically, the second declaration does not alter the fact that Haiti Teleco's by-laws had not been properly amended, as stated in the first declaration.

Third, the Government's response only establishes that the Government was not aware of the existence of the declaration until August 9, 2011. It does not establish when the Government was aware of the substance contained in the declaration – *i.e.*, that the Prime Minister did not consider Haiti Teleco to be a "state enterprise," or that Haiti Teleco's by-laws had not been amended as required to become a "state enterprise." Nor does the Government's response establish

what, if any, efforts it made to discover Haitian officials' opinions regarding the

status of Haiti Telco or whether the by-laws had been amended.  Given the degree

of cooperation between the Haitian government and the Government in this case –

a fact illustrated by the prompt second affidavit from Prime Minister Bellerive that

was created by the Government[58] - the Haitian government's knowledge may be

imputed to the Government.  *See United States v. Antone*, 603 F.2d 566, 569-70

(5th Cir. 1979) (holding that federal prosecutor was charged with knowledge

possessed by state investigators given the extent of interaction and cooperation

between the two governments).  Given these unique circumstances, the district

court's failure to conduct an evidentiary hearing to determine whether the

Government had complied with its *Brady* obligations was an abuse of discretion.

**II.    ESQUENAZI IS ENTITLED TO AN ACQUITTAL BECAUSE
EMPLOYEES OF HAITI TELECO WERE NOT DIRECTED
"FOREIGN OFFICIALS" WITHIN THE MEANING OF THE FCPA
SIMPLY BECAUSE THE NATIONAL BANK OF HAITI OWNED
SHARES OF HAITI TELECO AND THE HAITIAN GOVERNMENT
APPOINTED BOARD MEMBERS AND DIRECTORS**

The FCPA was primarily designed to protect the integrity of American

foreign policy and domestic markets.  *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024,

1029 (6th Cir. 1990).  Among other things, the FCPA prohibits making corrupt

---

[58] *See also* Dkt. 581-2 at 4, ¶ 9 ("[T]he Government of Haiti has always
supported and will continue to support the Government of the United Sates in its
efforts to fight against corruption[.]").

payments to a "foreign official" or a "foreign political party or official thereof or any candidate for political office" for the purpose of influencing the acts or decisions of the foreign official in his official capacity, or inducing the foreign official to influence an act or decision of the government or its instrumentality in order to obtain or retain business on behalf of a private concern.  15 U.S.C. § 78dd-2(a)(1)-(2).  Congress, in turn, defined the term "foreign official" as "any officer or employee of a foreign government or any department, agency, or instrumentality thereof" or "any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality[.]"  15 U.S.C. § 78-dd-2(h)(2)(A).

There is no dispute that Haiti Teleco is not a department or agency of the Haitian government.  The indictment instead labeled Haiti Teleco as a "state-owned national telecommunications company,"[59] which the Government claimed made it an "instrumentality" of the Haitian government.[60]  The jury instructions were based on the same "instrumentality" theory.[61]

The FCPA, however, does not define "instrumentality" of a foreign government.  Rather than conduct a statutory analysis to determine the meaning of

---

[59] Dkt. 3 at 2, ¶3.

[60] Dkt. 283.

[61] Dkt. 294.

the term "instrumentality" as it appears in the FCPA, the district court simply

adopted the Government's conclusory position on instrumentality at the motion to

dismiss, jury instruction, and post-trial motion stages.

The only court that has attempted to construe the term in light of its statutory

context has limited "instrumentality" to entities that perform governmental

functions.  *See United States v. Carson*, No. SACR 09–00077–JVS, 2011 WL

5101701, *5 (C.D. Cal. May 18, 2011).  This Court should hold likewise breach of

the context of the FCPA, the rules of construction for an ambiguous statute, and

avoidance of constitutional vagueness.  Because no evidence was presented at trial

that Haiti Teleco performed governmental functions, Esquenazi's conviction for

violation of, and conspiracy to violate, the FCPA should be reversed; the money

laundering and wire transfer counts, which are predicted on a violation of the

FCPA must therefore likewise fail.

**A.    The FCPA Must Be Construed to Exclude Payments Made to State-Owned Business Enterprises that Do Not Perform Governmental Functions.**

The FCPA is not a model of clarity.[62]  As noted above, the FCPA does not

define "instrumentality" of a foreign government, and nowhere in the statute are

state-owned companies or government ownership of the stock of a privately-

---

[62] *See United States v. Kay*, 359 F.3d 738, 743-44 (5th Cir. 2004) (finding "obtain or retain business" language in FCPA to be ambiguous).

formed business discussed as possible instrumentalities.[63]  The Dictionary Act, 1

U.S.C. §§ 1-6, likewise offers no definition of "instrumentality," and

"instrumentality" certainly does not have an established meaning at common law.[64]

The standard dictionary definition of "instrumentality" offers little help.[65]

*Black's Law Dictionary*, for example, defines "instrumentality" as "[s]omething by

which an end is achieved; a means, medium, agency."[66]  But no ends or means are

specified in the FCPA.  The term thus could potentially encompass: 1) government

bureaus akin to a department or agency, like the FBI or SEC ; 2) quasi-official

agencies, like the Legal Services Corporation; 3) government-run programs or

businesses, like the TVA; 4) programs or businesses that a government has

invested in, provided funding for, or licensed, like AIG or GM; 5) businesses that

---

[63] *See Schindler Elevator Corp. v. United States*, 131 S. Ct. 1885, 1891 (2011) ("[b]ecause the statute does not define 'report,' we look first to the word's ordinary meaning" and looking to dictionary definitions); *United States v. Santos*, 553 U.S. 507, 511 (2008) ("When a term is undefined, we give it its ordinary meaning.").

[64] *See Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 489 (2005) (relying on Dictionary Act); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (relying on common law meaning of "employee").

[65] *See Federal Aviation Administration v. Cooper*, 132 S. Ct. 1441, 1449-50 (2012) (examining dictionary definitions to determine meaning of "actual").

[66] *Black's Law Dictionary* at 801 (6th ed. 1990); *see also The American Heritage Dictionary of the English Language: New College Edition* at 681 (1981) ("[t]he quality or circumstance of being instrumental," or "[a]gency; means"); *Webster's New World College Dictionary* (4th ed. 2002) ("the condition, quality, or fact of being instrumental, or serving as a means" or "a means or agency").

have received government tax breaks or other incentives, like nearly every

company in the United States; 6) an entire regulated industry, like agriculture,

banking, or telecommunications; 7) privatized, government-formed companies,

like Fannie Mae; 8) government contractors; or even 9) completely private

businesses that step in to take the place of former government-run programs.  In

short, based on dictionary definitions alone, an instrumentality could include

almost anything that accomplishes some unspecified purpose (governmental or

not) that benefits from government action or inaction.

