CASE NO. 11-15331-C

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

vs.

CARLOS RODRIGUEZ,

Defendant - Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

CORRECTED INITIAL BRIEF OF APPELLANT

_____

Pamela L. Johnston
California Bar No. 132558
Jaime B. Guerrero
Foley & Lardner LLP
California Bar No. 192211
555 South Flower Street
Suite 3500
Los Angeles, CA 90071-2411
Phone: 213-972-4500
Fax: 213-486-0065

David W. Simon
Wisconsin Bar No. 1024009
G. Michael Halfenger
Wisconsin Bar No. 1024062
James F. Cirincione
Wisconsin Bar No. 1086061
Foley & Lardner LLP
777 E. Wisconsin Avenue
Milwaukee, WI 53202-5306
Phone: 414-271-2400
Fax: 414-297-4900

4841-2302-8751.16

Kenneth B. Winer
District of Columbia Bar No. 359052
Foley & Lardner LLP
3000 K. Street N.W., Suite 600
Washington, DC 20007-5109
Phone: 202-672-5300
Fax: 202-672-5399

Lauren L. Valiente
Florida Bar No. 034775
Foley & Lardner LLP
100 N. Tampa Street, Suite 2700
Tampa, Florida 33602
Telephone:  (813) 229-2300
Facsimile:  (813) 221-4210

Attorneys for Defendant-Appellant, Carlos Rodriguez

United States v. Rodriguez
Appeal No. 11-15331-C

## **CERTIFICATE OF INTERESTED PERSONS AND**
## **CORPORATE DISCLOSURE STATEMENT**

Appellant Carlos Rodriguez, through his undersigned counsel and pursuant

to 11th Circuit Rule 26.1-1, hereby submits the following list of all trial judge(s),

all attorneys, persons, associations of persons, firms, partnerships, or corporations

that have an interest in the outcome of this appeal, including subsidiaries,

conglomerates, affiliates and parent corporations, including any publicly held

corporation that owns 10% or more of the party's stock, and other identifiable legal

entities related to a party:

Anderson, Rhonda Anne, Appellant's trial counsel;

Cirincione, James F., counsel for Appellant;

Diaz, Richard John, counsel for co-defendant Joel Esquenazi;

Esquenazi, Joel, co-defendant;

Fagan, Aurora, counsel for Appellee;

Ferrer, Wilfredo A., counsel for Appellee;

Gerrity, Kevin B., counsel for Appellee;

Grove, Daren, counsel for Appellee;

Guerrero, Jaime, counsel for Appellant;

Halfenger, G. Michael, counsel for Appellant;

C-1

<u>United States v. Rodriguez</u>
Appeal No. 11-15331-C

Heller, Kirby A., counsel for Appellee;

Hernandez, Arturo V., Appellant's trial counsel;

Johnston, Pamela L., counsel for Appellant;

Koukios, James M, counsel for Appellee;

Martinez, Hon. Jose E., Trial Judge;

Mrazek, Nicola J., counsel for Appellee;

Republic of Haiti, country at issue in case;

Rodriguez, Carlos, Appellant;

Rosen, Michael James, counsel for co-defendant Joel Esquenazi;

Schultz, Anne R., counsel for Appellee;

Simon, David W., counsel for Appellant;

Telecommunications D'Haiti, business at issue in case;

Valiente, Lauren L., counsel for Appellant.

C-2

## STATEMENT REGARDING ORAL ARGUMENT

The appellant requests oral argument.  This case involves complex legal and factual issues, and the appellant believes that oral argument will assist the Court in resolving those issues.

4841-2302-8751.16

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ................................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES ................................................................................ v

STATEMENT REGARDING ADOPTION OF  BRIEFS OF OTHER
PARTIES ............................................................................................... 1

STATEMENT OF JURISDICTION .................................................................... 1

STATEMENT OF THE ISSUES .......................................................................... 2

STATEMENT OF THE CASE .............................................................................. 4

    I.       Course of Proceedings and Disposition Below .................................... 5

    II.     Statement of Facts ............................................................................ 7

          A.     Development of Terra .............................................................. 7

          B.     The Alleged Bribery Scheme ................................................. 9

          C.     The Government Presented Limited Evidence that
Rodriguez had any Knowledge of, or Played any Role in,
the Purported Conspiracy ....................................................... 12

    III.    Standard of Review ......................................................................... 18

SUMMARY OF ARGUMENT ............................................................................ 21

ARGUMENT ...................................................................................................... 25

    I.       Mr. Rodriguez's Convictions for Violations of the FCPA
Should be Reversed or Vacated ........................................................ 25

4841-2302-8751.16

A.　Properly Defining the Terms "Foreign Official" and "Instrumentality" in the FCPA is Critical in Determining the Reach of the FCPA ........................................................ 26

B.　The District Court's Jury Instructions Incorrectly Defined the Term "Instrumentality" of a Foreign Government Under the FCPA ......................................................................... 29

C.　The District Court Abused Its Discretion By Refusing To Charge The Jury Using Rodriguez's Requested "Instrumentality" Instruction. .................................................. 37

D.　The District Court Erred In Denying Rodriguez's Request for Discovery and an Evidentiary Hearing Regarding the Bellerive Declaration ..................................... 38

E.　The District Court's Jury Instructions As To The "Knowledge" Element Of The FCPA Were Vague And Ambiguous. ................................................................................. 44

F.　The Record Does Not Contain Sufficient Evidence To Support Mr. Rodriguez's Convictions Under The FCPA ........ 47

II.　Mr. Rodriguez's Convictions Based on Wire Fraud Should be Reversed or Vacated ....................................................................... 55

A.　The Jury Instruction on Wire Fraud was Plainly Erroneous and Misled the Jury. ............................................. 56

B.　The Record Does Not Contain Sufficient Evidence To Support the Convictions Based on Wire Fraud ...................... 59

C.　The Government's Attempt To Change the Base of the Wire Fraud Theory From the Wire Transfers to Facsimiles Constitutes an Impermissible Variance From The Indictment. ....................................................................... 64

III.　The Money Laundering Convictions Must be Reversed or Vacated Because (a) the District Court Improperly Instructed the Jury on Haitian Bribery Law as a Proper Predicate for the Money Laundering Charges; and (b) the Money Laundering Counts Violated the Merger Rule ...................................................... 67

4841-2302-8751.16

A.    The Instruction Given to the Jury on the Activities Constituting a Violation Haitian Bribery Law was Broader in Scope than Permitted by the Money Laundering Statute ................................................................. 68

B.    The District Court Erred by Not Instructing the Jury that Proceeds of the Bribery Must Constitute a Felony ................. 69

C.    The Money Laundering Counts Should Have Been Dismissed Because They Violated The Merger Rule And Mr. Rodriguez's Motion for Acquittal Should Have Been Granted For The Same Reason ................................................. 70

IV.    Mr. Rodriguez's Sentence Must be Vacated and Remanded to the District Court for Further Proceedings ......................................... 72

V.    The District Court's Entry of Forfeiture Must Be Vacated ............... 73

A.    Standard of Review ................................................................. 73

B.    The Forfeiture Order And The Amended Judgment and Commitment Order Must Be Vacated Because They Differ From the Oral Sentence Pronounced By The District Court ................................................................................ 73

CONCLUSION ................................................................................................... 75

CERTIFICATE OF COMPLIANCE ................................................................... 76

CERTIFICATE OF SERVICE ............................................................................ 77

iv

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Annulli v. Panikkar*,
    200 F.3d 189 (3d Cir. 1999) ............................................................................56

*Bolender v. Singletary*,
    16 F.3d 1547 (11th Cir. 1994) ........................................................................43

*Breedlove v. Moore*,
    279 F.3d 952 (11th Cir. 2002) .................................................................18, 43

*Edison v Douberly*,
    604 F.3d 1307 (11th Cir. 2010) ................................................................ Passim

*Grayson v. King*,
    460 F.3d 1328 (11th Cir. 2006) ......................................................................43

*Green v. City of N.Y.*,
    465 F.3d 65 (2d Cir. 2006) .......................................................................31, 36

*Johnson v. Breeden*,
    280 F.3d 1308 (11th Cir. 2002) ......................................................................45

*Libretti v. United States*,
    516 U .S. 29, 39, 116 S. Ct. 356 (1995) ..........................................................73

*Liparota v. United States*,
    471 U.S. 419, 105 S. Ct. 2084 (1985) ............................................................36

*Neder v. United States*,
    527 U.S. 1, 119 S. Ct. 1827 (1999) ........................................................... 57-58

*Skilling v. United States*,
    561 U.S. ___, 130 S. Ct. 2896 (2010) ............................................................35

*United States v. Aguilar*,
    No. 10-cr-01031-AHM (C.D. Cal.) ................................................................26

v

*United States v. Aguillard*,
217 F.3d 1319 (11th Cir. 2000) ....................................................21, 73

*United States v. Aleynikov*,
No. 11-1126, 2012 WL 1193611 (2d Cir. Apr. 11, 2012)...................36

*United States v. Beckles*,
565 F.3d 832 (11th Cir. 2009) ...........................................................48

*United States v. Bonilla*,
579 F.3d 1233 (11th Cir. 2009) ................................................... 74-75

*United States v. Carson*,
No. 09-cr-00077-JVS (C.D. Cal.)..................................................26, 28

*United States v. Chica*,
14 F.3d 1527 (11th Cir. 1994) ......................................................21, 70

*United States v. Christo*,
129 F.3d 578 (11th Cir. 1997) ...........................................................71

*United States v. Cotton*,
535 U.S. 625, 122 S. Ct. 1781 (2002).................................................57

*United States v. Couto*,
119 F. App'x 345 (2d Cir. 2005) ...................................................44, 52

*United States v. Elkins*,
885 F.2d 775 (11th Cir. 1989) ...........................................................65

*United States v. Granderson*,
511 U.S. 39 (1994)..............................................................................34

*United States v. Hill*,
643 F.3d 807 (11th Cir. 2011) ..................................................... 65-66

*United States v. Inclema*
363 F.3d 1177 (11th Cir. 2004) .........................................................36

*United States v. Izydore*,
167 F3d 213 (5th Cir. 1999) ........................................................ 56-57

*United States v. James*,
642 F.3d 1333 (11th Cir. 2011) ................................................................ 44-45

*United States v. Kay*,
359 F.3d 738 (5th Cir. 2004) ...............................................................33

*United States v. Kennard*,
472 F.3d 851 (11th Cir. 2006) ...............................................................55

*United States v. Khoury*,
901 F.2d 975 (11th Cir. 1990) ...............................................................74

*United States v. Kimble*,
178 F.3d 1163 (11th Cir. 1999) ...............................................................33

*United States v. Lanier*,
520 U.S. 259, 117 S. Ct. 1219 (1997)...............................................................36

*United States v. Lindemann*,
85 F.3d 1232 (7th Cir. 1996) ...............................................................57

*United States v. Martinelli*,
454 F.3d 1300 (11th Cir. 2006) ...............................................................37, 47

*United States v. Maxwell*,
579 F.3d 1282 (11th Cir. 2009) ...............................................................56

*United States v. McCrary*,
699 F.2d 1308 (11th Cir. 1983) ...............................................................66

*United States v. Mendez*,
528 F.3d 811 (11th Cir. 2008) ...............................................................67

*United States v. Navarro-Ordas*,
770 F.2d 959 (11th Cir. 1985) ...............................................................61

*United States v. O'Shea*,
No. 09-cr-00629 (S.D. Tex.)...............................................................26

*United States v. Olano*,
507 U.S. 725 (1993)...............................................................19, 73

vii

*United States v. Parker*,
  839 F.2d 1473 (11th Cir. 1988) ...........................................................60

*United States v. Puche*,
  350 F.3d 1137 (11th Cir. 2003) ..........................................................73

*United States v. Qaiala*,
  19 F.3d 569 (11th Cir. 1994) ........................................................21, 70

*United States v. Raad*,
  406 F.3d 1322 (11th Cir. 2005) (per curiam) ............................... 19-20

*United States v. Richards*,
  204 F.3d 177 (5th Cir. 2000), overruled on other grounds................................57

*United States v. Santos*,
  553 U.S. 507 (2008).............................................................. 36, 70-71

*United States v. Simon*,
  839 F.2d 1461 (11th Cir. 1988) ...........................................................60

*United States v. Starret*,
  55 F.3d 1525 (11th Cir. 1995) ...........................................................20

*United States v. Steed*,
  548 F.3d 961 (11th Cir. 2008) ...........................................................54

*United States v. Suba*,
  132 F.3d 662 (11th Cir. 1998) ...........................................................61

*United States v. Svete*,
  556 F.3d 1157 (11th Cir. 2009) (en banc) ..................................18, 57

*United States v. Taylor*,
  480 F.3d 1025 (11th Cir. 2007) ................................................. 19-20

*United States v. Williams*,
  340 F.3d 1231 (11th Cir. 2003) ................................................21, 72

*United States v. Williams*,
  527 F.3d 1235 (11th Cir. 2008) ..........................................................56

*United States v. Witek*,
 61 F.3d 819 (11th Cir. 1995) ..............................................................29

*United States v. Wolfson*,
 573 F.2d 216 (5th Cir. 1978) .............................................................47

**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

15 U.S.C. § 78 ...........................................................................5, 29, 32

18 U.S.C. § 371 ..............................................................................5, 58

18 U.S.C. § 1343 ......................................................................5, 56, 58

18 U.S.C. § 1956............................................................................ Passim

28 U.S.C. § 201 ...................................................................................52

42 U.S.C. § 12131 .........................................................................30, 32

Americans With Disabilities Act, 42 U.S.C. §§ 12101-12214 ...............30

Federal Rule of Evidence 1006................................................................62

U.S.S.G. § 2S1.1(a)(1) ..........................................................................72

**OTHER AUTHORITIES**

Black's Law Dictionary (9th Ed., 2009).................................................68

Court E. Golumbic and Jonathan P. Adams, *The "Dominant Influence"
 Test: The FCPA's "Instrumentality" and "Foreign Official"
 Requirements and the Investment Activity of Sovereign Wealth Funds*, 39
 AM. J. CRIM. L. 1 (Fall 2011) ............................................................28

Lanny A. Breuer, Asst. Att'y Gen., Prepared Keynote Address to the 10th
 Annual Pharmaceutical and Regulatory Compliance Congress and Best
 Practices Forum (Nov. 12, 2009), *available at*
 www.ehcca.com/presentations/pharmacongress10/breuer_2.pdf .....................27

Michael J. Koehler, *The Façade of FCPA Enforcement*, 41 GEO. J. INT'L L.
 907, 916 (2010) ................................................................................29

4841-2302-8751.16

DOJ, Office of Public Affairs, "*Executive Sentenced to 15 Years in Prison for Scheme to Bribe Officials at State-Owned Telecommunications Company in Haiti*", October 25, 2011, *available at* http://www.justice.gov/opa/pr/2011/October/11-crm-1407.html (emphasis added) (last visited May 7, 2012).....................................................40

## STATEMENT REGARDING ADOPTION OF
## BRIEFS OF OTHER PARTIES

Mr. Rodriguez adopts and joins the arguments set forth in Co-Defendant/Co-Appellant Joel Esquenazi's ("Esquenazi") "Brief of Appellant" filed concurrently with this Court.