But it is, of course, the statutory context that controls.  *See Small v. United

States*, 544 U.S. 385, 396-98 (2005); *see also Russell Motor Car Co. v. United

States*, 261 U.S. 514, 519 (1923) ("[A] word may be known by the company it

keeps.").  And the statutory context of the FCPA dictates that the term

"instrumentality" should be construed to exclude both state-owned business

enterprises that do not perform governmental functions and employees of the same.

In the alternative, considering that the FCPA's definition of "foreign official" is

ambiguous, the legislative history, similar statutory use of "instrumentality," and

the Rule of Lenity require the same construction.  Finally, if the FCPA is not

construed to exclude both state-owned business enterprises that do not perform

governmental functions and employees of the same ambiguity, then the FCPA is

unconstitutionally vague as applied to Esquenazi.

1.    *The Statutory Context of the FCPA Indicates that "Instrumentality" Must Be Construed to Exclude Both State-Owned Business Enterprises that Do Not Perform Governmental Functions and Employees of the Same.*

The statutory context of the FCPA indicates that "instrumentality" must be read to exclude both state-owned business enterprises that do not perform governmental functions, as well as their employees, because:  1) the FCPA is aimed at foreign governments; 2) the term instrumentality is to be read in line with government departments and agencies; and 3) treating employees of all state-owned enterprises as foreign officials would lead to absurd results.

It is well-settled that in construing terms within criminal statutes, courts should look to the context including the evils being addressed by the language of the statute.  *See Leocal v. Ashcroft*, 543 U.S. 1, 9-10 (2004).  The context of the FCPA reveals that Congress was particularly focused on the evils of bribing foreign *public* officials.  In addition to the prohibition covering "foreign officials," the statute also prohibits corrupt payments to "any foreign *political* party or official thereof or any candidate for foreign *political* office."  15 U.S.C. § 78dd-2(a)(2).  And within the definition of "foreign official," Congress in 1998 added officers and employees of "public international organizations."  Congress also created an exception to the FCPA for "facilitating or expediting payment[s]" made to secure "routine *governmental* action," 15 U.S.C. § 78dd-2(b) (emphasis added), implying that non-routine governmental action is still covered by the FCPA.  Finally, the

30

FCPA contains an affirmative defense for reasonable, bona fide payments to foreign officials directly related to, among other things, "the execution or performance of a contract with a foreign government or agency thereof." 15 U.S.C. § 78dd-(2)(c)(2)(B). This again illustrates an exception from the FCPA's general governmental focus. In short, every time Congress specified the evils that the FCPA is meant to address, it identified political, public, or governmental actors, not state-owned enterprises that do not perform a political, public, or governmental function.

The word "instrumentality," moreover, should be read narrowly not only in light of the word it seeks to define (foreign *official*), but also in light of the words it follows: a governmental "department" or "agency." *See United States v. Stevens*, 130 S. Ct. 1577, 1588 (2010) ("[A]n unclear definitional phrase may take meaning from the term to be defined,"); *United States v. Williams*, 553 U.S. 285, 294 (2008) ("When taken in isolation, the two remaining verbs—"promotes" and "presents"— are susceptible of multiple and wide-ranging meanings[,]" but "those meanings are narrowed by the commonsense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated"); *Norfolk & Western R. Co. v. Train Dispatchers*, 499 U.S. 117, 129 (1991) ("Under the principle of *ejusdem generis*, when a general term follows a specific one, the general term should be understood as a reference to subjects akin

to the one with specific enumeration.").  All three neighboring words, "official,"

government "department," and government "agency" suggest a specific

governmental position, subdivision, or function.[67]

As such, the phrase governmental "instrumentality" should be read to either:

1) be a governmental subdivision; or 2) require the performance of some

governmental function.  There is nothing in the language of the FCPA to suggest

that state-ownership or control of entity is enough.  For the same reason,

employees of a state-owned enterprise should not be deemed part of the relatively

small class of foreign officials unless the enterprise is performing a governmental

function similar to a political subdivision.[68]  *Cf. Hall v. American National Red

Cross*, 86 F.3d 919, 921 (9th Cir. 1996) ("{t}he use of the word 'instrumentality'

in a general, inclusionary definition does not indicate an intention to encompass

entities which are not part of the government, even though they may be

governmental 'instrumentalities' in some sense.").

---

[67] *Cf.* 18 U.S.C. §§ 112 & 1116.

[68] *See*, *e.g.*, *In re Grand Jury Subpoena Dated August 9, 2000*, 218 F. Supp. 2d 544, 557 (S.D.N.Y. 2002) (holding that FCPA involves "foreign public officials" and "by definition, violations of the FCPA touch upon 'official acts' of sovereign nations, and every investigation of a suspected violation of the FCPA has the potential to impugn the integrity of the officials of foreign sovereigns"); *United States v. Blondek*, 741 F. Supp. 116, 120 (N.D. Tex. 1990) (concluding that "foreign officials" are a "small class of persons" and a "well-defined group").

Finally, in construing statutes, courts should avoid interpretations that lead to farfetched or absurd results.  *See Nixon v. Missouri Municipal League*, 541 U.S. 125, 138 (2004); *United States v. American Trucking Assns., Inc.*, 310 U.S. 534, 543 (1940).  The use of the phrase "foreign *official*" itself suggests that the individuals who fall within the sweep of statute are not simply employees of state-owned enterprises who do not perform governmental functions.  This is borne out not only by considering the absurdity such a position would create if courts categorized domestic employees of entities like GM or AIG as "officials," but also by the provisions of the FCPA itself.

For example, the FCPA's exception for expediting payments for "routine governmental actions" would apply to actions of governmental employees.  But since employees of state-owned enterprises are not "governmental" employees, the Government's theory would create a gap in which expediting payments to employees of governmental departments or agencies are not criminalized under the FCPA, but similar payments to employees of state-owned enterprises are.  Similarly, the Government's position would make a hash out of the FCPA's affirmative defense that allows for payments of reasonable and bona fide expenditures directly related to "the execution or performance of a contract with a foreign government or agency thereof."  15 U.S.C. § 78dd-2(c)(2)(B).  Because the affirmative defense does not include a reference to "instrumentality," under the

33

Government's position there would be no affirmative defense available when otherwise qualifying payments are made to state-owned enterprises. The only way to avoid this absurdity is to read "instrumentality" as a governmental subdivision, instead of just a non-governmental but state-owned enterprise.

The context of the FCPA supports an interpretation of the word "instrumentality" consistent with a governmental or political subdivision - such as a bureau (like the Federal Bureau of Investigation), a commission (like the Federal Trade Commission), a committee (like the Committee on Foreign Investment in the United States), or a board (like the National Labor Relations Board) - that performs a governmental function. While some governmental divisions may operate in the form of a state-owned enterprise, not all state-owned enterprises perform governmental functions.[69] Thus, this Court should construe "instrumentality" to require the Government to prove that a state-owned enterprise performs a governmental function before payments made to that entity are deemed within the sweep of the FCPA.