## STATEMENT OF JURISDICTION

Defendant-Appellant Carlos Rodriguez ("Mr. Rodriguez") was named in a twenty-one count Indictment.  The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231.  After a jury trial, Rodriguez was convicted on all counts in the Indictment.  The District Court entered its final judgment and commitment order on October 26, 2011, and entered an amended final judgment and commitment order on November 3, 2011.  Pursuant to Federal Rule of Appellate Procedure 4(b), Rodriguez timely filed his notice of appeal in the District Court on November 9, 2011.

This Court has subject matter jurisdiction for this appeal pursuant to 28 U.S.C. § 1291.  This Court has subject matter jurisdiction to review Mr. Rodriguez's challenge to the sentence imposed on him by the District Court, pursuant to 18 U.S.C. § 3742(a).

4841-2302-8751.16

## <u>STATEMENT OF THE ISSUES</u>

1.      Whether the District Court erred as a matter of law in its jury instruction regarding what constitutes an "instrumentality" of a foreign government for purposes of construing the counts, including the money laundering counts, that were dependent upon the Foreign Corrupt Practices Act ("FCPA").

2.      Whether the District Court abused its discretion when it refused to hold an evidentiary hearing concerning the circumstances and history regarding a declaration from the current Haitian Minister of Justice that stated that Telecommunications D'Haiti ("Teleco") was not an "instrumentality" of the Haitian government that the Government turned over just after the jury's verdict followed by a second declaration that the United States Government was involved in procuring that reversed the first declaration, which contained clear exculpatory evidence .

3.      Whether the District Court erred as a matter of law in its "knowledge" jury instruction regarding the FCPA-dependent counts, including the money laundering counts.

4.      Whether there was sufficient evidence to support jury's verdicts as to the FCPA counts.

5.      Whether the District Court plainly erred when it submitted the wire fraud-dependent counts, including the money laundering counts, to the jury based

4841-2302-8751.16

on an erroneous jury instruction that failed to require proof that of the jurisdictional facts necessary for federal wire fraud, that is that the wire communications crossed state lines (*i.e.*, **inter**-state communications).

6.      Whether the District Court plainly erred in its *mens rea* instruction to the jury regarding the wire fraud-dependent counts, including the money laundering counts, because the jury was not asked to find intent to defraud for the wire fraud-dependent counts.

7.      Whether there was sufficient evidence to support the jury's verdicts as to the wire fraud-dependent counts.

8.      Whether the Government's attempt to change the basis of its wire fraud theory from wire transfers to facsimiles constitutes an impermissible variance from its initial theory of the case.

9.      Whether the District Court erred as a matter of law in its jury instruction of what constituted a violation of the Haitian bribery law as proper predicate for the money laundering counts.

10.     Whether the District Court abused its discretion in not granting a motion to dismiss the money laundering counts where the "proceeds" of the predicate crimes were the same transfers of money that were charged as the money laundering transactions, thereby violating the merger rule, and whether there was

3

sufficient evidence to support jury's verdicts as to the money laundering counts for the same reason.

11.    Whether Mr. Rodriguez's sentence must be vacated.

12.    Whether the forfeiture order and the forfeiture aspect of the amended judgment and commitment order must be vacated because the oral sentence pronounced by the District Court did not order forfeiture.

## STATEMENT OF THE CASE

At trial, the Government sought to prove that Mr. Rodriguez and Esquenazi, co-owners of a small telecommunications company in Florida, Terra Communications ("Terra"), caused payments to be sent to various consultants (the Government called these persons intermediaries) who in turn sent monies to two employees of a telecommunications company located in Haiti -- Telecommunications D'Haiti ("Teleco").  The Government alleged that the payments were, in fact, bribes paid in exchange for the Teleco employees' agreement to reduce (a) the amount of the monthly invoice sent by Teleco to Terra for Terra's purchase of telephone minutes from Teleco; and (b) the per-minute rate that Teleco charged to Terra for the purchase of those minutes.

Based on this alleged bribery scheme, Mr. Rodriguez, Esquenazi and several others were charged with: (a) one count of conspiracy; (b) seven substantive counts of violating the FCPA; (c) one count of conspiracy to commit money laundering;

4

and (d) twelve counts of concealment money laundering. The three specified

unlawful activities serving as predicates for the money laundering counts were

violations of the: (a) FCPA; (b) wire fraud statute; and (c) Haitian bribery law.

After a jury trial, Mr. Rodriguez was convicted on all 21 counts of the Indictment.

A few days after the jury returned its verdict, the Government disclosed a

declaration from the current Haitian Minister of Justice that stated that Teleco was

not an "instrumentality" of the Haitian government, followed by a second

declaration that the United States Government was involved in procuring that

reversed key aspects of the first declaration.

## I.     Course of Proceedings and Disposition Below

On December 4, 2009, Mr. Rodriguez and co-defendants Joel Esquenazi,

Robert Antoine, Jean Rene Duperval, and Marguerite Grandison were named in a

twenty-one count Indictment returned by a federal grand jury in the Southern

District of Florida. Mr. Rodriguez was charged with (a) one count of conspiracy,

in violation of 18 U.S.C. § 371, where the objects of the conspiracy were to violate

the Foreign Corrupt Practices Act ("FCPA"), in violation of 15 U.S.C. § 78dd-2 *et

seq.*, and to commit wire fraud, in violation of 18 U.S.C. § 1343 ("Count 1");

(b) seven substantive counts of violating the FCPA ("Counts 2 through 8"); (c) one

count of conspiracy to commit money laundering, in violation of 18 U.S.C. §

1956(h) ("Count 9"); and (d) twelve counts of concealment money laundering, in

4841-2302-8751.16

violation of 18 U.S.C. § 1956(a)(1)(B)(i) ("Counts 10 through 21").  On January 5,

2010, Mr. Rodriguez entered a plea of not guilty. (Dckt. 46; R.E. 132.)[1]

In May 2011, the District Court severed the trial of Mr. Rodriguez and Mr.

Esquenazi from the trial of the other defendants.  (Dckt. 428.)  The Government

subsequently filed a superseding indictment against Ms. Grandison and Mr.

Duperval, but tried Mr. Rodriguez and Mr. Esquenazi on the original Indictment.

(*Id.*)

Mr. Rodriguez's trial commenced on July 18, 2011.  (Dckt. 454.)  The

District Court denied the motion for a judgment of acquittal that Mr. Rodriguez

made at the close of the Government's case-in-chief.  (Dckt. 509, PGS. 39-49.)

Mr. Rodriguez renewed his motion for a judgment of acquittal at the close of trial,

and the District Court again denied that motion.  (Dckt. 513, PGS. 27-31.)

Thereafter, the jury convicted Mr. Rodriguez on all twenty-one counts of the

Indictment.  (Dckt. 523; R.E. 202-04.)  On October 13, 2011, the District Court

denied Rodriguez's two post-trial motions for Judgment of Acquittal or New Trial

and for Judgment of Acquittal or New Trial Based on Newly Discovered Evidence.

(Dckt. 609; R.E. 282.)

---

[1] The Record on Appeal is cited as "(Dckt. ___, PG. ____)" according to the
corresponding docket entry in the District Court; and, where applicable, the
corresponding page numbers.  Citations to the Appellant's Record Excerpts appear
as "(R.E. ____)" according to the page number of the corresponding docket entry.

On October 23, 2010, the District Court entered an Order of Forfeiture as to Mr. Rodriguez. (Dckt. 623, R.E. 283-85.) On October 26, 2011, the District Court entered a judgment and commitment order against Mr. Rodriguez, which did not reflect the previously-entered Order of Forfeiture. (Dckt. 628; R.E. 286-92.) On November 3, 2011, the District Court entered an amended judgment and commitment order "clarifying" that Mr. Rodriguez's sentence of 60 months imprisonment as to Counts One and 2 through 8 was to be followed consecutively by twenty-four months imprisonment as to Counts Nine and Ten through 21 for a total sentence of 84 months in custody, to impose the Order of Forfeiture, and to reflect a $2,100 assessment and $2.2 million in restitution. (Dckt. 637; R.E. 294-301.) On November 9, 2011, Mr. Rodriguez filed a timely notice of appeal. (Dckt. 642.) Mr. Rodriguez currently is serving his custodial sentence.

## II.    Statement of Facts

### A.    Development of Terra

Esquenazi and Mr. Rodriguez began working together in the telecommunications industry in the early 1990s. (Dckt. 511, PG. 11) Their business involved reselling long distance minutes purchased from various vendors throughout the world, including Latin America, and reselling that time to customers in the form of pre-paid calling cards or wholesale minutes. (Dckt. 509, PGS. 56-57; Dckt. 491, PG. 53.)

7

Esquenazi and Mr. Rodriguez formed Terra in 1997.  (Dckt. 504, PG. 38.)

Esquenazi owned 75% of the company, and Mr. Rodriguez owned the remaining

25%.  (Dckt. 508, PG. 12.)

Esquenazi served as Terra's President and Chief Executive Officer, Mr.

Rodriguez served as Terra's Executive Vice President of Operations, James Dickey

("Dickey") served as its in-house counsel, and Antonio Perez ("Perez") served as

its comptroller.  (*Id.* at 46, 50-51.)  Esquenazi was in charge of business

development, while Mr. Rodriguez was in charge of paying the company's bills.

(Dckt. 478, PG. 59; Dckt. 490, PG. 4.)  Esquenazi was known as the "brains

behind Terra," negotiating all of Terra's contracts and business dealings, while Mr.

Rodriguez was mostly involved in the accounting and operations/IT side of the

business.  (Dckt. 715, PG. 40; Dckt. 511, PGS. 13-14.)  Esquenazi's duties

included overseeing the running of the company and the company's relationships

with other companies, overseeing the sales department, finding financing, and

finding new business opportunities.  (Dckt. 498, PG. 74.)  It was also part of

Esquenazi's duties to supervise Mr. Rodriguez.  (*Id.*)  Mr. Rodriguez's

responsibilities included keeping track of the company's financial position and the

company's financial dealings.  (Dckt. 498, PG. 68.)  He oversaw the accounting

department, which included billing, accounts payable, and accounts receivable.

(Dckt. 498, PG. 68.)

8

**B.    The Alleged Bribery Scheme**

In the fall of 2000, Terra began doing business with Teleco.  As with its other vendors, Terra purchased long distance telephone minutes from Teleco and resold those minutes to its customers.  (Dckt. 704, Ex. 209.)  On a monthly basis, Teleco invoiced Terra for the total minutes used by Terra's customers for that month in making calls to Haiti. (Dckt. 702, PG. 25.)  Terra was billed for these minutes at a per-minute rate.  *Id.*

The Government's case against Esquenazi and Mr. Rodriguez focused on trying to prove the existence of a scheme orchestrated by Esquenazi to bribe Robert Antoine, Teleco's Director of International Relations, and Antoine's successor, Jean Rene Duperval, in exchange for reductions in Teleco's invoices to Terra and in the rates paid by Terra to Teleco.  The evidence presented by the Government with respect to the alleged bribes paid to Antoine rested almost entirely on the testimony of four cooperating witnesses:  Antoine, Juan Diaz, Jean Fourcand, and Antonio Perez (collectively, the "Antoine Conspirators").  The Antoine Conspirators were indicted for their role in the conspiracy, pled guilty prior to trial, and agreed to testify against Esquenazi and Mr. Rodriguez in exchange for the possibility of obtaining a reduced sentence.  (Dckt. 496, PGS. 13-14; Dckt. 495, PG. 40, 57; Dckt. 482, PG. 94.)

9

### 1.    The Alleged Scheme to Bribe Robert Antoine

The Antoine Conspirators testified that sometime in late October 2001, after several conversations with Esquenazi and an in-person meeting with Perez, Antoine agreed to accept bribe payments from Terra in exchange for reducing Teleco's invoices to Terra.  (Dckt. 491, PGS. 75-84; Dckt. 702, PGS. 33-36.) Specifically, Antoine testified that Esquenazi agreed to (a) provide calling cards, free of charge, to Fourcand; and (b) pay Antoine 50% of the amount by which Antoine reduced the invoices.  (Dckt. 702-1, PG. 35.)  At Antoine's request, Terra made these alleged bribe payments to two intermediaries: (a) J.D. Locator, a company owned by Juan Diaz; and (b) A&G Distributors, a company owned by Alix Pradel.  (Dckt. 702-1, PGS. 39-45.)

On November 2001, Terra and J.D. Locator executed a written consulting agreement, which provided that Diaz (a) had expertise "in the creation of telecommunications infrastructures in the Caribbean Basin and the acquisition and financing of telecommunications business enterprises"; and (b) would provide certain services to Terra based upon that expertise.  (Dkt. 704, Ex. 301.)  Antoine and Diaz testified that Diaz had no such expertise and that the J.D. Locator Agreement was a sham designed to disguise the fact that the payments being made from Terra to Diaz were, in fact, bribes meant for Antoine.  (Dkt. 800, PGS. 81, 94; Dckt. 702-1, PGS. 44, 49.)