---

[69] *Cf.* 28 U.S.C. § 2671 ("'Federal agency' includes the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and *corporations* primarily acting as instrumentalities *or agencies* of the United States, but does not include any contractor with the United States").

    2.    *In the Alternative, the FCPA's Definition of "Foreign Official" Is Ambiguous, and Should Be Construed to Exclude State-Owned Business Enterprises that Do Not Perform Governmental Functions.*

If the FCPA is not construed as set forth immediately above, then the FCPA's definition of "foreign official" is ambiguous, given the multitude of varied and indeterminate meanings conveyed solely by the dictionary definitions. *See Deal v. United States*, 508 U.S. 129, 131-32 (1993). The legislative history, similar statutory use of "instrumentality," and the rule of lenity also require the FCPA to be construed to exclude both state-owned business enterprises that do not perform governmental functions and employees of the same.

    a.    Legislative History Supports Construing the FCPA to Exclude State-Owned Business Enterprises that Do Not Perform Governmental Functions.

When a statute is as vague or ambiguous as the FCPA, other interpretative tools may be used, including an examination of the act's purpose and of its legislative history. *See Garcia v. United States*, 469 U.S. 70, 75-76 n.3 (1984); *United States v. Pringle*, 350 F.3d 1172, 1180 n.11 (11th Cir. 2003). Several courts have looked to legislative history for help in construing the FCPA.[70]

---

[70] *See United States v. Kozeny*, 582 F. Supp. 2d 535 (S.D.N.Y. 2008) (exploring legislative history on the FCPA's local law affirmative defense); *United States v. Jensen*, 532 F. Supp. 2d 1187 (N.D. Cal. 2008) (exploring legislative history on the FCPA's penalty provisions); *United States v. Bodmer*, 342 F. Supp. 2d 176 (S.D.N.Y. 2004) (exploring legislative history on the FCPA's jurisdiction).

As detailed in Professor Michael J. Koehler's declaration filed in *United States v. Carson*, the legislative history of the FCPA is both extensive and complex.[71]  Although the legislative history also does not offer a clear definition of the term "instrumentality," several salient points stand out:

1.      The events discussed by Congress that eventually gave rise to the FCPA concerned allegations that domestic companies had made payments to traditional foreign government officials or foreign political parties.[72]

2.      Congress used the terms "foreign government official," "foreign public official," and "foreign official" interchangeably during discussions on the bills that eventually became the FCPA.[73]

3.      At the time it was considering the bills that eventually became the FCPA, Congress was aware of questionable payments to state-owned entities.  Several draft competing bills specifically included state-owned entities, but the bills that eventually became the FCPA did not.[74]

4.      In 1998, in accordance with the adoption of the Organization for Economic Cooperation and Development Convention on Combating Bribery of Foreign Public Officials in International Business Transactions (OECD Convention), Congress amended the definition of "foreign official" to include "public international organizations."  Congress did not amend the

---

[71] *United States v. Carson*, No. SA CR 09-00077-JVS (C.D. Cal.), DE 305 ("Koehler Dec."); *see also* Ex. I to Defendant Rodriguez's Motion for Release Pending Appeal.  *See Territory of Alaska v. American Can Company*, 358 U.S. 224, 226-27 (1959) (a court can take judicial notice of legislative history).

[72] Koehler Dec. at ¶¶ 16(a), 29, 33, 39, 42-43, 49, 58-59, 75-77, 91, 159, 165-66, 197, 222, 236, 243, 252, 269, 301, 327, and 336.

[73] Koehler Dec. at ¶¶ 16(b), 76, 108, 183, 238, 253, 266, 273, 275, and 336.

[74] Koehler Dec. at ¶¶ 16(c),(d),(f), 41, 79, 95, 148-51, 162, 230-31, and 279-80.

definition to include officials of "public enterprises," despite the fact that that term was included and defined in the OECD convention.[75]

Based on the foregoing, the legislative history supports construing the term "instrumentality" to include only those entities similar to departments and agencies that perform a governmental function, rather than businesses such as Haiti Teleco that are merely owned or controlled by a foreign government.

>    b.    The Use of the Term "Instrumentality" in Other Statutes
>           Supports Construing the FCPA to Exclude State-Owned
>           Business Enterprises that Do Not Perform Governmental
>           Functions.

When a term is ambiguous, courts may look to the use of a similar term in other statutes to help determine the meaning of the ambiguous term. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341-42 (1997).

Several domestic statutes that use but do not define the word "instrumentality" have construed the term narrowly to require more than just governmental ownership, regulation, or funding.  In the Employee Retirement Income Security Act (ERISA), for example, certain "governmental plan[s]" are exempt from its provisions.  The statute defines such plans as those established by "the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing."

---

[75] Koehler Dec. at ¶¶ 17, 385-89, 407, 428, and 435-37.  *See also* DE 283 at 12-13.

28 U.S.C. § 1002(32).  The term "instrumentality" in ERISA has been construed

by courts to be limited to those entities that perform a governmental function.  *See*

*Koval v. Washington County Redevelopment Authority*, 574 F.3d 238, 240-41 (3d

Cir. 2009); *Rose v. Long Island R.R. Pension Plan*, 828 F.2d 910, 917-18 (2d Cir.

1987).  Similarly, the Supreme Court has construed the word "instrumentalities or

agencies" under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, to

require a showing of the day-to-day power to direct the detailed physical

performance of a contractor.  *United States v. Orleans*, 425 U.S. 807, 814-16

(1976).  The Court rejected an argument the mere provision of funds and

regulation by the government were sufficient, standing alone, to turn a contractor

into an "instrumentality."[76]  *Id.* at 815-16.

    In contrast, when Congress intended to include state-owned entities in the

definition of "instrumentality," it knew how to do so.  Indeed, in enacting the

Foreign Sovereign Immunities Act (FSIA), Congress specifically included entities

a "majority of whose shares or other ownership interest is owned by a foreign

statute or political subdivisions" within the definition of "agency or instrumentality

---

[76] Similar examples abound.  *See*, *e.g.*, Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(1) & (B) (defining "public entity" as "any department, agency, special purpose district, or other instrumentality of a State or States or local government[.]"); *Edison v. Douberly*, 604 F.3d 1307, 1309-10 & n.4  (11th Cir. 2010) (holding that "the term 'instrumentality of a State' refers to governmental units or units created by them").

of a foreign state." 28 U.S.C. § 1603(b). Likewise, in the Dodd–Frank Wall Street

Reform and Consumer Protection Act, Pub.L. No. 111–203, 124 Stat. 1376, § 1054

(2010), codified at 15 U.S.C. § 78m(q)(1)(B), Congress specifically defined

"foreign government" to include "a department, agency, or i*nstrumentality* of a

foreign government, *or a company owned by a foreign government*, as determined

by the Commission." *Id.* (emphasis added). The presence of such explicit

definitions in FSIA and Dodd-Frank regarding foreign-owned entities indicates

that Congress knew how to include such language in the FCPA, but chose not to do

so. *See Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 176-77

(1994) ("Congress knew how to impose aiding and abetting liability when it chose

to do so," but it did not use the words "aid" and "abet" in the statute, and, hence,

did not impose aiding and abetting liability); *see also Whitfield v. United States*,

543 U.S. 209, 216 (2005) (applying same principle to conspiracy to commit money

laundering statute).