10

Bank records showed that between November 2, 2001 and April 29, 2002, Terra made approximately 27 payments via check or wire transfer in the total amount of $784,193.00 to J.D. Locator and A&G Distributors.  (Dckt. 503, PG. 57-58; Dckt. 704, Exs. 700D, 700G.)  Antoine allowed Diaz and Pradel to keep between 7% to 10% of the payments for themselves as commissions.  (Dckt. 482, PG. 55.)  Antoine and Fourcand also claimed that Terra gave calling cards to Fourcand free of charge and that Fourcand sold those cards at his Miami deli and split the profits with Antoine.  (Dckt. 482, PG. 55; Dckt. 704, Ex. 117.)  Bank records presented at trial showed that Antoine received approximately $507,900.00 from Diaz, Pradel, and Fourcand.  (Dckt. 704, Ex. 700J.)  The Government sought to prove that over an 18 month period, beginning in September 2001 and ending in February 2003, in exchange for the payments from Terra, Antoine reduced Terra's invoices by $2,272,776.17.  (Dckt. 704, Ex. 700N.)

### 2.    Alleged Scheme to Bribe Jean Rene Duperval

Esquenazi and Mr. Rodriguez were also convicted of bribing Duperval, who succeeded Antoine as Teleco's Director of International Relations in August 2003. (Dckt. 496, PG. 6.)  The Government claimed that Terra paid Duperval bribes through an intermediary company called Telecom Consulting Services Corporation ("Telecom"), which was formed by Terra's in-house attorney James Dickey, and was owned by Duperval's sister, Marguerite Grandison.  (Dckt. 503, PG. 12; Dckt.

11

703, PGS. 51-56.)  On November 18, 2003, Terra and Telecom executed a

Commission Agreement whereby Terra agreed to pay Telecom a commission for

assisting Terra in obtaining a contract with Teleco (the "Terra/Telecom

Agreement").  (Dckt. 703-1, PG. 62; Dckt. 704, Ex. 73.)  Esquenazi signed the

agreement on behalf of Terra, and Grandison signed the agreement on behalf of

Telecom.  *Id.*  Bank records showed that between November 20, 2003 and March

25, 2004, Terra made seven wire transfers totaling $75,000.00 to Telecom, and

between December 15, 2003 and March 29, 2005, Grandison made 23 payments

totaling $73,572.00 to Duperval and his wife.  (Dckt. 503, PG. 12; Dckt. 704, Exs.

700F, 700H.)  In exchange for these payments, the Government claimed that

Duperval reduced Teleco's invoices to Terra and charged Terra a lower per-minute

rate for than was charged to other carriers for calls routed through Teleco.  (Dckt.

503, PG. 13, 25-28; Dckt. 704, Ex. 601.)

> ### C. The Government Presented Limited Evidence that Rodriguez had any Knowledge of, or Played any Role in, the Purported Conspiracy
>
> #### 1. Testimony of Esquenazi, Antoine, Diaz, and Fourcand Overwhelmingly Established that Antoine Had No Knowledge, or Played Any Role in, the Conspiracy.

Esquenazi admitted that he was primarily responsible for the business

relationship between Terra and Teleco and that he alone was responsible for

resolving disputes between Terra and Teleco.  (Dckt. 511, PG. 23, 33.)  Esquenazi

12

did not recall Mr. Rodriguez ever meeting with Joseph, Fourcand, Pradel, or Grandison.  (Dckt. 511, PGS. 27-28.)

Significantly, the testimony of the Government's own witnesses, particularly Antoine, Diaz, and Fourcand, was devoid of any facts suggesting that Mr. Rodriguez had any knowledge of the conspiracy.  In overseeing the Terra relationship, Antoine interacted with Esquenazi and Perez.  Although Antoine was introduced to Mr. Rodriguez, he only interacted with Mr. Rodriguez once or twice. (Dckt. 702-1, PG. 29.)  When asked to name the individuals who knowingly participated in the bribery scheme, Antoine did not name Mr. Rodriguez (Dckt. 496, PG. 137.)   The initial target of the bribery scheme and a key government cooperator – Antoine – testified that Mr. Rodriguez was not involved.

Diaz testified that his contact with Mr. Rodriguez was minimal and Diaz admitted that he never (a) discussed the purported bribery scheme with Mr. Rodriguez; (b) never discussed with Mr. Rodriguez the fact that the J.D. Locator Agreement was a "bogus agreement"; (c) never picked up any payments from Mr. Rodriguez; and (d) never had any substantive discussions with Mr. Rodriguez beyond small talk.  (Dckt. 460, PGS. 83-85, 89.)  Significantly, Diaz failed to mention Mr. Rodriguez or identify him as a member of the conspiracy during his first three meetings with Government agents.  (Dckt. 460, PGS. 87-89.)

13

Fourcand's testimony did not implicate Mr. Rodriguez in the bribery scheme. Specifically, Fourcand did not claim to have had any discussions with Mr. Rodriguez about the bribery scheme, and Fourcand provided no other testimony that in any way indicated that Mr. Rodriguez had knowledge of the bribery scheme.

### 2. Mr. Rodriguez's Execution of Checks and Authorization of Wire Transfers

Mr. Rodriguez signed many of the checks and caused many of the wire transfers that Terra issued to intermediaries. There was, however, no evidence presented to the jury to establish that Mr. Rodriguez knew that the payments were being used for any illegal or improper purpose. Mr. Rodriguez's primary responsibility was to ensure Terra's bills got paid. (Dckt. 511, PG. 6.) Every Friday, Mr. Rodriguez met with Jose Arroliga, who worked in Terra's accounting department overseeing Terra's accounts payable. (Dckt. 478, PG. 36; Dckt. 482, PG. 6.) During these weekly meetings, Mr. Rodriguez and Arroliga reviewed the expected cash flow for the week and decided how much to pay the company's vendors. (Dckt. 482, PG. 5.) A large stack of checks were put on Mr. Rodriguez's desk on a weekly basis for his signature. (Dckt. 482, PG. 6.) Mr. Rodriguez signed approximately 100 checks per week. (Dckt. 511, PG. 17.)

4841-2302-8751.16

### 3.     Payments to Consultants Were a Common Practice at Terra

At trial, the Government used the fact that Terra executed written consulting agreements with J.D. Locator and Telecom, whose owners had no experience with telecommunications consulting, to suggest that Esquenazi and Mr. Rodriguez must have been part of a conspiracy to bribe Teleco officials.  The evidence showed, however, that Terra commonly used consultants in its legitimate business operations  (Dckt. 491, PG. 4-5.)  Teleco was not the exclusive source of Terra's business.  Rather, Terra had numerous venders throughout Latin America.  (Dckt. 491, PG. 53.)  Teleco was about 20% to 25% of Terra's overall business.  (Dckt. 504, PG. 46.)  It was common for Terra to employ a number of consultants to assist in its various business dealings throughout Latin America.  (Dckt. 491, PG. 4-5.)  Consultants are a necessary and legitimate part of the telecommunications business because consultants assist the company to learn the laws and the people of the various countries where they do business.  (Dckt. 511, PG. 20.)  Terra utilized more than ten different consultants in its business operations.  (Dckt. 511, PG. 20.)  Esquenazi admitted that Mr. Rodriguez had no involvement in the negotiation of the consulting agreement between Terra and Telecom.  (Dckt. 511, PG. 29.)

### 4.     Testimony of Antonio Perez

Of all the Government's witnesses, including all of its cooperators, only Perez implicated Mr. Rodriguez in the bribery conspiracy.  Specifically, Perez

15

testified that after an in-person meeting with Antoine in October 2001 where Antoine purportedly agreed to the proposed bribery scheme, Perez drove back to Terra's offices and immediately informed Esquenazi of Antoine's agreement to accept bribes from Terra.  (Dckt. 491, PG. 80.)  Later that afternoon, Perez testified that he went back to Esquenazi's office, and in the presence of Esquenazi, Mr. Rodriguez, and Dickey, again shared that Antoine had agreed to accept payments in exchange for reducing Terra's bills.  (*Id*.)  Perez testified that Mr. Rodriguez and Dickey congratulated Perez on a job well done.  (*Id*.)

Despite the foregoing, Perez admitted that he had very little interaction with Mr. Rodriguez while he was employed at Terra.  (Dckt. 715, PG. 40.)  Perez also acknowledged that he (a) was not aware of Mr. Rodriguez having any role in negotiating the Terra/Teleco contract; (b) did not recall Mr. Rodriguez ever traveling to Haiti; (c) never observed Mr. Rodriguez meet with any of the individuals from Teleco when they visited Miami; (d) never observed Mr. Rodriguez have any conversations with Antoine, beyond saying "hello"; (e) was not aware of Mr. Rodriguez ever meeting with Diaz in person; and (f) never observed Mr. Rodriguez meet or speak with Fourcand.  (Dckt. 715, PGS. 39-44.)

During his first proffer session with Government agents in June 2008, however, Perez said he did not know what Mr. Rodriguez did at Terra.  (Dckt. 715, PG. 39.)  At trial, Perez claimed he lied to Government agents during that meeting.

16

(Dckt. 495, PG. 66.)  During his second meeting with Government agents, Perez did not include Mr. Rodriguez among those present at the meeting, which he claims took place at Terra after his lunch with Antoine wherein Perez communicated Antoine's agreement to participate in the bribery scheme.  (Dckt. 715, PG. 52.)  It was not until December 2008, six months after his first meeting with Government agents that Perez first said anything that implicated Mr. Rodriguez, claiming at that point that Mr. Rodriguez knew about the alleged bribery scheme.  (Dckt. 715, PG. 52.)  Even at the December 2008 meeting with Government agents, Perez claimed not to recall Mr. Rodriguez's response when he was informed of the bribery scheme.  (Dckt. 715, PG. 53.)  At trial, Perez acknowledged that by the time he implicated Mr. Rodriguez in the bribery scheme, Perez understood that the Government's investigation was targeting both Esquenazi and Mr. Rodriguez and that the Government wanted to obtain facts connecting Mr. Rodriguez to a crime.  (Dckt. 715, PG. 56.)

Perez was fired from Terra in January 2002, three months after his alleged meeting with Antoine.  (Dckt. 495, PG. 31-32.)  Esquenazi and Mr. Rodriguez fired Perez after they discovered that Perez was introducing the owner of one of Terra's competitors, Manny Sanchez, to Terra's vendors in Nicaragua.  (Dckt. 495, PG. 32.)  Sanchez's company was also a customer of Terra and owed Terra a sizeable debt.  (Dckt. 495, PG. 34.)  Shortly after firing Perez, Esquenazi and Mr.

17

Rodriguez discovered that Perez was hiding in his office approximately $800,000.00 in checks written by Sanchez's company to Terra. (Dckt. 495, PG. 34.) At the urging of Sanchez, Perez kept the checks hidden rather than depositing them in Terra's accounts. (*Id.*) After he was fired from Terra, Perez went to work for Sanchez. During his employment with Sanchez's company, Perez contacted Antoine and attempted, without success, to negotiate a contract between Teleco and Sanchez's company. (Dckt. 493, PG. 18.)

## III.  <u>Standard of Review</u>

1.      Whether the District Court erred as a matter of law in its jury instruction regarding what constitutes an "instrumentality" of a foreign government for purposes of construing the counts, including the money laundering counts, that were dependent upon the Foreign Corrupt Practices Act ("FCPA") is reviewed *de novo*. *See United States v. Svete*, 556 F.3d 1157, 1161 (11th Cir. 2009) (en banc).

2.      Whether the District Court erred when it failed to conduct an evidentiary hearing on *Brady* issues is reviewed for abuse of discretion. *See Breedlove v. Moore*, 279 F.3d 952, 959 (11th Cir. 2002).

3.      Whether the District Court erred as a matter of law in its "knowledge" jury instruction regarding the FCPA dependent counts, including the money laundering counts is reviewed *de novo*. *Id.*

4.    Whether there was sufficient evidence to support the FCPA counts is reviewed *de novo*, "viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007).

5.    Whether the district court erred when it submitted the wire fraud-dependent counts, including the money laundering counts, to the jury based on an erroneous jury instruction that failed to require proof of the jurisdictional facts necessary for federal wire fraud, that is that the wire communications crossed state lines (i.e. *inter*-state communications), is reviewed for plain error. *United States v. Raad*, 406 F.3d 1322, 1323 (11th Cir. 2005) (per curiam) (recognizing that "when a defendant fails to object to an error before the District Court, [the appellate court] review[s] the argument for plain error.") Plain error exists only where (1) there is an error; (2) the error is plain or obvious; and (3) the error affects the defendant's substantial rights. *United States v. Olano*, 507 U.S. 725, 732-34 (1993).

6.    Whether the district court erred in its *mens rea* instruction to the jury regarding the wire fraud-dependent counts, including the money laundering counts, because the jury was not asked to find intent to defraud for the wire fraud-dependent counts is reviewed for plain error. *Id.*

19

7.     Whether there was sufficient evidence to support the wire fraud-dependent counts is reviewed *de novo*, "viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007).

8.     Whether the Government's attempt to change the basis of its wire fraud theory from wire transfers to facsimiles constitutes an impermissible variance from its initial theory of the case is reviewed for substantial prejudice. *United States v. Starret*, 55 F.3d 1525, 1553 (11th Cir. 1995).

9.     Whether the District Court erred as a matter of law in its jury instruction of what constituted a violation of the Haitian bribery law as proper predicate for the money laundering counts is reviewed for plain error. *United States v. Raad*, 406 F.3d 1322, 1323 (11th Cir. 2005) (per curiam) (recognizing that "when a defendant fails to object to an error before the District Court, [the appellate court] review[s] the argument for plain error.")

10.     Whether the District Court erred in not granting a motion to dismiss the money laundering counts where the "proceeds" of the predicate crimes were the same transfers of money that were charged as the money laundering transactions thereby violating the merger rule, is reviewed for abuse of discretion.

20

*See United States v. Qaiala*, 19 F.3d 569, 570 (11th Cir. 1994); *United States v. Chica*, 14 F.3d 1527, 1530 (11th Cir. 1994).

11.    Whether Mr. Rodriguez's sentencing must be vacated because of the other errors is reviewed *de novo. United States v. Williams*, 340 F.3d 1231, 1240 (11th Cir. 2003) (citing *United States v. De La Mata*, 266 F.3d 1275, 1302 (11th Cir. 2001)).

12.    Whether the forfeiture order and the forfeiture aspect of the amended judgment and commitment order must be vacated because the oral sentence pronounced by the District Court did not order forfeiture is reviewed for plain error.  *United States v. Aguillard*, 217 F.3d 1319, 1320 (11th Cir. 2000).