That absence in the FCPA's definition of "instrumentality" is significant and

warrants construing "instrumentality" narrowly. Thus, state-owned or state-

controlled entities that are not political subdivisions that perform governmental

functions should not be grafted into the definition "instrumentality." *See Dole

Food Co. v. Patrickson*, 538 U.S. 468, 475-76 (2003) (contrasting the absence of

language in FSIA with that used in other statutes and concluding that the absence

of language was instructive).

> c.    The Rule of Lenity Requires the Court to Construe the FCPA to
> Exclude State-Owned Business Enterprises that Do Not
> Perform Governmental Functions.

When, "after consulting traditional canons of statutory construction," a court

is left with an ambiguous statute, it should apply the well-thought rule of lenity.

*United States v. Shabani*, 513 U.S. 10, 17 (1994).  The rule of lenity requires that a

criminal statute be strictly construed in favor of the accused so as to apply only to

conduct "clearly covered."  *United States v. Santos*, 553 U.S. 507, 514 (2008);

*United States v. Lanier*, 520 U.S. 259, 266 (1997).  Where, as here, a court is left to

guess as to what Congress intended, the rule of lenity should be applied.  *See Reno*

*v. Koray*, 515 U.S. 50, 65 (1995).  Ties should go to the defendant.  *Santos*, 553

U.S. at 514.  Put another way, unless the Government's position is

"unambiguously correct," the Court must resolve the ambiguity in Esquenazi's

favor.  *See United States v. Granderson*, 511 U.S. 39, 54 (1994) ("[W]here text,

structure, and history fail to establish that the Government's position is

unambiguously correct," the court must "apply the rule of lenity and resolve the

ambiguity in the defendant's favor").  Indeed, at least one court has previously

applied the rule of lenity to the FCPA.  *See United States v. Bodmer*, 342 F. Supp.

2d 176 (S.D.N.Y. 2004).

The Government certainly has not demonstrated that its position on the meaning of "instrumentality" is unambiguously correct.  To the contrary, based on the statutory context, legislative history, and similar uses of the term in other statutes, the Government cannot do so.  As such, the rule of lenity requires a narrow construction of the FCPA that excludes Esquenazi's conduct.  *See United States v. Brown*, 459 F.3d 509, 523 (5th Cir. 2006) ("Given our repeated exhortation against expanding federal criminal jurisdiction beyond specific federal statutes to the defining of common-law crimes, we resist the incremental expansion of a statute that is vague and amorphous on its face and depends for its constitutionality on the clarity divined from a jumble of disparate cases. . . . Instead, we apply the rule of lenity and opt for the narrower, reasonable interpretation that here excludes the Defendants' conduct").

3.    *In the Alternative, the FCPA Is Unconstitutionally Vague as Applied to Esquenazi.*

The Due Process Clause of the Fifth Amendment "requires that a penal statute define [a] criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  A statute is unconstitutionally vague if people "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926); *see also United States v.*

41

*Biro*, 143 F.3d 1421 (11th Cir. 1998).  The "touchstone" of fair warning is whether it was "reasonably clear at the relevant time" that a defendant's conduct was criminal under "the statute, either standing alone or as construed."  *United States v. Lanier*, 520 U.S. 259, 267 (1997).

If the FCPA is not construed to exclude both state-owned business enterprises that do not perform governmental functions and employees of the same either based on the statutory context or through resolution of the statutory ambiguity, then the only alternative is to find that the FCPA is unconstitutionally vague as applied to Esquenazi.  As illustrated above, based on dictionary definitions alone, an instrumentality could include almost anything that accomplishes some unspecified purpose (governmental or not) that in some form benefits from government action or inaction.  Thus, it certainly is not clear from the face of the FCPA that employees of business enterprises in which a government holds some sort of ownership interest qualify as "foreign officials."

And unlike the situation at issue in *United States v. Kay*, whether Haiti Teleco qualifies as an "instrumentality" determines whether his conduct was criminal or not.  *See United States v. Kay*, 513 F.3d 432, 441-42 (5th Cir. 2007) (noting that, regardless of the meaning of the phrase "business nexus," the defendant was "was treading close to a reasonably-defined line of illegality").  If Haiti Teleco was a purely private enterprise, there would be no FCPA violation, no

42

violation of Haitian bribery laws, and several of the predicate acts for the money

laundering and wire fraud violations would disappear.  But the statutory definition

provides no basis for Esquenazi to know whether Haiti Teleco or its employees

were subject to the FCPA (potentially rendering payments may be criminal) or not

(rendering the payments non-criminal).  Individuals like Esquenazi are left

guessing as to whether the statute covers an entity with which they deal.

Consequently, "instrumentality" is a vague term that escapes comprehension by

people of common intelligence - a point echoed by many FCPA commentators.

*See*, *e.g.*, Koehler, *The Façade of FCPA Enforcement*, 41 Geo. J. Int'l L. at 998

(criticizing "foreign official" definition as vague and ambiguous); James R. Doty,

*Toward a Reg. FCPA: A Modest Proposal for Change in Administering the*

*Foreign Corrupt Practices Act*, 62 Bus. Law. 1233, 1238-39 (2007) ("Vagueness

and ambiguity are the DNA of the FCPA," which "on its face is purposefully – and

for companies seeking to comply, often maddeningly – short on specifics.").

The Government's theory that state-owned enterprises in some cases

(depending on a fact-intensive inquiry) may qualify as an instrumentality does

nothing to remedy the complete open-endedness of the threshold issue of statutory

coverage.  In fact, the vagueness in the statute gives largely unfettered discretion to

prosecutors, especially at the charging stage, as to whether a particular business

43

entity falls within the ambit of the FCPA.[77]  Such discretion, however, is inconsistent with constitutional Due Process standards.  *Cf. United States v. Nosal*, --- F.3d ----, 2012 WL 1176119, *6 (9th Cir. April 10, 2012) (noting, in context of CFAA prosecution, that "we shouldn't have to live at the mercy of our local prosecutor.  And it's not clear we *can* trust the government when a tempting target comes along."); *United v. Goyal*, 629 F.3d 912, 922 (9th Cir. 2011) (Kozinski, C.J., concurring) (noting in context of securities fraud prosecution that "[t]his is just one of a string of recent cases in which courts have found that federal prosecutors overreached by trying to stretch criminal law beyond its proper bounds," which "is not the way criminal law is supposed to work") (citations omitted).  To satisfy the Due Process Clause, the FCPA must either be construed in a limited fashion or be invalidated.  *See Skilling v. United States*, 130 S. Ct. 2896, 2927-28 (2010).