## SUMMARY OF ARGUMENT

1.    The District Court abused its discretion by refusing to charge the jury using Mr. Rodriguez's proposed instructions as to the terms "foreign official" and "instrumentality."  The interpretation of these terms under the FCPA is an issue of first impression in this Court.  However, the District Court's instructions conflict with this Court's existing precedent.  The District Court instructed the jury that an instrumentality of the Haitian government "is a means or agency through which a function of the foreign government is accomplished."  (Dckt. 527, PG. 23.)  This Court explicitly rejected such a definition while interpreting another statute that contains the term "instrumentality" in a virtually identical statutory context.

21

Addressing whether a private corporation that operated a prison system on behalf of the State of Florida was an "instrumentality of a state," this Court held that the term "instrumentality of a state" referred to "governmental units or units created by them," and rejected the functionality test incorporated into the instructions given by the District Court. *Edison v Douberly*, 604 F.3d 1307 (11th Cir. 2010). Mr. Rodriguez's proposed instructions were consistent with this Court's precedent. Because this Court rejected the functionality test in the context of another statute, the District Court abused its discretion by giving such an instruction in this case, in which Mr. Rodriguez may lose his liberty for seven years.

2.    The District Court abused its discretion by denying Mr. Rodriguez's motion for an evidentiary hearing regarding two contradictory declarations executed by Jean Max Bellerive, the Minister of Justice and Public Safety for Haiti (the Haitian government's analog to the United States Attorney General). During the course of Mr. Rodriguez's trial, Bellerive signed a declaration stating that Teleco "has never been and until now is not a State enterprise. Since its formation to date, it has and remains a Company under common law." (Dckt. 543-1, PG. 4.) The Government disclosed this declaration five days after Mr. Rodriguez had been convicted.

In opposing  Mr. Rodriguez's motion for an evidentiary hearing, the Government produced a second declaration signed by Bellerive that "clarified"

22

several of the declarations key statements about Teleco's status under Haitian law. (Dckt. 563-1, PG. 5.)  The United States government substantially assisted the Minister in preparing the second, "clarifying" declaration.  Despite the confusion created by the conflicting declarations, the District Court declined to hold an evidentiary hearing on the potential *Brady* issues posed by these events.  That was an abuse of discretion.

3.     The District Court also abused its discretion by rejecting Mr. Rodriguez's requested jury instructions as to the "knowledge" requirement of the FCPA and by giving a deliberate ignorance instruction with no basis in the evidence.

4.     The District Court erred by denying Mr. Rodriguez's motion for acquittal, because the evidence is insufficient to support the jury's determination that Teleco was an "instrumentality" of the Haitian government under the FCPA, and because no evidence was admitted at trial establishing that Teleco performed a function of the Haitian government.

5.     The District Court erred by denying Mr. Rodriguez's motion for acquittal based on the insufficiency of the evidence.  Most of the trial testimony centered on Mr. Rodriguez's co-defendant, Esquenazi, who had been the CEO of the small telecommunications company at issue here.  He, not Mr. Rodriguez, had direct contacts with Haitian citizens.  The Government's evidence against Mr.

Rodriguez amounted to the fact that he signed Terra's checks and Terra's former Comptroller, Perez, thought Mr. Rodriguez was in one meeting where bribes were discussed. Perez's testimony was uncorroborated, contradicted by his earlier statements to the Government, and inherently unreliable. The evidence is insufficient to support the jury's verdict that Mr. Rodriguez conspired to violate any federal law.

6.    The District Court erroneously instructed the jury as to the jurisdictional element for the interstate wire fraud communication counts and the elements of money laundering, because the jury was not instructed that the wires must cross state lines, and the jury was not instructed that Government had to prove that the proceeds of the specified unlawful activity resulted from a felony under Haitian law to support a money laundering conviction.

7.    The evidence does not support the jury's determination that Mr. Rodriguez committed wire fraud, because there is no evidence that any interstate wires were sent. The District Court evidence adduced at trial does not support the jury's verdict as to any count of conviction, even when the evidence is construed in favor of the Government.

8.    Finally, the District Court's Amended Judgment and Commitment Order imposed an invalid sentence by including forfeiture because the District

24

Court did not announce an order of forfeiture as part of Mr. Rodriguez's orally-imposed sentence.

## ARGUMENT

### I. Mr. Rodriguez's Convictions for Violations of the FCPA Should be Reversed or Vacated

Mr. Rodriguez's convictions under the FCPA should be reversed or vacated for four reasons.  First, the District Court abused its discretion by refusing to give Mr. Rodriguez's requested jury instructions as to the correct definition of the term "instrumentality" of a foreign government under the FCPA and adopting the Government's proposed instructions which misstated the law.  Second, the District Court abused its discretion in failing to grant Mr. Rodriguez motion to compel discovery and an evidentiary hearing regarding a declaration signed by Haiti's Minister of Justice, Jean Max Bellerive (the "Bellerive Declaration"), that directly contradicts an essential element of the Government's FCPA case.  Third, the District Court abused its discretion by refusing to give Mr. Rodriguez's requested jury instructions as to the "knowledge" element of an FCPA-violation and instead adopting the Government's proposed instruction which was vague and ambiguous.  Fourth, the record contains insufficient evidence to support Mr. Rodriguez's convictions under the FCPA, whether under the instructions given by the District Court or under the correct legal standard.

Accordingly, this Court either should reverse each of Rodriguez's convictions predicated on the FCPA or vacate those convictions and grant a new trial on all such counts of the indictment.

A.     **Properly Defining the Terms "Foreign Official" and "Instrumentality" in the FCPA is Critical in Determining the Reach of the FCPA**

All of the FCPA-related counts required the Government to prove that bribes were paid to a "foreign official."  Who is a "foreign official" under the FCPA is a question left open by the text of the FCPA because the statute does not define either "foreign official" or "instrumentality" of a foreign government.  In this case and others, the Government has advocated for a broad interpretation of the term "instrumentality," which would expand the reach of the statute to include state-owned enterprises that are not a part of any foreign government and whose employees then would be considered "foreign officials" under the FCPA.[2]   Indeed, it is undisputed that the issue of whether Teleco was or was not an "instrumentality" of Haiti is an essential to whether Mr. Rodriguez violated the FCPA.

---

[2] A number of recent cases have involved challenges to the Government's sweeping definitions of the FCPA's statutory terms, including *United States v. Carson*, No. 09-cr-00077-JVS (C.D. Cal.), *United States v. Aguilar*, No. 10-cr-01031-AHM (C.D. Cal.), and *United States v. O'Shea*, No. 09-cr-00629 (S.D. Tex.).

4841-2302-8751.16

The scope of the Government's enforcement efforts have broadened to the point that Assistant Attorney General Breuer has acknowledged the uncertainty, and the government's broad interpretation, of who is considered to be a "foreign official" under the FCPA:

> . . . consider the possible range of 'foreign officials' who are covered by the FCPA.  Some are obvious, like health ministry and customs officials of other countries.  But some others may not be, such as the doctors, pharmacists, lab technicians and other health professionals who are employed by state-owned facilities.  Indeed, it is entirely possible, under certain circumstances and in certain countries, that nearly every aspect of the approval, manufacture, import, export, pricing, sale and marketing of a drug product in a foreign country will involve a 'foreign official' within the meaning of the FCPA.

Lanny A. Breuer, Asst. Att'y Gen., Prepared Keynote Address to the 10th Annual Pharmaceutical and Regulatory Compliance Congress and Best Practices Forum (Nov. 12, 2009), *available at* www.ehcca.com/presentations/pharmacongress10/breuer_2.pdf (last visited May 7, 2012).

The Government's admittedly broad interpretation of who is considered to be a "foreign official" is in direct contrast to the purpose of the FCPA.  As summarized by Professor Michael J. Koehler in another FCPA case:

> It is clear from this legislative history that the terms "foreign government official," "foreign public official" and "foreign official" all refer to the same thing – traditional foreign government officials.  The term "foreign official" – the

27

> shortest of the three terms commonly used – quickly
> developed into a short-hand or condensed term to describe
> traditional foreign government officials throughout the
> FCPA's legislative history.  In passing the FCPA, Congress
> intended to prohibit payments to this narrow recipient
> category of traditional foreign government officials
> performing official or public functions.

(Motion for Release Pending Appeal, *United States v. Rodriguez*, No. 11-15331-C

(11th Cir. Dec. 30, 2011), Ex. I (Decl. of Professor Michael J. Koehler In Support

of Defendants' Motion to Dismiss Counts One Through Ten of the Indictment in

*United States v. Carson*, No. 8:09-cr-00077 (C.D. Cal. Feb. 21, 2011) (hereinafter,

"Koehler Declaration")), at ¶¶ 16(b).)

        The proper scope of the terms "foreign official" and "instrumentality" of a

foreign government under the FCPA are issues of first impression in this Court,

and no other federal appellate court has interpreted these provisions of the FCPA.

Recently, there has been widespread recognition and commentary about the

Government's pursuit of "an increasingly expansive view of what makes an

enterprise an 'instrumentality' of a foreign government, and, therefore, what makes

employees of such enterprises 'foreign officials.'"  Court E. Golumbic and

Jonathan P. Adams, *The "Dominant Influence" Test:  The FCPA's*

*"Instrumentality" and "Foreign Official" Requirements and the Investment*

*Activity of Sovereign Wealth Funds*, 39 AM. J. CRIM. L. 1 (Fall 2011).   Professor

Koehler has noted that no FCPA element "is more urgently in need of judicial

28

scrutiny than the FCPA's 'foreign official' element."  Michael J. Koehler, *The Façade of FCPA Enforcement*, 41 GEO. J. INT'L L. 907, 916 (2010).

Based on the foregoing, it is clear that the scope of the "instrumentality" and "foreign official" is an issue that should be resolved by this Court.

**B.**    **The District Court's Jury Instructions Incorrectly Defined the Term "Instrumentality" of a Foreign Government Under the FCPA.**

   **1.**    **An "instrumentality" of a foreign government is a part of that government that performs a public function traditionally carried out by that government.**

The FCPA prohibits certain corrupt payments made to a "foreign official." The FCPA defines the term "foreign official" as "any officer or employee of a foreign government or any department, agency or instrumentality thereof."  15 U.S.C. § 78dd-1(f)(1)(A).  The FCPA does not define the term "instrumentality," and the definition given by the District Court conflicts with Eleventh Circuit case law.  Questions of statutory interpretation are questions of law and are reviewed *de novo*.  *United States v. Witek*, 61 F.3d 819, 821 (11th Cir. 1995).  "A criminal conviction cannot rely on conduct which the statute did not intend to prohibit."  *Id.*

      **a.**    The District Court's jury instruction conflicted with Eleventh Circuit law and the applicable canons of statutory construction

Mr. Rodriguez proposed jury instructions regarding the terms "foreign official" and "instrumentality," which defined "an instrumentality of a foreign government" as "part of the foreign government itself."  (Dckt. 404-2, PG. 2; RE.

29

198.)  Mr. Rodriguez's proposed instructions correctly defined "foreign official" and "instrumentality" under Eleventh Circuit case law and applicable canons of statutory construction.

Instead of charging the jury using Rodriguez's correct instructions, the District Court instructed the jury that an "'instrumentality' of a foreign government is "a means or agency through which a function of the foreign government is accomplished." (Dckt. 527, PG. 23; R.E. 227.)  The District Court further instructed the jury that "[s]tate-owned or state-controlled companies that provide services to the public may meet this definition." (*Id.*)  The District Court then set forth an unhelpful non-exhaustive list of factors for the jury to consider while instructing that the list was non-exclusive and no single factor should determine whether Teleco was an instrumentality of a foreign government.  (*Id.* at 23-24, R.E. 227-28.)

In *Edison v. Douberly*, 604 F.3d 1307 (11th Cir. 2010), this Court addressed the analogous question of whether a private prison management corporation was an "instrumentality" and therefore a "public entity" under the Americans With Disabilities Act, 42 U.S.C. §§ 12101-12214 (the "ADA").  In relevant part, the ADA defines a "public entity" as " . . . (B) any department, agency, special purpose district, or other ***instrumentality of a State*** or States or local government[.]" *Id.* at 1410 (citing 42 U.S.C. § 12131(1)) (emphasis added).  This

30

Court agreed with the United States Court of Appeals for the Second Circuit that

the term "instrumentality" is susceptible to more than one meaning. *Id.* at 1308

(citing *Green v. City of N.Y.*, 465 F.3d 65, 79 (2d Cir. 2006)). The Second Circuit

explained that the term "instrumentality"

> may, for instance, mean "something by which an end is
> achieved." Websters Third New International Dictionary
> 1172 (Philip Babcock Grove ed., 1993). But, it may also
> mean "a part, organ, or subsidiary branch, esp. of a
> governing body." *Id.* The former meaning supports the
> conclusion that a hospital that contracts with a municipality
> to provide services is an instrumentality, while the latter
> suggests that to be an instrumentality, an entity must
> somehow belong to the government or have been created by
> it.

*Id.* In *Edison*, to resolve this ambiguity, this Court (following the Second Circuit

in *Green*) applied the statutory construction "*noscitur a sociis*" under which "a

word is known by the company it keeps." 604 F.3d at 1309-10. This Court

explained:

> The 'company' which 'instrumentality' keeps in [the
> ADA's] definition of public entity include the words
> 'department, agency, and special purpose district.' The
> court [in *Green*] noted that all of these words are qualified
> by the remaining words in the definition – 'of a State or
> States or local government.' Agencies and departments are
> units of a governmental entity . . . ***The defining
> characteristic of all of these entities is that they are either
> traditional governmental units or created by one***.

*Id.* at 1309 (emphasis added, internal citation and footnote omitted). This Court

agreed with the Second Circuit's resolution of this ambiguity, concluding:

31

> Our job . . . is to interpret the ADA's use of the words
> 'instrumentality of a State' in a manner consistent with their
> plain meaning and context, and . . . we are persuaded that
> the Second Circuit has 'got it right.'  ***We, too, hold that the
> term 'instrumentality of a State' refers to governmental
> units or units created by them***.

*Id.* at 1310 (emphasis added).  In so doing, this Court explicitly rejected the

argument that the term "instrumentality" includes "entities that are the 'functional

equivalent' of governmental entities."  *Id*. at 1309 n.4.

The FCPA's definition of "foreign official" is strikingly similar to the

ADA's definition of "public entity."  *Compare* 15 U.S.C. § 78dd-1(f)(1)(A) (a

foreign official is "any officer or employee of a foreign government or any

department, agency, or instrumentality thereof"), *with* 42 U.S.C. § 12131(1) ("any

department, agency, special purpose district, or other instrumentality of a State").