---

[77] *See* Ashcroft & Ratcliffe, *The Recent and Unusual Evolution of an Expanding FCPA*, 26 NOTRE DAME J.L. ETHICS & PUB. POL'Y at 34 (noting that concerns over, among other things, prosecutors' unfettered discretion in the absence of judicial construction to "extend the boundaries of FCPA interpretation to fit the facts and circumstances of any particular investigation" are "worthy of consideration").

**B.    The Government Failed to Present Any Evidence that Haiti Teleco Performed a Governmental Function Similar to that Performed by Political Subdivisions Like a Department or Agency.**

The Government's case regarding Haiti Teleco's qualification as an "instrumentality" under the FCPA rested on four categories of evidence: 1) the testimony of Gary Lissade;[78] 2) the testimony of various individuals that Haiti Teleco was state-owned or nationalized;[79] 3) documents evidencing Haitian governmental appointments to Haiti Teleco's Board of Directors and position of Director General;[80] and 4) an alleged insurance application.[81]  None of these categories, however, whether viewed in isolation or combination, establish that Haiti Teleco was an "instrumentality" performing a governmental function akin to a department or agency under the FCPA.

Mr. Lissade's only opined that Haiti Teleco was part of "the public administration" of Haiti – a term that is different from the FCPA's

---

[78] *See* Dkt. 493 at 31-98 (testimony of Gary Lissade).

[79] Dkt. 716 at 11-15 (testimony of Robert Antoine); Dkt. 482 at 31-32 (testimony of Jean Fourcand); Dkt. at 800 tt 64 (testimony of Juan Diaz).

[80] Government Exhibit's 404, 451-458; 404T, 451T-458T.

[81] Dkt. 492 at 70-71 (testimony of Antonio Perez); Dkt. 703 at 7-8 (testimony of John Marsha); *see generally* DE 561 at 5-8.

"instrumentality" and which the district court confessed it did not understand.[82] Otherwise, Mr. Lissade's testimony was focused on the Haitian government's control over the appointment of officials to the Board of Directors and the Director General position (a right the government had with respect to the board of directors since the 1968 inception of the company as an admittedly private enterprise), benefits Haiti Teleco received (again dating back to the 1968 formation of the private company); Government ownership, via the National Bank, of 97% of the stock of Haiti Teleco; and occasional references to Haiti Teleco as a S.A.M. (even though no formal legal act was ever taken to transform Haiti Teleco into an S.A.M., as was required by Haitian law to qualify as a state-run entity). This evidence, however, does not establish that Haiti Teleco performed a governmental function akin to a department or agency under the FCPA – no testimony was elicited on that subject. After all, appealing to rights and privileges that largely, if not entirely, existed when Haiti Teleco was a private company hardly establishes that the company was somehow transformed into a government "instrumentality" simply because the National Bank purchased stocks in the company.

---

[82] Dkt. 493 at 37 (in response to Government's request that Mr. Lissade be accepted as an expert on "Haitian public institution," the district court responded "And Haitian public institutions. I don't know what that means but, yeah").

What's more, several countervailing pieces of evidence strongly suggest that during the relevant time period (2001-04), Haiti Teleco was not operating anything like a department or agency of the Haitian government.  Consider that no law or public pronouncement announced a change to public or governmental status; no effort was made to formally transform the company into S.A.M. as required by Haitian law; no effort was made to alter the by-laws of Haiti Teleco (a point later revealed by the Bellerive declaration); and on October 16, 1996, Haiti passed a law modernizing or privatizing Haiti Teleco.  And, given the lack of a change of status to a "S.A.M." or revision of the by-laws, the appointments and commissions made by the President of Haiti were in any event not invalid.

So uncertain was Haiti Teleco's status during this period, that even Mr. Lissade had to admit "there was no specific law that has decided that at the beginning that [Haiti] Teleco is public entity," and that "if there was a doubt whatsoever, the law came in 2008 vanish completely this doubt by name, by citing Teleco as a public administration."[83]  When Governments cannot determining whether a state-owned business qualifies loosely as part of the "public administration," except with the benefit of hindsight unavailable to the defendant,

---

[83] Dkt. 493 at 60.

the evidence can hardly be sufficient to establish the narrower statutory requirements for an "instrumentality" under the FCPA.

The rest of the evidence, even if assumed true, fails to establish that Haiti Teleco qualified as a government "instrumentality" akin to a government department or agency.  Public perception of state-ownership or control cannot be presumed to accurately reflect legal requirements – and even if it could, "state ownership" is not equivalent to "government function."  Nor do references to "S.A.M" on letterhead and bills, or "instrumentality" in purported insurance documents, establish that Haiti Teleco operated as an instrumentality as that term is used in the FCPA.  None of these thin pieces of evidence, standing alone or together, provide sufficient proof that Haiti Teleco was providing true government functions like a government department or agency would.

**C.    Esquenazi Is Also Entitled to Acquittal on the Money Laundering and Wire Transfer Counts Because They Were Predicated on Unproven FCPA Violations.**

In addition to the FCPA courts, the indictment also charged Esquenazi with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 371 and 1343 (Count 1); one count of conspiracy to commit money laundering, in violation of 18 U.S.C. 1956(h) (Count 9); and twelve counts of concealment money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Counts 10 through 21).

The three predicate specified unlawful activities for the money laundering counts were violations of FCPA, wire fraud, and Haitian Bribery law.[84]

Because, as discussed above, there was no evidence presented that Haiti Teleco performed a government function, or that its employees qualified as "public officials," Esquenazi is entitled to acquittal on the FCPA counts – thus removing the first of the Government's predicate unlawful activities for the money laundering counts.

The second predicate unlawful activity was wire fraud.  But it, too, was directly predicated in part on a putative FCPA violation.  Count 1 alleged a conspiracy with the object of violating the FCPA and committing wire fraud as part of the FCPA violation.  Absent an FCPA violation, no fraudulent conduct was alleged or proven with respect to the FCPA predicate act sufficient to constitute wire fraud. Thus, the second of the Government's unlawful predicate acts for the money laundering counts is also inadequate.[85]

---

[84] Dkt. 3, at 24-25, ¶ 15.

[85] In addition, as argued by Co-Appellant Rodriguez and adopted herein, the Government relied on intra-state wire transfers at trial, which are inadequate to establish the remaining predicate act for wire fraud.  *See United States v. Robertson*, 493 F.3d 1322, 1331 (11th Cir. 2007); *United States v. Izydore*, 167 F.3d 213, 219 (5th Cir. 1999).  The district court's instructions failed to properly instruct the jury on the requirement that the wire communication cross state lines.