Consequently, "instrumentality" should be defined under the FCPA consistently

with the definition that this Court has adopted for the purpose of the ADA.  Mr.

Rodriguez's proposed instructions as to the term "instrumentality of a foreign

government" were consistent with *Edison's* definition of "instrumentality of a

State."  (Dckt.  404-2, PG. 2; R.E. 198.)  By contrast, the instructions requested by

the Government. and delivered by the District Court, are almost identical to the

"functional equivalent" definition explicitly rejected in *Edison*.  604 F.3d at 1309

n.4.  Accordingly, this Court should conclude that Mr. Rodriguez's proposed jury

32

instructions correctly defined the term "instrumentality" and the instructions given

by the District Court misstated the law.

> i.    Consideration of Congressional intent
>        demonstrates that Congress did not intend the
>        definition given by the District Court.

When statutory language is ambiguous, such that the meaning of a statute

cannot be divined from its plain language, courts look to the statute's legislative

history to resolve the ambiguity. *United States v. Kimble*, 178 F.3d 1163, 1166

(11th Cir. 1999); *see also United States v. Kay*, 359 F.3d 738, 743 (5th Cir. 2004)

(reviewing the FCPA's legislative history to resolve ambiguity as to the FCPA's

so-called "business nexus element). Although reference to legislative history is not

necessary given the canons of construction discussed above and as applied in

*Edison*, the legislative history of the FCPA indicates that Congress did not intend

for the FCPA to cover state-owned enterprises such as Teleco.

Congress was prompted to enact the FCPA as a result of mid-1970s

allegations concerning bribes paid to traditional government officials or foreign

political parties. (*See* Koehler Declaration, at ¶¶ 16(a)-(f).) The legislative history

shows that the terms "foreign government official," "foreign public official," and

"foreign official" were used interchangeably by Congress to refer to the same class

of persons: traditional foreign government officials. (*Id.* ¶¶ 16(b), 76, 108, 183,

238, 253, 266, 273, 275, 336.) Competing bills were introduced in Congress,

which contained definitions of "foreign government" that expressly *included* state-owned enterprises.  (*Id.* ¶¶ 16(d), 149-51, 230-31.)  "However, despite being aware of [state-owned enterprises], despite exhibiting a capability for drafting a definition that expressly included [state-owned enterprises] in other bills, . . . Congress chose not to include such definitions or concepts in the bill that ultimately became the FCPA."  (*Id.* ¶¶ 16(b), 76, 108, 183, 238, 253, 266, 273, 275, 336.)

Nothing in the FCPA's legislative history supports the Government's position that Congress intended the term "instrumentalities" to ensnare a broad and diverse range of companies by including the term "instrumentalities" in its definition of "foreign official."  The FCPA's legislative history demonstrates the opposite – Congress intended the definition of "foreign official" to apply to traditional government officials, not employees of state-owned enterprises such as Teleco.  *Id.*

Finally, the interpretation of instrumentality adopted by the District Court yields absurd results, which are to be avoided.  *See United States v. Granderson,* 511 U.S. 39, 47 n.5 (1994).  Under the interpretation adopted by the District Court, every entity "through which a function of the foreign government is accomplished" is an instrumentality of that government within the meaning of the FCPA.  This yields absurd results, especially if the phrase "function of the foreign government" is not limited to functions that the foreign government has authoritatively declared

34

as government functions in an article of its Constitution, in a statute or otherwise.

Under the standard incorporated into the jury instructions, as long as the provision

of telecommunication services was a function of the Haitian government, private

companies that sold equipment to private companies that provided cellular

telephone services in Haiti would be instrumentalities of the Haitian government

under the FCPA.  This cannot have been the intent of Congress.

> ii.    This Court should resolve statutory ambiguities
> in favor of lenity.

If this Court is unable to determine the correct definition of

"instrumentality" after considering the plain language of the FCPA, the canons of

construction, and the statute's legislative history, the Court should resolve the

FCPA's ambiguity under the rule of lenity, and conclude that the District Court

should have given his requested jury instructions based on the more narrow

definition of "instrumentality."  Given this Court's narrow interpretation of the

term "instrumentality" in *Edison*, it would be incongruous and incorrect for the

Court to adopt the broad interpretation chosen by the District Court and advanced

by the Government.

The United States Supreme Court has repeatedly held that "ambiguity

concerning the ambit of criminal statutes should be resolved in favor of lenity."

*Skilling v. United States*, 561 U.S. ___, 130 S. Ct. 2896, 2905-06 (2010).  The rule

of lenity "ensures fair warning" by "resolving ambiguity in a criminal statute as to

apply it only to conduct clearly covered," *United States v. Lanier*, 520 U.S. 259, 266, 117 S. Ct. 1219, 1225 (1997), and should be applied when a broad construction of a criminal statute would "criminalize a broad range of apparently innocent conduct." *Liparota v. United States*, 471 U.S. 419, 426, 105 S. Ct. 2084, 2088 (1985).

Both this Court in *Edison* and the Second Circuit in *Green* concluded that the term "instrumentality" is susceptible to more than one interpretation. *Edison*, 604 F.3d at 1309; *Green*, 465 F.3d at 79. If this Court is unable to reach a conclusion as to the correct interpretation of that term under the FCPA "after seizing every thing from which aid can be derived," the Court is left with two possible interpretations, one of which is harsher than the other. In *United States v. Inclema*, this Court explained that "the rule of lenity dictates that we are to choose the harsher one only when Congress has spoken 'in language that is clear and definite.'" 363 F.3d 1177, 1182 (11th Cir. 2004) (citation omitted); see also *United States v. Aleynikov*, No. 11-1126, 2012 WL 1193611, at *9 (2d Cir. Apr. 11, 2012). If this Court's resolution of the proper scope of the FCPA turns on a choice between two interpretations of the term "instrumentality," the Court cannot "speculate regarding a dubious Congressional intent" – it must adopt the narrower interpretation. *United States v. Santos*, 553 U.S. 507, 515 (2008).

36

**C.**    **The District Court Abused Its Discretion By Refusing To Charge The Jury Using Rodriguez's Requested "Instrumentality" Instruction.**

The District Court abused its discretion by refusing to give Mr. Rodriguez's proposed instructions as to the definition of "instrumentality" because (1) Mr. Rodriguez's instructions were a correct statement of the law, (2) their subject matter was not substantially covered by other instructions, and (3) their subject matter dealt with an issue in the District Court that was so important that failure to give them seriously impaired Mr. Rodriguez's ability to defend himself. *See United States v. Martinelli*, 454 F.3d 1300, 1309 (11th Cir. 2006). Under the District Court's erroneous instructions, the jury determined that Teleco is an "instrumentality" of the Haitian government and Teleco's officers are "foreign officials."

Mr. Rodriguez's proposed instructions satisfy each element set forth in *Martinelli*. Regarding the first element, the definition of "instrumentality" formulated by Mr. Rodriguez is correct under the existing case law of this Court and the Supreme Court. Regarding the second element, the subject matter of Mr. Rodriguez's proposed instructions was not covered by other instructions. In fact, the District Court's instructions on this issue directly conflict with Mr. Rodriguez's requested instructions. Regarding the third element, the District Court's refusal to charge the jury on Mr. Rodriguez's proposed instructions as to the meaning of the

37

term "instrumentality" of a foreign government seriously impaired Mr.

Rodriguez's defense because Mr. Rodriguez was deprived of arguing that Teleco

was not an instrumentality because it was not a Haitian governmental unit or an

entity created by that government.

Accordingly, at a minimum, Mr. Rodriguez's convictions under the FCPA

should be vacated.  If the Court accepts either Mr. Rodriguez's argument (as

discussed in Section III below) that the evidence was insufficient to support a

conviction either under the instructions given by the District Court or that the

evidence was insufficient under the correct statement of law, then this Court should

reverse Mr. Rodriguez's convictions under the FCPA.

### D.   The District Court Erred In Denying Rodriguez's Request for Discovery and an Evidentiary Hearing Regarding the Bellerive Declaration

The jury returned its verdict against Mr. Rodriguez on August 5, 2011.  Five

days later, on August 10, 2011, the Government disclosed to Mr. Rodriguez, for

the first time, the existence of a declaration signed by Jean Max Bellerive

("Bellerive"), Haiti's then Prime Minister and acting minister of Justice and Public

Safety (the "Declaration").  In the Declaration, Bellerive explained the origins and

status of Teleco and admitted, among other things, that (a) "Teleco is not nor will

be an organization subject to public law"; (b) "Teleco has never been and until

now is not a State enterprise;" and (c) the by-laws of Teleco were never amended

to reflect the Government's acquisition of Teleco shares and such an amendment was "essential to allow the State to appoint its representatives to [Teleco's] Board of Directors." (Dckt. 543-1, PG. 4.) The District Court explicitly instructed the jury that in evaluating whether Teleco was an "instrumentality" of the Government of Haiti, the jury may consider whether directors of Teleco had been appointed by the Haitian government officials. (Dckt. 527, PG 23; R.E. 227.) Accordingly, the information in the declaration that the Haitian government lacked the right to appoint Teleco's directors may have resulted in the jury's concluding that the Government had not met its burden of establishing that Teleco was an instrumentality of the Haitian government. Although the Declaration is dated July 26, 2011 – ten days before the jury verdict – the Government claimed it did not receive the Declaration until August 9, 2011. (*Id.* at 1.)

There is no evidence that the Government had knowledge or was in possession of the Declaration prior to August 9, 2011. Given the level of cooperation the Government received from Haiti in its investigation of alleged corruption at Teleco, the Declaration raises serious questions regarding the Government's understanding, prior to Rodriguez's trial, of Haiti's official position on the status of Teleco.[3]

---

[3] The DOJ expressed gratitude to the Haitian government for providing "substantial assistance" in gathering evidence in support of the Government's case

The Declaration appears to have been drafted in response to a letter sent to Bellerive by Richard Klugh, the attorney representing Patrick Joseph ("Joseph"), a former Teleco official awaiting trial on charges of violating the FCPA and other charges similar to the ones asserted against Mr. Rodriguez. (Dckt. 581-4.) On July 19, 2011, Mr. Klugh sent a letter to Mr. Bellerive inquiring about the status of Teleco, asking whether Teleco "is a private company or a government owned company." (*Id.*) In response, on July 26, 2011, seven days *after* Mr. Klugh's attorney sent the letter requesting the Declaration, Mr. Bellerive's office sent the Declaration to Mr. Klugh along with a cover letter. (Dckt. 581-5, PG 2.) The cover letter acknowledged Mr. Klugh's July 19, 2011 letter and noted that the Declaration was in response to that letter: "In response, The Minister of Justice and Public Safety hereby sends, as a joint document, the requested declaration." (*Id.*) The Government claims it did not become aware of the Declaration until it received a copy of it on the evening of August 9, 2011 from Paul Calli, another attorney representing Patrick Joseph. (Dckt. 543-1, PG. 1.)

---

against Mr. Rodriguez. DOJ, Office of Public Affairs, "*Executive Sentenced to 15 Years in Prison for Scheme to Bribe Officials at State-Owned Telecommunications Company in Haiti*", October 25, 2011, *available at* http://www.justice.gov/opa/pr/2011/October/11-crm-1407.html (emphasis added) (last visited May 7, 2012).

On August 24, 2011, based on the statements of Bellerive in the Declaration that directly contradicted the Government's theory of the case, Mr. Rodriguez filed a Motion for a Judgment of Acquittal or New Trial Based Upon Newly Discovered Evidence ("the JOA Motion").  (Dckt. 543.)  The JOA Motion included a request for an evidentiary hearing for the purpose of discovering what information the Government learned during its extensive investigation regarding the status of Teleco, and when such information was obtained.  (*Id.* at 7.)  On September 12, 2011, the Government responded to the JOA Motion with the following explanation:

> After receiving the letter from Mr. Calli, the Government reached out to representatives of the Haitian Government, including Mr. Bellerive, to ascertain the origin and purpose of the July 26[th] declaration.  The Government learned that the letter was actually an internal document created in connection with Teleco's modernization and was not intended to convey a position that Teleco was not a government entity, as had been interpreted by Mr. Calli (and now Rodriguez and Esquenazi).  The Haitian Government reiterated the position it has held throughout the course of this investigation and prosecution—that Haiti Teleco was part of the public administration during the relevant time period.  The Haitian Government, and Mr. Bellerive in particular, offered to clarify its position on this issue.  As a result of those conversations, the Government assisted Mr. Bellerive in preparing the declaration attached to this response as Exhibit 1 (hereinafter, the "second Bellerive declaration").

(Dckt. 561, PG. 10.)

41

In the second Bellerive Declaration, Bellerive stated, in part, that he signed the first Declaration (a) "not know[ing] that it was going to be used in criminal legal proceedings in the United States," (Dckt. 563-1, PG. 2.); and (b) "strictly for internal purposes and to be used un support of the on-going modernization process of Teleco[.]" (*Id.*) Bellerive's statements in his second Declaration, however, are expressly contradicted by the documentary evidence, which establish that Bellerive signed the first Declaration in *response* to an inquiry from Mr. Klugh and it was sent to Mr. Klugh, not maintained within the Haitian government for "internal purposes."

On October 28, 2011, Rodriguez filed a Motion to Compel Discovery and Renewed Request for Evidentiary Hearing Regarding Newly Discovered Evidence (the "Motion to Compel"), which requested discovery and an evidentiary hearing for the purposes of determining the circumstances under which Bellerive executed the second Declaration and the nature of the "assistance" provide by the Government to Bellerive in drafting that declaration. (Dckt. 581.) Despite the significant issues raised by the first Declaration, the clear contradictions in Bellerive's Second Declaration, and the generally suspicious circumstances surrounding the execution of the Second Declaration, the District Court refused to grant an evidentiary hearing on these issues, and denied the JOA Motion and the Motion to Compel. (Dckt. 609.)