The only remaining possible predicate specified unlawful act is a violation of the Haitian Bribery law under 18 U.S.C. § 1956(c)(7)(B).  But Section 1956 requires that the bribery involve a "public official."  That term too is undefined, but as established above, the plain meaning is the "holder of a public office though not all persons in public employment are public officials, because [a] public official's position requires the exercise of some portion of the sovereign power, whether great or small."  *Black's Law Dictionary* at 1230 (6th ed. 1990).  The district court's instruction impermissibly broadened the definition of "public official" to include "any agent or officer of a public authority."[86]  Reading the term "public official" in Section 1956 more broadly than the term "foreign official" in the FCPA simply cannot be justified.[87]  Consequently, foreign bribery under Haitian law cannot serve as a specified unlawful predicate act.

Absent a specified unlawful predicate act, both the money laundering and conspiracy counts fail.  *See United States v. Galardi*, 476 F.2d 1072, 1079 (9th Cir. 1973) ("It should require no citation of authority to say that a person cannot

---

[86] Dkt. 527 at 23.

[87] In addition, as argued by Co-Appellant Rodriguez and adopted herein, the Government failed to prove that a violation of the Haitian bribery statute amounted to a felony under foreign law as required by 18 U.S.C. § 1956(c)(1).  The Government's expert testified that a violation of the Haitian bribery statute could be treated like a misdemeanor.  *See* Dkt. 493 at 55.  The district court's instructions failed to properly instruct the jury on this requirement.

conspire to commit a crime against the United States when the facts reveal there could be no violation of the statute under which the conspiracy is charged.")  Thus, Esquenazi is entitled to an acquittal on all counts.

### III.    THE JURY INSTRUCTIONS ON THE FCPA DID NOT ADEQUATELY CONVEY THE REQUISITE GOVERNMENTAL FUNCTION NECESSARY TO ESTABLISH THAT HAITI TELECO WAS AN "INSTRUMENTALITY" OF THE HAITIAN GOVERNMENT OR ESQUENAZI'S KNOWLEDGE OF THE SAME

Jury instructions must adequately convey all statutory requisites for a criminal offense.  *See Arthur Anderson LLP v. United States*, 544 U.S. 696, 706 (2005).

Prior to trial, Esquenazi proposed jury instructions defining "foreign official" and "instrumentality" of a foreign government as "part of the foreign government itself."[88]  The district court, however, rejected Esquenazi's proposed instruction, opting instead for a far broader instruction that defined "instrumentality" as "a means or agency through which a function of the foreign government is accomplished," and specifically stated that "[s]tate-owned or state-controlled companies that provide services to the public may meet this definition"[89]  The district court then further broadened the definition by providing

---

[88] Dkt. 404 at 6.

[89] Dkt. 520 at 23.

the jury the following non-exclusive list of factors to determine whether Haiti

Teleco was an "instrumentality":

> 1.    Whether it provides services to the citizens and inhabitants of Haiti;
>
> 2.    whether its key officers and directors are government officials or are appointed by government officials;
>
> 3.    the extent of Haiti's ownership of Teleco, including whether the Haitian government owns a majority of Teleco's shares or provides financial support such as subsidies, special tax treatment, loans, or revenue from government-mandated fees;
>
> 4.    Teleco's obligations and privileges under Haitian law, including whether Teleco exercises exclusive or controlling power to administer its designated function; and
>
> 5.    whether Teleco is widely perceived and understood to be performing official or governmental functions.[90]

The district court instructed that the jury need not "find that all the factors listed

above weigh in favor of Teleco being an instrumentality in order to find that

Teleco is an instrumentality."[91]  The Court, however, totally provided no

clarification as to what it meant by "official or governmental functions."

The district court's jury instructions were inadequate as given.  In the first

place, the instructions are not cumulative, but non-exhaustive and disjunctive.  As

a result, that the jury could have determined that Haiti Teleco was an

---

[90] *Id.* at 23 -24.

[91] *Id.*

instrumentality simply because "it provides services to the citizens and inhabitants of Haiti," the Haitian government owns a majority of Haiti Teleco (or "provides financial support such as subsidies, special tax treatment, loans, or revenue from government-mandated fees"), or Haitian law creates obligations or privileges for Haiti Teleco.[92]  None of these elements, of course, establish whether Haiti Teleco was performing a governmental function akin to a political subdivision of the Haitian government.  Thus, even if the instructions included a requirement that Haiti Teleco actually perform such a governmental function, the non-exhaustive and disjunctive list would allow a jury to find that Haiti Teleco was an "instrumentality" without considering whether it actually preformed one.  This error is only compounded by the district court's broad definition of "instrumentality" as "a means or agency through which a function of the foreign government is accomplished," and its statement, without qualification or explanation, that "[s]tate-owned or state-controlled companies that provide services to the public may meet this definition."

As for the remaining elements, state appointment of directors and officers and public perception are likewise inadequate.  Appointment power is referenced in element two, but appointment power, standing alone or in combination with the

---

[92] Dkt. 404; Dkt. 527 at 23-24 (elements (1), (3), and (4)).

following elements, does not make a state-owned enterprise an "instrumentality" akin to a political subdivision of the Haitian government.  Nor can the public perception element – the only element to mention "governmental functions" – answer whether factually and legally Haiti Teleco operated as an "instrumentality" of the Haitian government.  Lastly, the determination of criminal culpability or "public perception" of Haiti Teleco's status is wholly inadequate, especially where "government function" was never defined by the district court[93] and the district court did not specifically instruct the jury that the Government had to prove that Esquenazi knew that Haiti Teleco was an "instrumentality" of the Haitian Government.  Instead, the district court should have instructed the jury that the corrupt payment had to be made to "a person the defendant knew or believed was a foreign official," like the district court did in *United States v. Carson*.[94]  And, as shown above, both the state appointment and public perception factors are especially inadequate where, as here, the legal requirements for government appointments were hence carried out – namely, the change in corporate organization from a "S.A." to a "S.A.M."

---

[93] *Accord United States v. Gonzalez*, 940 F.2d 1413, 1427 (11th Cir. 1991) ("[T]erms which are *within the common understanding* of the jury need not be defined in the jury instructions") (emphasis added).

[94] No. SACR 09–00077–JVS, DE 549 at 10-11 (C.D. Cal. Feb. 16, 2012).

## IV. THE DISTRICT COURT ERRED BY IMPROPERLY APPLYING THE SENTENCING GUIDELINES AS TO LEADERSHIP ROLE, PERJURY AND LOSS AMOUNT

Fundamental sentencing law requires that the calculated guideline be accurate. Failure to do so requires reversal.[95] *Williams v. United States*, 503 U.S. 193, 201-203 (1992); *United States v. Booker*, 543 U.S. 220 (2003). Over objection, Esquenazi received numerous sentencing guideline enhancements.[96] Three of four objections raised here relate to findings of a leadership role, perjury, and loss amount.