42

The District Court's decision not to grant an evidentiary hearing is reviewed for abuse of discretion. *Breedlove v. Moore*, 279 F.3d 952, 959 (11th Cir. 2002). An evidentiary hearing is merited where the proffered evidence would affect the defendant's conviction. *Bolender v. Singletary*, 16 F.3d 1547, 1555 n.9 (11th Cir. 1994). Evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Grayson v. King*, 460 F.3d 1328, 1337 (11th Cir. 2006) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

By its own admission, the Government had unique access to Haitian government officials and to the records of Teleco. The Government, not Mr. Rodriguez, was in the position to know if a Haitian government official could fundamentally challenge the Government's position as to whether Teleco was an "instrumentality" of the Haitian government. If the Government knew, prior to the end of the trial, that Haiti's Prime Minister did not believe that Teleco was a state enterprise, and failed to disclose that fact to Mr. Rodriguez, such an omission would clearly constitute a *Brady* violation. Given that Mr. Rodriguez could not have been convicted of violating the FCPA absent a finding that Teleco was an "instrumentality" of the Haitian government, there is no doubt that the fact that the

43

Haitian government did not consider Teleco to be a state enterprise, if adduced at trial, would have, in all reasonable probability, produced a different outcome.

Based on the foregoing, the District Court abused its discretion in denying Mr. Rodriguez's JOA motion and Motion to Compel.

### E.    The District Court's Jury Instructions As To The "Knowledge" Element Of The FCPA Were Vague And Ambiguous.

The District Court rejected the "knowledge" instruction proposed by Mr. Rodriguez.  (Dckt. No. 403-1, PG. 5-6; R.E. 194-95.)  Instead, the District Court instructed the jury that Mr. Rodriguez could be convicted if the "payment or gift was to a foreign official or to any person, while the defendant knew that all or a portion of the payment or gift would be offered, given, or promised, directly or indirectly, to a foreign official."  (Dckt. 527, PG. 21; R.E. 225.)   Under this instruction, a jury could reasonably have misunderstood that Mr. Rodriguez could be convicted if he knew that the alleged intermediaries would make a payment to an individual and that individual happened to be a foreign official.  This instruction does not make clear that Mr. Rodriguez must have *known* that the recipient of the payment had characteristics that made the recipient a "foreign official."  Thus, it potentially misled the jury.  *See United States v. Couto*, 119 F. App'x 345, 347-48 (2d Cir. 2005).

This Court reviews *de novo* whether the instructions issued by the District Court misstated the law or misled the jury.  *United States v. James,* 642 F.3d 1333,

44

1337 (11th Cir. 2011).  The Court should examine whether the jury instructions, considered as a whole, were sufficient "so that the jurors understood the issues and were not misled."  *Johnson v. Breeden*, 280 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted).

When Mr. Rodriguez raised below the defect in the "knowledge" instruction, the Government did not dispute that Mr. Rodriguez could not have violated the FCPA unless he knew that the individual for whom the bribes were intended was a foreign official.  Instead, the Government argued that its requested instruction was appropriate because any defect on the "knowledge" instruction was cured by the instruction on the "corruptly element" and because of a statement that the Government made in its closing argument.  (Dckt. 599, PG. 3-5.)

The defect in the instruction on the "knowledge" element was not cured by the instruction on the "corruptly" element.  With respect to the "corruptly" element, the District Court instructed the jury:

> An act is "corruptly" done if it's done voluntarily and intentionally and with a bad purpose or evil motive of accomplishing either an unlawful end or result or a lawful end or result but by some unlawful method or means.  The term, 'corruptly' in the FCPA is intended to connote that the offer, payment or promise was intended to induce the foreign official to misuse his or her official position.

(Dckt. 527, PG. 22; R.E. 226.)  This instruction does not rectify the misleading and confusing "knowledge" instruction for two reasons.

45

First, the intention set forth in the second sentence of this instruction is satisfied if the defendant intended to induce an individual and the individual happened to be a foreign official, regardless of whether the defendant actually *knew* that the individual being induced had the characteristics that made him a foreign official.  Thus, this sentence could reasonably be understood to include a situation where Mr. Rodriguez understood that a payment was intended to induce a Teleco employee to misuse his position at Teleco, without *knowing* that Teleco had characteristics that made it an instrumentality of the Haitian government.

Second, a jury could reasonably interpret the instruction as meaning that, if the conditions in the first sentence are satisfied, then the act was done "corruptly," regardless of whether the act was intended to induce an individual to misuse his position.  Although the second sentence purports to describe what Congress intended by the term "corruptly," only the first sentence of the instruction purports to define "corruptly."  Thus, a jury reasonably could conclude from this instruction (and indeed was obligated to conclude) that even if a payment was made for a bad purpose and was intended to induce a foreign official to perform a task that the official was obligated to perform, the act was done to induce the foreign official to misuse his or her official position.  For those two reasons, the jury likely was misled by the District Court's instructions.

46

The Government's closing argument also does not save the defective instruction.  As a matter of law, in the federal courts, argument of counsel cannot save a jury instruction that is defective.  *United States v. Wolfson*, 573 F.2d 216, 221 (5th Cir. 1978) (citation omitted).

The District Court abused its discretion by refusing to give Mr. Rodriguez's proposed instructions on the "knowledge" issue because (1) Mr. Rodriguez's instructions were a correct state of the law, and the instruction given by the District Court was ambiguous; (2) its subject matter was not substantially covered by other instructions; and (3) its subject matter dealt with an issue in the District Court that was so important that failure to give it seriously impaired Mr. Rodriguez's ability to defend himself.  *See Martinelli,* 454 F.3d at 1309.  Therefore, Mr. Rodriguez's convictions under the FCPA should be vacated in favor of a new trial, or reversed as discussed below.

## F.     The Record Does Not Contain Sufficient Evidence To Support Mr. Rodriguez's Convictions Under The FCPA

This Court should reverse Mr. Rodriguez's conviction because the record does not support the jury's determination either that Teleco was an instrumentality of the Haitian government or that Mr. Rodriguez knew that the recipient of the payments at issue had characteristics that made the recipient a "foreign official."

"This Court reviews *de novo* whether there is sufficient evidence in the record to support a jury's verdict in a criminal trial, viewing the evidence in the

light most favorable to the government, and drawing all reasonable factual

inferences in favor of the jury's verdict." *United States v. Beckles*, 565 F.3d 832

(11th Cir. 2009).  Evidence in the record will be sufficient to support a conviction

only if a reasonable trier of fact could find that the evidence established guilt

beyond a reasonable doubt.  *Id.*

> **1.    The Record Does Not Contain Sufficient Evidence For a Jury To Find Beyond a Reasonable Doubt That Teleco Was an "Instrumentality" of a Foreign Government Under Either the District Court's Instructions or Mr. Rodriguez's Proposed Instructions**

Mr. Rodriguez's convictions should be reversed because the record evidence

does not support the jury's determination that Teleco performs "a function of" the

Haitian government by providing telecommunications services.  As discussed

above, the District Court defined an "instrumentality" of a foreign government as

"a means or agency through which a function of the foreign government is

accomplished." (Dckt. 527, PG. 23; R.E. 227.)

The record evidence is insufficient to support the jury's verdict that Mr.

Rodriguez violated the FCPA because the Government did not introduce any

evidence that the Haitian Constitution or any Haitian statute or regulation provides

that the supply of telecommunication services is a function of the Haitian

government.  Essentially, the record reflects that Teleco is a state-owned enterprise

that provides telecommunications services, that receives favorable tax treatment

48

(which it also had received when it was a private company), and for which the

Haitian government appoints the General Manager and Board of Directors (though

there is no evidence that this power derived from either statute or company

charter). The Government relied on the following evidence (primarily introduced

through the direct testimony of its expert witness, Gary Lissade) to establish that

Teleco was an instrumentality of the Haitian government:

- Teleco was part of Haiti's "public administration" which, according to Lissade, is comprised of "entities that the state used to perform and to give services to the people living in Haiti. And also as an instrument . . . for the country, the state, to reach its missions, objectives, and goals." (Dckt. 493, PG. 36);

- Even though Teleco never underwent any legal process to change its name, Teleco use of the term, "S.A.M." reflected its partial state ownership (*id.* at 41-42, 67-68);

- The Board of Directors and General Director of Teleco were appointed by an executive order signed by Haiti's President, Prime Minister and relevant Ministers (*id.* at 42-49);

- The people who worked under these political appointees were considered by Haitian citizens to be "public agents" working for the "public administration" (*id.* at 60-61, 95, 97);

- Teleco was entitled to special treatment under Haitian tax laws (*id.* at 49);

- Revenues of Teleco were controlled by the central bank of Haiti (*id.* at 53);

- Haiti's bribery laws applied to Teleco officials during the relevant time period  (*id.* at 56-57);

- In 2008 (years after the conclusion of the alleged conspiracy), Haiti would pass an asset disclosure law, intended to combat public

corruption, that required certain employees of Teleco and other public institutions to declare their assets (*id.* at 58-60, 95); and

- Teleco was 97% owned and operated by the Haitian government. (*id.* at 40-41, 68.)

Lissade did not testify that Teleco was part of the Haitian government, drawing a distinction between "the state" itself and "entities the state used" to provide services to its citizens and to accomplish its missions and goals—Haiti's "public administration." (Dckt. 493, PG. 36.) Nor did Lissade testify that providing telecommunications services was a function of the Haitian government during the time period relevant to this case. Consequently, a jury could not find beyond a reasonable doubt based on this testimony that Teleco was a means through which a government function was accomplished.

Moreover, whether or not the Haitian government "used" Teleco "to reach its missions, objectives, and goals" does not establish that providing telecommunications services was a *function* of the Haitian government or that Teleco was a part of that government itself. Lissade's testimony allows for the possibility that Haiti's public administration includes every private entity that the government used in some way to achieve its goals, including, but not limited to, private utility companies, parochial schools, and church-sponsored hospitals.

Further, under the correct interpretation of "instrumentality" that Mr. Rodriguez requested, there is insufficient record evidence to support the jury's

50

determination that Teleco is a unit of the Haitian government or a unit created by it. *See Edison*, 604 F.3d at 1310.  The record does not include any constitutional provision, statute, or executive order that established Teleco as a unit of the Haitian government or demonstrates that the Haitian government created Teleco.  In short, Lissade's testimony (1) establishes that Teleco is *not* a part of "the state" and (2) provides insufficient evidence to satisfy the definition of "instrumentality" on which the District Court instructed the jury.

Accordingly, the record does not contain evidence on which a reasonable jury could have determined that Teleco is an "instrumentality" of the Haitian government, and this Court should reverse Mr. Rodriguez's convictions under the FCPA.

**2.     No Reasonable Jury Could Have Found Beyond a Reasonable Doubt that Mr. Rodriguez Knew That an Employee of Teleco Was a "Foreign Official" or That He Willfully Violated Any Law**

The record does not contain evidence from which a reasonable jury could have found beyond a reasonable doubt that Mr. Rodriguez knew that an employee of Teleco had characteristics that made him or her a "foreign official" or that he willfully committed any act with the intent to violate any law.  Indeed, as is clear from the statement of facts, the evidence that Mr. Rodriguez even knew about the improper payments, much less that they went to a foreign official, was exceptionally thin.

The facts of this case contrast with those of *United States v. Couto*, 119 F. App'x 345, 347 (2d Cir. 2005), in which the defendant was convicted under 28 U.S.C. § 201(b)(1)(A) for attempting to bribe a public official to prepare false immigration papers. On appeal, the Second Circuit concluded that the evidence was sufficient to establish that the defendant knew the target of the bribe was a public official, because the defendant knew that the individual (1) had access to the Government's immigration files, (2) described immigration processing centers as "our local offices," (3) referred to the Government's computer system as "our system," (4) stated that he had an "approval stamp" that would allow the defendant to avoid questioning by immigration agents, and (5) was generally very knowledgeable about immigration terminology and procedures. *Id*. at 347. The court found that, under those circumstances, a rational juror could have concluded that the defendant intended "an item of value to be given indirectly to an individual she had every reason to perceive to be a public official[.]" *Id*. at 348.

Here, by contrast, there is no evidence that any of Teleco's employees made statements to Mr. Rodriguez that should have alerted him that such employees were Haitian government officials or that Teleco itself was a part of the Haitian government. The record does not include evidence that Mr. Rodriguez actually knew much, if any, of the evidence on which the Government relied to establish that Teleco was an instrumentality of the Haitian government. Even assuming that

52

Teleco did have the characteristics of an instrumentality of the Haitian government (which it did not have), based on the limited evidence that Mr. Rodriguez actually knew, a reasonable jury could not find that Mr. Rodriguez knew that Teleco had the characteristics that made it an instrumentality of the Haitian government and that its employees would be considered "foreign officials."

In fact, the evidence indicates that Mr. Rodriguez *did not* know that Teleco's officers would be considered public officials. Although Terra had the option of designating Teleco as a "Govt Dept" in its insurance application, Terra instead identified Teleco simply as a "Government Owned Entity." (Dckt. 704-93, PG. 37; Dckt. No. 703-1, PG. 12.) The evidence establishes only that, at most, Mr. Rodriguez knew that Teleco's employees worked for a state-owned enterprise. That fact is not in dispute and is not dispositive of the question of whether Teleco was an "instrumentality" of the Haitian government.

Accordingly, the record contains insufficient evidence to establish that Mr. Rodriguez knew that an employee of Teleco was an official of the Haitian government and this Court should thus reverse Mr. Rodriguez's convictions under the FCPA.

53

   **3.**      **The District Court Committed Reversible Error By Giving A Deliberate Ignorance Instruction Because There Was Insufficient Evidence Either Of Actual Knowledge Or Of Deliberate Ignorance**

The record contains insufficient evidence to affirm Mr. Rodriguez's convictions under a theory of deliberate ignorance. During the August 3, 2011, charging conference, the District Court stated that it "was not sure that there's any evidence" that Mr. Rodriguez was deliberately ignorant of illegal activity and characterized as "sparse" any evidence that is in the record. (Dckt. 513, PG. 14, 16.) Yet, over Mr. Rodriguez's objection, the District Court gave a deliberate indifference instruction to the jury. This is reversible error because there is no evidence in the record that Mr. Rodriguez deliberately kept himself ignorant either of whether Teleco was an instrumentality of the Haitian government or whether the payments to Teleco were illegal.

This Court has held that "a deliberate ignorance instruction is warranted 'only when the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution.'" *United States v. Steed*, 548 F.3d 961, 977 (11th Cir. 2008) (citation omitted). To affirm Mr. Rodriguez's FCPA convictions, there must be sufficient evidence to support the jury's finding under a theory of deliberate ignorance, because there is insufficient evidence to affirm his convictions under a theory of

54

actual knowledge. *United States v. Kennard,* 472 F.3d 851, 858 (11th Cir. 2006) ("any error in giving an unwarranted deliberate ignorance instruction is harmless *if* the jury could have convicted on an alternative, sufficiently supported theory of actual knowledge") (emphasis added).