### A. Esquenazi Did Not Exercise a Leadership Role

The Court imposed a four level increase finding Esquenazi to be "very much … in charge"; the "boss of Rodriguez [and] … others"; "was in fact the leader of the organization"; "not just the President in name, but that he actually participated

---

[95] Notwithstanding the harmless error rule discussed in *United States v. Keene*, 470 F.3d 1347 (11th Cir. 2011), the reversal in the present matter pertains to incorrectly calculated guidelines concerning leadership, loss value and perjury. This Court *cannot presume* that a further reduction beneath the guideline would not occur if the trial court was incorrect in believing it was sentencing a leader or perjurer. Unlike *Keene*, there was no expression in this matter as to the impact on the sentence were it wrong on the calculations; and in *United States v. Lane*, 435 F. App'x 857, 858 (11th Cir. 2011), the issue concerned receipt of a thing of value under an admitted child pornography violation. These differences are fundamental and Esquenazi is entitled to reconsideration of the district court's improper guideline calculation.

[96] For purposes of these arguments, the Government's case as alleged is presumed, although not conceded as correct.

in may of the decisions that took place[.]"[97]  Esquenazi challenges the role of

leader, suggesting his true factual role was at most a manager or supervisor,

entitling Esquenazi to a one level role reduction.[98]

Section 3B1.1(a) provides for a four level enhancement to the base offense

level of any defendant who "was an organizer or leader of a criminal activity that

involved five or more participants or was otherwise extensive, and a three level

enhancement for a manager or supervisor under the same circumstance.  Section

3B1.1(b), cmt. n. 4.  *See Unites States v. Martinez*, 584 F.3d 1022, 1028 (11th Cir.

2009); *United States v. Yates*, 990 F.2d 1179, 1182 (11th Cir. 1993).

To receive a four level increase, there must be clear acts of leadership,

*United States v. Suarez,* 313 F.3d 1287, 1299 (11th Cir. 2002) (defendant's

direction of others on the movement of cocaine); *as compared with United States

v. Zimmer*, 299 F.3d 710 (8th Cir. 2002) (directing another on 30 to 36 occasions in

cooking methamphetamine, for a three point manager/supervisor increase); *see

United States v. DeGovanni*, 104 F.3d 43 (3d Cir. 1997) (supervisor of illegal

activity, for a three level increase).

---

[97] Dkt. 646 at 26.

[98] No issue is raised regarding the number of participants or the "otherwise
extensive" requirements.

But the district court here never adequately established over whom Esquenazi asserted any role, and what the role entailed.[99]  On the "Haitian side," the primary players – Grandison, Diaz and Forecand – were all directed by the receivers of these bribes, namely, Messrs. Antoine and Duperval.  Esquenazi's relationship with the Haitian side, thus, was not one of control, leadership or management.  *United States v. Yates*, 990 F.2d at 1182, citing *United States v. Brown*, 944 F.2d 1377, 1385 (7th Cir. 1991); (ruling that a buyer-seller relationship does not make or create an enhanced relationship).  The Haitian side was controlled by Robert Antoine.

Within Terra, two financial people, Rodriguez and Perez, and in-house counsel, Maes Dickey, were involved with Esquenazi.  Esquenazi had an inherent employer-employee relationship which was interwoven with the alleged criminal conduct of bribery.  The Government's case was that the business between Terra and Haiti Teleco was both legitimate and illegitimate.

Perez, as Comptroller on his own volition developed a relationship with Antoine.  In Perez's own words, "I made a point of meeting Robert Antoine in an effort…to grow the company, for recognition in the company…make more money

---

[99] While there were others, these people played a primary role in this case.

in the company."[100]  Perez is the individual who discussed a side payment with

Antoine, and Antoine instructed Perez on how side payments would be made.[101]

According to Perez, Esquenazi "authorized" a side payment if debt negotiations

failed.[102]  In a display of the mutuality of involvement which evidences a lack of

leadership, "[Esquenazi] was happy, and both James Dickey and Carlos Rodriguez

also congratulated me on a job well done" following the Antoine meeting.[103]

Carlos Rodriguez was the Executive Vice-President of Terra, Manager of the

Accounting Department, and an authorized signatory for the company.[104]  While

Rodriguez's conduct can be viewed either in business or criminal terms, depending

on one's perspective, there is simply a lack of evidence of Esquenazi directing

Rodriguez in any criminal activity.[105]

Dickey, an unindicted co-conspirator, served as Terra's in-house counsel and

an officer of Terra.  He provided legal advice, drafted and vetted contracts.  Dickey

---

[100] Dkt. 491 at 69.

[101] *Id.* 78-79.

[102] *Id.* at 77.

[103] *Id.* at 80.

[104] Dkt. 498 at 68, 78.

[105] Rodriguez was the individual who signed the JDL Consulting agreement that James Dickey drafted.  Dkt. 495 at 8-9.  The testimony does not evidence that Esquenazi directed Dickey to draft this agreement, nor did it show that Esquenazi directed Rodriguez to sign it.

provided legal advice to Perez as to his activities with Robert Antoine.[106]  On

request by Duperval, and as a favor/obligation to Teleco, Dickey created a

corporation for Marguerite Grandison.[107]  This request was not unusual because

Dickey had performed legal work for Teleco in the past.[108]  *Id.*

At most, Esquenazi exercised management and supervision with more than

five participants, where each conducted their own independent acts and judgment,

both business-wise and in a criminal capacity.  *See United States v. Jennings,* 599

F.3d 1241, 1253 (11th Cir. 2010); 3B1.1(b), cmt. n. 4.

Notwithstanding the proper deference to the district court in this case, it

clearly erred in applying the highest level of role enhancement.  The court

confused business activities and criminal conduct, and improperly found leadership

over the Haitian participants.[109]

## B.    Esquenazi Did Not Obstruct Justice or Commit Perjury

Four elements must be present under § 3C1.1 in order for a court to make a

finding that a *defendant* perjured himself:  1) the testimony must be under oath or

affirmation; 2) the testimony must be false; 3) the testimony must be material; and

4) the testimony must be given with the willful intent to provide false testimony

---

[106] Dkt. 491 at 81.

[107] Dkt. 505 at 34-35.

[108] *Id.*

[109] Dkt. 646 at 25-26.

and not as a result of a mistake, confusion, or faulty memory.  *United States v. Dunnigan*, 507 U.S. 87, 94 (1993); 18 U.S.C. § 1621(1).  In *Dunnigan,* the court held that:

> [I]t is preferable for a district court to address each element of the alleged perjury in a separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if, as was the case here, the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury.

*Id.* at 95.  *Dunnigan* also recognized that a defendant's testimony may be truthful, even if rejected by a jury.  *Id.*

This issue *concerns* both the substantive finding by the district court and the manner in which the sentence was imposed.[110]  The Government identified certain specific areas of contested testimony:  1) whether documents were invoices (Government) or reports of minutes used (Esquenazi); 2) whether Esquenazi bribed Antoine; 3) the amount of time and questions associated with the agent's interview;[111] and 4) the destruction of documents.[112]

---

[110] There was sufficient back and forth between counsel and the district court to alert the district court to the failure to be specific.  *See United States v. Gregg,* 179 F.3d 1312, (11th Cir. 1999), *citing United States v. Geffard*, 87 F.3d 448, 453 (11th Cir. 1996).