At the charging conference, the Government contended that certain of Mr. Rodriguez's counsel's questions elicited answers that raised the question of whether Mr. Rodriguez deliberately failed to investigate whether he was involved in illegal activity. (Dckt. 513, PG. 14, 16.) Upon review of the trial transcript, it is clear that Mr. Rodriguez's counsel's questions elicited no evidence sufficient to support an inference either that Mr. Rodriguez was aware of a high probability that he was involved with illegal activity or that he purposefully took action to avoid learning of any such illegal activity.

The District Court committed reversible error by instructing the jury that it could convict Mr. Rodriguez under a theory of deliberate ignorance because the evidence supports *neither* a conviction under an actual knowledge nor a deliberate ignorance theory.

## II.    Mr. Rodriguez's Convictions Based on Wire Fraud Should be Reversed or Vacated

Mr. Rodriguez's convictions based on wire fraud should be reversed or vacated for two reasons. First, the District Court failed to instruct the jury properly on the need for the wire transfers to be interstate communications – that they

crossed state lines, as opposed to non-actionable ***intra***-state communications.

Second, there is insufficient evidence in the record to establish that the wires, on

which the counts were based, actually did cross state lines.

### A.  __The Jury Instruction on Wire Fraud was Plainly Erroneous and Misled the Jury.__

#### 1.  __The wording of 18 U.S.C. § 1343 unambiguously requires an <u>interstate</u> wire communication.__

Wire fraud requires proof of a scheme or artifice to defraud "and the use of

***interstate*** wire transmissions in furtherance of the scheme."  *United States v.*

*Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008); *United States v. Maxwell*, 579

F.3d 1282, 1299 (11th Cir. 2009).  Wire fraud, 18 U.S.C. § 1343, "targets not the

defendant's creation of a scheme to defraud, but the defendant's execution of a

scheme to defraud."  *Id.*  "To that end, it punishes each ***interstate*** wire transmission

that carries out that scheme."  *Id.* (citation omitted) (emphasis added).

Thus, for a fraud scheme to constitute a federal wire fraud, the Government

must prove beyond a reasonable doubt that the "wire communication" crossed state

lines (was between or "***<u>inter</u>***state"); an ***<u>intrastate</u>*** wire communication (*e.g.,* a wire

that travels within the state of Florida) is not sufficient.  *See United States v.*

*Izydore,* 167 F3d 213, 219 (5th Cir. 1999); *Annulli v. Panikkar,* 200 F.3d 189, 200

& n.9 (3d Cir. 1999).

This interstate requirement that the wire, which must further the fraud scheme, must cross state lines is an "immutable requirement" for the wire fraud statute. *Izydore,* 167 F.3d at 219. This interstate element is itself "'the linchpin for federal jurisdiction.'" *United States v. Richards*, 204 F.3d 177, 207 (5th Cir. 2000), overruled on other grounds by *United States v. Cotton*, 535 U.S. 625, 122 S. Ct. 1781 (2002). This is because "Congress's power over intrastate activities is limited by the Commerce Clause;" thus, the need for a wire communication to travel between the states is mandated in order to provide the federal jurisdiction that makes the activity a federal crime. *United States v. Lindemann,* 85 F.3d 1232, 1240-41 (7th Cir. 1996). The District Court's failure to instruct the jury on this requisite nexus requires reversal.

> **2.    The District Court's instruction failed to properly instruct the jury on the need for the wire transfers to be interstate communications.**

This Court reviews *de novo* "whether a jury instruction mischaracterized the law or misled the jury to the prejudice of the defendant." *United States v. Svete*, 556 F.3d 1157, 1161 (11th Cir. 2009) (en banc). "A district court's failure to instruct a jury on all of the statutory elements of an offense is subject to harmless-error analysis." *Id.* The failure to instruct a jury on an essential element of an offense is harmless when it is "clear beyond a reasonable doubt that a rational jury

57

would have found the defendant guilty absent the error." *Neder v. United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 1838 (1999).

Because wire fraud requires an *interstate* wire communication, wires sent within the State of Florida do not constitute the federal crime of wire fraud because they are missing the essential hook of federal jurisdiction. Despite this, the District Court failed to instruct the jury that in order for wire transfers to qualify as "wire communications" under Section 1343, those wires must cross state lines. Specifically, when discussing wire fraud in support of the Section 371 wire fraud object of the conspiracy, the District Court described the crime of wire fraud as needing "interstate wire communications," instructing that "Wire fraud, which is Title 18, United States Code, Section 1343, makes it a federal crime or offense for anyone to use *interstate* wire communications in carrying out a scheme to defraud." (Dckt. 527, PG. 17; R.E. 221.) The District Court then negated the "interstate" part of its prior instruction by instructing: "To 'use' interstate wire communications is to act so that something would normally be sent through wire, radio or television communications in the normal course of business." (*Id.* at 19; R.E. 223.) This instruction fails, as it negates the requisite *interstate*, as opposed to *intrastate*, element of wire fraud. Similarly, the jury was never told in connection with the Section 371 conspiracy count (count one) that those wire communications needed to cross state lines to qualify as federal "wire fraud." Nor

58

was the requirement that the wire cross state lines described to the jury in the money laundering instructions.  (*Id.* at 27-33; R.E. 231-35.)  These instructions fail to make clear that the wires must have crossed state lines to be actionable.

As discussed further below, no evidence was admitted that the charged wire transfers, which are the wire communications relied upon by the Government at trial, crossed state lines.  Had the jury been properly instructed, it could have, and as explained below, likely would have, found that the Government failed to prove that the wires crossed state lines.

### B. The Record Does Not Contain Sufficient Evidence To Support the Convictions Based on Wire Fraud

#### 1. The Government Failed to Prove That the Wire Transfers Crossed State Lines

The Government argued that the wire transfers authorized by Mr. Rodriguez are the wire communications that support all the wire fraud dependent counts. (Dckt. 513, PG. 76.)  There is, however, no evidence that these wires were *inter-state* wires.  Instead, the Government's evidence demonstrated that only ***intra-state*** wires were used.

The wire transfers upon which the Government relied can be summarized as follows, based upon the evidence admitted at trial:

| Overt Act/Ex. No. | Location | Bank | Account Holder |
|---|---|---|---|
| **Overt Act 23, Exhibits 700a/503** | **Originating from** Miami, Florida | International Finance Bank | Terra |
| | **Received in** North | Kislak National | JD Locator |

|  | Miami, Florida | Bank | Services, Inc. |
|---|---|---|---|
| **Overt Act 46, Exhibits 700d/502** | **Originating from** Tampa, Florida | Bank of America | Terra |
|  | **Received in** Miami, Florida | Ocean Bank | A&G Distributors |
| **Overt Act 47, Exhibits 700d/503** | **Originating from** Tampa, Florida | Bank of America | Terra |
|  | **Received in** Miami, Florida | Ocean Bank | A&G Distributors |

Each of these wire transfers went from a Florida account of Terra to a Florida account of one of the consultants. Some of the transfers were even *intrabank* transfers (*e.g.*, Terra South Trust Bank account to Telecom South Trust Bank account, *see* Ex. 700F and Indictment, ¶ 64.) The Government did not suggest that the wire communications somehow crossed state lines despite the in state origination and destination. Without such evidence, the jury could not find beyond a reasonable doubt that interstate wires were used.

> **2.    The Government Failed to Prove Mr. Rodriquez Had the Necessary Intent to Defraud Another Out of Money or Property**

The specific intent required to convict an individual of conspiracy to commit mail or wire fraud is the intent to defraud another. *United States v. Simon*, 839 F.2d 1461, 1469 (11th Cir. 1988). The Government was required to demonstrate that Mr. Rodriguez knew of the illegal scheme and voluntarily participated in it. *See United States v. Parker*, 839 F.2d 1473, 1478 (11th Cir. 1988). The issue of whether there was insufficient evidence to sustain convictions wire fraud is an

60

issue this Court decides *de novo*. *United States v. Suba*, 132 F.3d 662, 671 (11th Cir. 1998). The Court reviews the evidence to determine whether "a reasonable jury, viewing the evidence and all reasonable inferences therefrom in the light most favorable to the Government could find the defendants guilty as charged beyond a reasonable doubt." *United States v. Navarro-Ordas*, 770 F.2d 959, 966 (11th Cir. 1985) (internal citations omitted).

a.   The Government's Evidence Could Not Give Rise to a
Reasonable Inference of Intent to Defraud

The essence of the intent to defraud charged in this case is that Mr. Rodriguez intended to defraud Teleco of revenue. The only direct evidence presented regarding Mr. Rodriguez's express knowledge of, or participation in, the conspiracy to commit wire fraud was the testimony of Perez. Specifically, Perez testified that, after he arranged for a payment to Antoine, he had a meeting with Esquenazi, Mr. Rodriguez, and Dickey in which the three congratulated him for arranging a "side payment." (Dckt. 715, PGS. 18, 28.) This is the sole testimonial evidence of Mr. Rodriguez's purported intent to defraud. In fact, of the 18 witnesses the Government called to testify, only Perez claimed that Mr. Rodriguez even knew of the existence of an agreement to pay Antoine to receive side payments in exchange for reductions of the invoices owed to Teleco. Perez's testimony, however, was heavily impeached.

Perez, a CPA who was serving time and was hopeful that his testimony would result in a reduction of his 24 month sentence, acknowledged that he was not aware of what duties Mr. Rodriguez performed and admitted that he had very little interaction with Mr. Rodriguez when he (Perez) worked at Terra. (Dckt. 715, PGS. 39-40.) Perez further acknowledged that Mr. Rodriguez never traveled to Haiti or negotiated any of the contracts on Terra's behalf. (*Id.* at 43.) In addition, when Perez, in his capacity as Terra's comptroller, had a lunch meeting with Antoine in November 2001 at the Novillo restaurant to negotiate payment arrangements for Terra, Mr. Rodriguez was not present. (*Id.* at 47-48.) In fact, during the first six months after he was first contacted by the agents in this matter, Perez never mentioned that Mr. Rodriguez had any knowledge or involvement in the side payment deal that Perez made with Antoine. (*Id.* at 52-53.)

> b.    Admissions Regarding a Lack of Evidence of Any Fraudulent Knowledge by Mr. Rodriguez.

The Government called IRS Special Agent Briones as its last witness; the Government treated him as a Federal Rule of Evidence 1006 "summary witness." When counsel for Mr. Rodriguez examined Agent Briones about the evidence admitted at trial which he was there to summarize, a string of admissions emerged. Those admissions, and the state of the evidence which they reflect, establish that

Mr. Rodriguez never formed the type of intent, the intent to defraud another out of

money or property, necessary for wire fraud:

> Q.    --my question is a simple one, yes, there were checks
> that went from Terra to Telecom Consulting but no witness
> testified what Marguerite Grandison did with her account,
> correct?
>
> A.    That's correct.
>
> Q.    And no witness testified that Mr. Rodriguez ever
> reviewed her bank accounts, correct?
>
> A.    That's correct.
>
> . . . .
>
> Q.    Please tell us what witness testified that Mr.
> Rodriguez had knowledge that A&G Distributors wrote five
> checks wirth $53,600.00 to Robert Antoine.
>
> A.    There's no witness that stated that.
>
> . . . .
>
> Q.    Can you please tell the jurors what witness came in
> and said that Mr. Rodriguez had knowledge that there were
> twenty checks and wire transfers from JD Locator to Robert
> Antoine?
>
> A.    This summary is trying to depict JD Locators transfers
> to Mr. Antoine.  There hasn't been any witness that stated
> that Mr. Rodriguez would have knowledge of this and of
> those transactions.  Just the initial Terra checks to JD
> Locator.
>
> Q.    Did you ever make a chart that said that no witness
> had come in to testify regarding the secondary financial
> transactions after the intermediaries who could testify to
> knowledge on the part of Mr. Rodriguez?
>
> A.    No.

63

(Dckt. 509, PGS. 23-25.)

The complete lack of evidence demonstrating that Mr. Rodriguez had any knowledge of the true purpose of the check or wire payments that the Government alleges constitutes fraud precludes a finding that Mr. Rodriguez was guilty of the wire fraud-dependent counts.

**C.    The Government's Attempt To Change the Base of the Wire Fraud Theory From the Wire Transfers to Facsimiles Constitutes an Impermissible Variance From The Indictment.**

In response to Mr. Rodriguez's motion for acquittal or for a new trial, without providing any record citations, the Government argued that the interstate communications on which it relied were actually the facsimile transmissions ("faxes") from Teleco in Haiti to Terra in Miami-Dade County, not the monetary wire transfers identified in the indictment.  (Dckt. 561, P.G. 22-23.)  This "faxed invoices" theory was not set forth in the Indictment.  Indeed, invoices are not even mentioned in the Indictment, nor was this theory presented to the jury in such a manner that the jury could understand those faxes were the charged wires underlying the alleged conspiracy to commit wire fraud.  (Dckt. 3, PGS. 6-19, 22-27; R.E. 102-15, 118-23; Dckt. 513, PGS. 52-53, 60.)  The Government has attempted to "swap out" one set of "wire communications" to a different set of "wire communications" to fix the absence of evidence and the faulty jury instructions given to the jury regarding the "interstate communication" requirement

described above.  That theory creates numerous constitutional notice problems and issues fatal to the Government's post-trial position.

This Court has long held that it "cannot affirm a criminal conviction based on a theory not contained in the indictment, or not presented to the jury." *United States v. Elkins*, 885 F.2d 775, 782 (11th Cir. 1989); *United States v. Hill*, 643 F.3d 807, 859 (11th Cir. 2011).  In the Indictment and at trial, the Government's sole focus in describing the conspiracy for wire fraud was on the <u>payments</u> (which the Government described as wire transfers) made to various individuals that the Government alleged constituted fraudulent payments for reduced amounts.  There are several pages of the Indictment dedicated to describing each of these money transfers, including the wire transfers.  There is <u>no mention</u> in the Indictment of the faxed invoices being sent as an interstate wire communication.  Mr. Rodriguez prepared his defense to the wire fraud dependent counts in response to the Government's theory that the wire fraud was on the payments.  All the discussion and exhibits presented to the jury as the basis of Mr. Rodriguez's wire fraud conviction focused on the payments rather than on the faxed invoices.  Exhibits involving faxed invoices were peripheral and did not involve any substantive discussion that would have been sufficient for the jury to convict on the "faxed invoices" theory.