[111] This is not a material issue.

[112]  One last issue concerned financial conclusions marked in the PSIR, although this was never resolved.  Dkt. 646 at 35-37.

Clearly, the bribery answer goes to the heart of the case, yet it is merely a conclusory statement underlying all the activities. Ultimately, there can be no argument that Esquenazi's testimony opposes the Government's.

Yet, the district court never addressed any factual issue, but repeatedly talked about Esquenazi's demeanor and the jury's possible dislike of him.[113] In fact, the district court prematurely (and improperly) announced its view of Esquenazi's testimony in front of the jury:

> Prosecutor:   … you're sticking to your story … .
>
> Esquenazi:   May lightning strike me if I'm lying.
>
> Court:  Do you want to go stand somewhere else if you're going to say things like that?  I'm not suggesting it will –
>
> Esquenazi:  I think I'm fine.
>
> Court:  -- but I don't like people next to me saying that.[114]

Yet, when it came time to sentence Esquenazi, at no place did the district court find the testimony to be false, material or mistaken or confused. As close as the district court came to ruling was referring to the Government's factual examples. The district court said, "But in this case, we're not talking about one. We're not talking about two. We're talking about a bunch. And any one of those things might not be the one thing[.]" But then spoke to Esquenazi's demeanor,

---

[113] Dkt. 646 at 28-29.

[114] Dkt. 505 at 50.

"And lest you think I personally dislike Mr. Esquenazi, he reminds me almost 100 percent of my very best friend[.]"[115]

Esquenazi's protestation of his innocence, notwithstanding the jury verdict, *Dunnigan,* is simply insufficient to amount to a finding of perjury.

### C.    The Amount of Loss Should Have Been Measured by the Personal Benefit to Esquenazi, Not Terra

A careful analysis of the district court's § 2C1.1 findings reveal the district court's failure to distinguish the benefits received by the corporation (Terra) and the individual employee (Esquenazi), who acted on behalf of the corporation. Because Esquenazi, not Terra, was on trial, Esquenazi's own personal benefit should have been the determinative factor.[116]

In *United States v. Anderson*, 517 F.3d 953 (7th Cir. 2008), the court discussed how to best assess the value received and the *individual benefit* derived by Anderson from the two properties that were developed as a result of bribes paid, holding "we must now calculate the benefit Anderson derived from these two properties," *id.* at 964, notwithstanding that Anderson acted through his company.

---

[115] Dkt. 646, at 35.

[116] Although this ground was not specifically raised at sentencing, the valuation was raised and argued.  Dkt. 646 at 8-12.

Moreover, in *United States v. DeVegter,* 439 F.3d 1299 (11th Cir. 2006), this Court faced the question of the proper valuation of the benefit,[117] holding that a company's year-end bonus to employees could not be subtracted as a direct cost from the net benefits used to calculate the sentence.  Footnote 2 of *DeVegter* reads "[t]he appropriate measure of the improper benefit should be the benefit to Lazard (the company), as opposed to merely any benefit directly attributable to Poirier (the defendant)."  This is dicta, as it was not an issue in *DeVegter.*

None of the three cases cited by *DeVegter* are Eleventh Circuit cases, and all use a different guideline, Section 2B4.1.  In *United States v. Cohen,* 171 F.3d 796 (3d Cir. 1999), the salesman for a food company paid bribes to customers and meat managers to induce them to purchase from the company. Cohen held that the improper benefit "refers to the net value accruing to the entity on whose behalf the individual paid the bribe."  This case is in direct conflict with the Seventh Circuit's opinion of *Anderson* and is the only case that directly addresses this question.  The other two cases in footnote 2 are not on point.  *See United States v. Landers,* 68 F.3d 882, 884 (5th Cir. 1995); *United States v. Ziglin*, 964 F.2d 756, 758 (8th Cir. 1992).

---

[117] It should be noted at the outset that a different statute, 18 U.S.C. § 1343, was charged in *DeVegter*, leading to the use of the Sentencing Guidelines, § 2B4.1.

Per section 2C1.1, with the accurate value of Esquenazi's personal benefit unclear, the guideline requires the amount of the bribe; therefore, the offense level should drop by two points (level 14).

## CONCLUSION

Based on the foregoing, this Court should direct a judgment of acquittal in favor of Esquenazi, or, in the alternative, reverse his convictions and remand for a new trial or for resentencing.

Respectfully submitted this 9th day of May, 2012.

*/s/ Michael A. Sink*
Michael A. Sink (CO Bar #36064)
T. Markus Funk, (CO Bar #43500)
Perkins Coie LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Phone: (303) 291-2300
Fax: (303) 291-2400
Email:  msink@perkinscoie.com

Michael J. Rosen, Esq.
Fla. Bar No.: 183719
MICHAEL J. ROSEN, P.A.
2937 SW 27th Avenue, Suite 101
Miami, Florida 33133
Tel: 305-446-6116
Fax: Michael Rosen@305-446-6150
Email: mjr@mjrosenlaw.com

Attorneys for Appellant, Joel Esquenazi

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

1.     This brief contains 13,851words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because:

a.     this brief has been prepared in a proportionally spaced typeface using WordXP in Times New Roman 14 pt.

65

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by via Electronic Filing this 9th day of May, 2012, to the following:

Aurora Fagan
Richard J. Diaz
David W. Simon
Kenneth Bruce Winer
Anne Ruth Schultz
Kathleen Mary Salyer
With a copy mailed to the following:

Lauren Lisette Valiente
Rhonda Anne Anderson
Kirby A. Heller
Pamela L. Johnston
Jaime B. Guerrero

Wifredo A. Ferrer
U.S. Attorney's Office
99 NE 4TH ST STE 521
MIAMI, FL 33132

James F. Cirincione
Foley & Lardner, LLP
777 E WISCONSIN AVE STE 3800
MILWAUKEE, WI 53202-5306

Arturo Virgilio Hernandez
Attorney at Law
2937 SW 27TH AVE STE 101
MIAMI, FL 33133-3772

James M. Koukios
U.S. Attorney's Office
99 NE 4TH ST STE 521
MIAMI, FL 33132

G. Michael Halfenger
Foley & Lardner, LLP
777 E WISCONSIN AVE STE 3800
MILWAUKEE, WI 53202-5306

Nicola J. Mrazek
US Department of Justice - Criminal Division
1400 NEW YORK AVE NW STE 600
WASHINGTON, DC 20005-2107

Daren Grove
U.S. Attorney's Office
99 NE 4TH ST STE 521
MIAMI, FL 33132

*/s/ Michael A. Sink*
Michael A. Sink (CO Bar #36064)
T. Markus Funk, (CO Bar #43500)
Perkins Coie LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Phone: (303) 291-2300
Fax: (303) 291-2400
Email:  msink@perkinscoie.com
        mfunk@perkinscoie.com