65

"A variance between indictment and proof is fatal only when it affects the 'substantial rights' of the defendant by insufficiently notifying him of the charges against him so that he may prepare a proper defense." *See Hill*, 643 F.3d at 860 (internal citation omitted). "Reviewing a claim of variance requires use of a two step analysis: (1) was there in fact a variance between the indictment and proof, and (2) was the variance prejudicial." *United States v. McCrary*, 699 F.2d 1308, 1310 (11th Cir. 1983) (quotation omitted).

Mr. Rodriguez would meet both elements of the variance test. First, there is a variance between the theory of wire fraud asserted in the Indictment and at trial and the theory put forward earlier by the Government on appeal. The complete absence of any citation providing a basis for how a jury of lay persons could discern that the charged wires being relied upon as the basis for interstate wire fraud were faxed invoices, rather than wire transfers that received the Government's complete focus at trial, demonstrates a fatal variance from the Indictment. Second, this variance between trial and appeal unfairly prejudices Mr. Rodriguez's rights on appeal. If the Government chooses to maintain its new position that the faxed invoices, rather than the payments, are the basis of its claim, it would prejudicially limit Mr. Rodriguez's ability to make a key argument about the Government's failure to establish the existence of any inter-state wire transfers in support of the wire fraud counts of conviction.

66

The Government cannot now be permitted to shift the charged wires from the payments via wire transfer to the faxed invoices in a belated attempt to cure the problem that the charged wire transfers did not cross state lines.  If the Government makes an assertion or puts forth a theory that was neither in the Indictment nor presented at trial, as is the case here, this Court may not affirm the conviction on the basis of the new theory.  *See United States v. Mendez*, 528 F.3d 811, 816 (11th Cir. 2008) ("The  government also asserts that Mendez defrauded the United States Army.  Mendez correctly recognizes, however, that this theory was neither in the indictment nor presented at trial. Accordingly, we may not affirm the conviction on this basis.").  Any variance is fatal to the Government's case.

Substantial questions exist with respect to all wire fraud-related counts that warrant the overturning of all these counts.

III.    **The Money Laundering Convictions Must be Reversed or Vacated Because (a) the District Court Improperly Instructed the Jury on Haitian Bribery Law as a Proper Predicate for the Money Laundering Charges; and (b) the Money Laundering Counts Violated the Merger Rule**

Three specified unlawful activities ("SUAs") formed the basis of the money laundering counts in the Indictment: (a) wire fraud; (b) violation of the FCPA; and (c) violation of Haitian bribery law.  As discussed above, any convictions based on wire fraud and violations of the FCPA fail for a number of reasons.  Similarly, any conviction based on a violation of Haitian bribery law must also fail because the

67

District Court failed to properly instruct the jury on that offense as a predicate for the money laundering charges. Thus, due to the reversible errors present in all three SUAs underlying the money laundering convictions, those convictions must be reversed or vacated. Even if the Court determines that there was no error in the way that one or more of the SUAs was presented to the jury, the money laundering convictions nevertheless fail because those convictions violate the merger rule.

### A. The Instruction Given to the Jury on the Activities Constituting a Violation Haitian Bribery Law was Broader in Scope than Permitted by the Money Laundering Statute

This foreign bribery SUA is defined in 18 U.S.C. § 1956(c)(7)(B) as "an offense against a foreign nation involving . . . bribery of a public official." The District Court failed to instruct the jury as to the meaning of the term "public official" within § 1956. As the term "public official" is not defined in § 1956, the District Court should have looked to the plain meaning of this term and provided such a definition to the jury. Black's Law Dictionary (9th Ed., 2009) defines "public official" as "one who holds or is invested with a public office; a person elected or appointed to carry out some portion of a government's sovereign powers." Additionally, for the reasons set forth above discussed in connection with the FCPA-dependent counts, the District Court should have (a) limited the term public official to those individuals who had been appointed or elected to a

68

position within a part, organ, or subsidiary branch of the Haitian government; and (b) excluded from the definition, employees of state-owned entities like Teleco.

Moreover, in instructing the jury on what activities under Haitian law constituted a SUA, the District Court instructed that Haitian law makes it illegal for any person to corrupt or attempt to corrupt any public official or ***any agent or officer of a public authority.*** (Dckt. 527, PG. 23; R.E. 227.) The District Court allowed the jury to find that individuals who fit a category broader than that allowed by Section 1956's term "public official" could be the recipient of a bribe under Haitian law. This was error.

### B.   The District Court Erred by Not Instructing the Jury that Proceeds of the Bribery Must Constitute a Felony

To obtain a conviction for money laundering under 18 U.S.C. § 1956, the Government had to prove that the proceeds of the specified unlawful activity resulted from a ***felony*** under foreign law. 18 U.S.C. § 1956(c)(1). The testimony of the Government's expert witness indicated that under Haitian law bribery could at times be treated as a misdemeanor. (Dckt. 32, PG. 55.) The District Court failed to address this issue properly and failed to properly instruct the jury on what constituted a felony under Haiti's bribery statute. The District Court's instructional error was prejudicial.

69

### C.    The Money Laundering Counts Should Have Been Dismissed Because They Violated The Merger Rule And Mr. Rodriguez's Motion for Acquittal Should Have Been Granted For The Same Reason

The District Court erred in denying Esquenazi's and Mr. Rodriguez's pre-trial motion to dismiss the money laundering counts because those charges violated the merger rule.  This Court reviews the District Court's denial of a motion to dismiss an indictment for abuse of discretion.  *United States v. Qaiala*, 19 F.3d 569, 570 (11th Cir. 1994); *United States v. Chica*, 14 F.3d 1527, 1530 (11th Cir. 1994).

The Government charged Mr. Rodriguez with concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), which applies to transactions involving proceeds of specified unlawful activities "designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds."  Thus, because a money laundering conviction under § 1956(a)(1)(B)(i) depends upon a transaction involving proceeds of an SUA, the charged SUA must first generate proceeds before an liability for money laundering can attach.  The term "proceeds" is not defined in the money laundering statute, and attributing a broad interpretation to the terms "proceeds" in the context of certain SUAs can lead to a "merger problem," which, in effect, exposes a defendant to double jeopardy.  *See United States v. Santos*, 553 U.S. 507, 526-27, 128 S. Ct. 2032-33 (2008) (Stevens, J., concurring) (recognizing that interpreting

70

the term proceeds to mean "gross receipt" in the context of an illegal gambling operation leads to a merger problem with a practical effect of imposing double jeopardy on a defendant).  Money laundering is distinct, and is punished separately, from the underlying specified unlawful activity.  *See United States v. Christo*, 129 F.3d 578, 579-80 (11th Cir. 1997).  Thus, to avoid a merger problem, the conduct forming the basis of the money laundering charge must occur after the predicate SUA is complete.  Interpreting the term "proceeds" too broadly can lead to a situation where a financial transaction that is a normal part of a SUA, and which occurs prior to the completion of the SUA, is also charged as a separate money laundering offense, thus exposing defendants to the threat of double jeopardy.  *See Santos*, 553 U.S. at 526-27, 128 S. Ct. at 2032-33.

The monetary transactions that served as the basis for the money laundering convictions were the alleged bribe payments made by Telecom to Duperval. (Dckt. 3, PGS. 25-27; R.E. 121-23.)  Because the payment of a bribe is the essence of crime of bribery, the money laundering counts as proven at trial merged with the bribery counts and thus should be reversed.  The issue was also preserved at trial when Mr. Rodriguez moved for judgment of acquittal.  (Dckt. 509, PGS. 39-49; Dckt. 513, PGS. 27-31.)

The alleged bribe payments here are an indispensible part of the charged crimes, and thus cannot form the basis of a separate money laundering conviction.

71

Allowing the Government to treat the payment of the bribes as both the "bribes" and the "proceeds" of the bribery scheme constitutes an abuse of discretion that should be reversed.  The judgment of acquittal should have been granted once the counts were tried.

## IV.  Mr. Rodriguez's Sentence Must be Vacated and Remanded to the District Court for Further Proceedings

This Court reviews *de novo* "whether the district court applied the correct sentencing guideline (or subsection of a sentencing guideline) for the defendant's underlying conduct."  *United States v. Williams*, 340 F.3d 1231, 1240 (11th Cir. 2003) (citing *United States v. De La Mata*, 266 F.3d 1275, 1302 (11th Cir. 2001)).

In addition to the arguments made by Esquenazi, which Mr. Rodriguez has adopted and joined, Mr. Rodriguez's FCPA convictions and his conviction for conspiracy to commit wire fraud must be reversed or vacated for the reasons discussed above in Sections I.  If those convictions are reversed or vacated, but this Court affirms any of Mr. Rodriguez's other convictions, this case must be remanded for resentencing because Mr. Rodriguez's base offense level was established by reference to the sentencing guideline related to the conviction for conspiracy to commit violations of the FCPA, pursuant to U.S.S.G. § 2S1.1(a)(1). (Presentence Investigation Report, at ¶¶ 64-65.)

**V.    The District Court's Entry of Forfeiture Must Be Vacated**

**A.    Standard of Review**

The Court reviews *de novo* the District Court's legal conclusions regarding

forfeiture and the court's findings of fact for clear error." *United States v. Puche*,

350 F.3d 1137, 1153 (11th Cir. 2003).  If no objections regarding the forfeiture

were made before the District Court, the Court reviews challenges for plain error.

*United States v. Aguillard*, 217 F.3d 1319, 1320 (11th Cir. 2000).  Plain error

exists where (1) there is an error; (2) the error is plain or obvious; and (3) the error

affects the defendant's substantial rights.  *United States v. Olano*, 507 U.S. 725,

732-34 (1993).

**B.    The Forfeiture Order And The Amended Judgment and
Commitment Order Must Be Vacated Because They Differ From
the Oral Sentence Pronounced By The District Court**

The forfeiture portion of the amended judgment and commitment order and

the separate forfeiture order must be vacated because the District Court did not

orally order forfeiture as part of Mr. Rodriguez's sentence during his sentencing

hearing.  (Dckt. 651, PGS. 30-34; Dckt. 623; R.E. 283-85; Dkt. 628; R.E. 286-92.)

It is well established that criminal forfeiture is part of the sentence imposed on a

defendant in a criminal case.  *Libretti v. United States*, 516 U .S. 29, 39, 116 S. Ct.

356, 363 (1995) ("Forfeiture is an element of the sentence imposed following

conviction . . . . Our precedents have . . . characterized criminal forfeiture as an

73

aspect of punishment imposed following conviction of a substantive criminal offense").

It is well established that the sentence orally announced to the defendant by the District Court during the sentencing hearing controls over the sentence set forth in the judgment and commitment order. Where there is a discrepancy between an orally imposed sentence and the written order of judgment and commitment, the oral sentence controls. *United States v. Bonilla*, 579 F.3d 1233, 1245 (11th Cir. 2009); *see also United States v. Khoury*, 901 F.2d 975, 977 (11th Cir. 1990).

Here, the orally-imposed sentence and the original judgment and commitment order did not include any forfeiture, contrary to what the District Court ordered in its forfeiture order filed the day before Mr. Rodriguez's sentence. (Dckt. 651, PGS. 30-34; Dckt. 623.) Specifically, the order of forfeiture ordered prior to the sentencing said that "this Order of Forfeiture shall become final as to the Defendants at the time of their respective sentencing, shall be announced as part of each of the Defendants' respective sentence and shall be included in the Judgment in this cause[.]" (Dkt. 623, PG. 2; R.E. 284.) The District Court did not announce to Mr. Rodriguez during his sentencing any forfeiture of his property. It was not included in the original judgment and commitment order. (Dckt. 628; R.E. 286-92.) The District Court, at the urging of the government, inserted the forfeiture language into the amended judgment and commitment order. (Dckt.

74

637.)  Therefore the forfeiture order should be vacated and any other reference to any forfeiture in Rodriguez's amended judgment and commitment order vacated and stricken.  The oral sentence must control over the written orders. *United States v. Bonilla*, 579 F.3d at 1245.

## CONCLUSION

For the reasons stated above, this Court should (a) reverse each of Mr. Rodriguez's convictions under the FCPA or vacate such convictions and remand this case for a new trial and with instructions to this District Court to hold an evidentiary hearing regarding the Bellerive Declarations; (b) reverse or vacate Mr. Rodriguez's wire-fraud convictions; (c) reverse or vacate Mr. Rodriguez's money laundering convictions; (d) vacate the forfeiture portion of Mr. Rodriguez's sentence; and (e) remand this case for resentencing, if some, but not all, of Mr. Rodriguez's convictions are affirmed.

/s/ Pamela L. Johnston
Pamela L.  Johnston
California Bar No. 132558
Foley & Lardner LLP
555 S. Flower St., Ste. 3500
Los Angeles, CA  90071
Telephone:  213-972-4500
Facsimile:  213-486-0065

*Attorneys for Defendant-Appellant Carlos Rodriguez*

4841-2302-8751.16

## <u>CERTIFICATE OF COMPLIANCE</u>

**I HEREBY CERTIFY** that: (1) this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by this Court's order dated March 8, 2012, because it contains 16,995 words (according to the word-count function of the word-processing program used to prepare this brief), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and (2) this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word version 2003, in 14-point, Times New Roman style.

/s/ Pamela L. Johnston
Pamela L. Johnston

76

4841-2302-8751.16

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has

been furnished by Federal Express overnight delivery, this 9th day of May, 2012,

to (a) the Clerk of Court, United States Court of Appeals for the Eleventh Circuit,

56 Forsyth Street, N.W., Atlanta, Georgia, 30303; (b) Kirby A. Heller, United

States Department of Justice, 950 Pennsylvania Ave., N.W., Room 1256,

Washington, D.C., 20530; (c) Michael J. Rosen; Rosen Law Offices, PA, 2937

Southwest 27th Avenue, Suite 101, Miami, Florida 33133-3772; and (d) Michael A.

Sink, Perkins Coie LLP, 1900 16th Street, Suite 1400, Denver, Colorado, 80202-

5255.


/s/ Pamela L. Johnston
Pamela L. Johnston

4841-2302-8751.16